# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE, LLC, a Michigan Limited Liability Company,

     Plaintiff/Counter-Defendant,

v

                                     Case No. 22-cv-10228
                                     Hon. Judith E. Levy

AMERICA'S MONEYLINE, INC., a California Company,

     Defendant/Counter-Plaintiff.

_____/

| | |
|---|---|
| WILLIAM E. McDONALD III (P76709) | JEFFREY B. MORGANROTH (P41670) |
| MAHDE Y. ABDALLAH (P80121) | JASON R. HIRSCH (P58034) |
| BUSH SEYFERTH PLLC | MORGANROTH & MORGANROTH, PLLC |
| Attorneys for Plaintiff/Counter-Defendant | Attorneys for Defendant/Counter-Plaintiff |
| 100 W. Big Beaver Road, Suite 400 | 344 North Old Woodward Avenue, Suite 200 |
| Troy, Michigan 48084 | Birmingham, Michigan 48009 |
| (248) 822-7800 | (248) 864-4000 |
| abdallah@bsplaw.com | jmorganroth@morganrothlaw.com |
| mcdonald@bsplaw.com | jhirsch@morganrothlaw.com |
| | |
| | MATTHEW D. NOVELLO (P63269) |
| | NOVELLO & ASSOCIATES, PC |
| | Co-counsel for Defendant/Counter-Plaintiff |
| | 3542 Lakeview |
| | Highland, Michigan 48356 |
| | mnovello@novellolawfirm.com |

_____/

## DEFENDANT/COUNTER-PLAINTIFF, AMERICA'S MONEYLINE, INC.'S, ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT, COUNTER-COMPLAINT AGAINST UNITED WHOLESALE MORTGAGE, LLC AND DEMAND FOR JURY TRIAL

## ANSWER TO COMPLAINT

Defendant/Counter-Plaintiff, America's Moneyline, Inc. ("AML"), by and through its attorneys, for its Answer and Affirmative Defenses to Plaintiff/Counter-Defendant, United Wholesale Mortgage, LLC's ("UWM"), Complaint states as follows:

### PARTIES

1.      In answer to Paragraph 1, AML neither admits nor denies the allegations for lack of sufficient information upon which to form a belief.

2.      In answer to Paragraph 2, AML admits.

### JURISDICTION AND VENUE

3.      In answer to Paragraph 3, AML admits.

4.      In answer to Paragraph 4, AML denies for reason untrue in the manner and form alleged but does not dispute personal jurisdiction.

5.      In answer to Paragraph 5, AML denies for reason untrue in the manner and form alleged but does not dispute personal jurisdiction.

6.      In answer to Paragraph 6, AML denies for reason untrue in the manner and form alleged but admits that the Parties agreed that they would submit any action arising out of the 2020 Wholesale Broker Agreement to this Court.

1

## **GENERAL ALLEGATIONS**

7.     In answer to Paragraph 7, AML neither admits nor denies for lack of sufficient information upon which to form a belief.

8.     In answer to Paragraph 8, AML admits that UWM does not work directly with borrowers but denies the remaining allegations for reason untrue.

9.     In answer to Paragraph 9, AML denies for reason untrue.

10.     In answer to Paragraph 10, AML denies for reason untrue.

11.     In answer to Paragraph 11, AML admits.

12.     In answer to Paragraph 12, AML denies for reason untrue.

13.     In answer to Paragraph 13, AML admits only that it executed the 2020 Wholesale Broker Agreement (the "2020 Agreement"). In further answer, AML denies for reason untrue that the 2021 Amendment to the 2020 Agreement (the "2021 Amendment") is valid or enforceable.

14.     In answer to Paragraph 14, AML states UWM quotes a small portion of the 2020 Agreement and that the full 2020 Agreement speaks for itself.

15.     In answer to Paragraph 15, AML states UWM quotes a small portion of the 2020 Agreement and that the full 2020 Agreement speaks for itself.

16.     In answer to Paragraph 16, AML denies for reason untrue in the manner and form alleged.

17.    In answer to Paragraph 17, AML admits that it makes certain warranties and representations to UWM in connection with mortgage loans AML submits to UWM for underwriting.

18.    In answer to Paragraph 18, AML admits that UWM announced its Ultimatum on or around March 4, 2021. In further answer, AML denies for reason untrue the remaining allegations in the manner and form alleged.

19.    In answer to Paragraph 19, AML denies for reason untrue.

20.    In answer to Paragraph 20, AML admits that the Ultimatum was added as well as an unenforceable liquidated damages penalty.

21.    In answer to Paragraph 21, AML admits.

22.    In answer to Paragraph 22, AML denies for reason untrue inasmuch as UWM expressly represented that it would not seek to enforce the Ultimatum and liquidated damages provision against AML.

23.    In answer to Paragraph 23, AML denies for reason untrue.

24.    In answer to Paragraph 24, AML denies for reason untrue.

25.    In answer to Paragraph 25, AML denies for reason untrue.

26.    In answer to Paragraph 26, AML denies for reason untrue inasmuch as UWM expressly represented that it would not seek to enforce the Ultimatum or liquidated damages provision against AML.

27.    In answer to Paragraph 27, AML denies for reason untrue.

28.     In answer to Paragraph 28, AML admits that UWM has referenced the prevailing party fee provision.

## COUNT ONE
### BREACH OF CONTRACT

29.     In answer to Paragraph 29, AML restates and incorporates by reference all Paragraphs of this Answer as if fully set forth herein.

30.     In answer to Paragraph 30, AML denies for reason untrue.

31.     In answer to Paragraph 31, AML denies for reason untrue.

32.     In answer to Paragraph 32, AML denies for reason untrue.

33.     In answer to Paragraph 33, AML denies for reason untrue.

## PRAYER FOR RELIEF

34.     In answer to Paragraph 34, AML denies for reason untrue.

WHEREFORE, AML respectfully requests that this Court dismiss UWM's Complaint in its entirety with prejudice, and award AML the costs and attorney fees it incurred in having to defend against the Complaint.

## <u>AFFIRMATIVE DEFENSES</u>

AML, for its Affirmative Defenses to UWM's Complaint, states as follows:

1.      <u>Failure to State a Claim Upon Which Relief May Be Granted</u>.

2.      <u>Fraud in the Inducement</u>. UWM is precluded from pursuing any claims against AML by virtue of UWM's fraud in the inducement against AML, as more particularly set forth in the Counter-Complaint.

3.      <u>Unclean Hands.</u>  UWM is precluded from pursuing any claims against AML by virtue of its unclean hands, as more particularly set forth in the Counter-Complaint.

4.      <u>Estoppel.</u> UWM is estopped from collecting any amounts from AML by virtue of its wrongful, tortious and bad faith acts in violation of the law, as more particularly set forth in the Counter-Complaint.

5.      <u>No Breach by AML.</u> AML has not breached any obligations owed to UWM.

6.      <u>Counter-Complaint</u>. UWM is not entitled to any recovery against AML by virtue of the allegations set forth in the Counter-Complaint.

7.      <u>No Proximate Cause</u>. Any damages suffered by UWM, which damages are denied, were not proximately caused by any act or omission of AML or breach of any legal duty owed by AML to UWM, but were instead caused by the acts, omissions or conduct of UWM itself.

8.    <u>No Damages</u>. UWM has suffered no damages.

9.    <u>Failure to Mitigate</u>. UWM is not entitled to any relief because it has failed to take reasonable steps to mitigate its alleged damages.

10.    <u>Bad Faith and Harassment</u>. UWM's claim against AML is brought in bad faith and for purposes of harassment.

11.    <u>Good Faith Conduct by AML</u>. UWM is barred from pursuing its claims by virtue of the fact that AML acted in good faith at all times relevant hereto.

12.    <u>Antitrust Violations</u>. The 2021 Agreement is void, invalid and unenforceable inasmuch as it is anticompetitive in violation of the antitrust laws of the United States.

13.    <u>Unconscionable</u>.  The 2021 Agreement is unconscionable for the reasons fully set forth in the Counter-Complaint.

14.    <u>Economic Duress</u>. The 2021 Agreement is unenforceable because it was entered into under economic duress for the reasons fully set forth in the Counter-Complaint.

15.    <u>Reservation to Supplement or Amend</u>. AML reserves the right to supplement or amend these Affirmative Defenses as additional information becomes known during discovery.

## AML'S COUNTER-COMPLAINT

AML, by and through its attorneys, for its Counter-Complaint against UWM states as follows:

## JURISDICTION AND PARTIES

1.     AML is a California corporation which conducts business in the State of Michigan, among other places.

2.     AML is a mortgage broker in the business of taking applications for residential mortgage loans, assisting borrowers in: (a) pre-qualifying for mortgage loans, (b) selecting a mortgage product and (c) completing an application, and processing such applications on behalf of others.

3.     UWM is a Michigan limited liability company which has its principal place of business in Oakland County, Michigan.

4.     UWM is engaged in the business of wholesale mortgage lending.

5.     The amount in controversy is in excess of $75,000, exclusive of interest, costs and attorney fees.

## GENERAL ALLEGATIONS

### AML's Agreements with Wholesale Mortgage Lenders

6.     The wholesale mortgage industry is comprised of wholesale mortgage lenders, like UWM, and independent mortgage brokers, like AML, who together provide mortgage loans to consumers (borrowers).

7

7.     Wholesale mortgage lenders, like UWM, offer mortgage loans, which they originate and fund, through third parties, such as mortgage brokers, but do not work directly with borrowers.

8.     Mortgage brokers enter into broker agreements with multiple wholesale mortgage lenders in order to work with and consider whether the mortgage products offered by various wholesale mortgage lenders are the best fit and price for their respective clients/borrowers.

9.     AML executed a Wholesale Broker Agreement with UWM on April 14, 2020 (the "Original AML/UWM Agreement").

10.     As is customary, the Original AML/UWM Agreement did *not* restrict AML from conducting business with wholesale mortgage lenders other than UWM.

11.     Rocket Mortgage offers retail mortgage lending through its retail mortgage lending division and also offers wholesale mortgage lending through its wholesale mortgage lending division, Rocket Pro TPO ("Rocket Pro").

12.     Rocket Pro is one of UWM's primary competitors and routinely offers better pricing for AML's clients.

13.     AML executed a Wholesale Broker Agreement with Rocket Pro on November 18, 2020 (the "AML/Rocket Pro Agreement").

14.     As is customary, the AML/Rocket Pro Agreement does *not* restrict or prohibit AML from doing business with any wholesale mortgage lender including

8

UWM.

15.     In addition to utilizing Rocket Pro and UWM, and in effort to provide the most competitive and cost-effective options to its home buying clients, AML has also entered into lending relationships with other wholesale lenders including, without limitation, Loan Depot, Freedom Mortgage, Caliber and PRMG.

16.     The more lending relationships that an independent mortgage broker has with different wholesale lenders, the greater ability the independent mortgage broker has to provide more options and flexibility to its consumer/borrower by being able to offer various competing opportunities to the consumer/borrower.

17.     AML has the exact same compensation plan with all of the wholesale lenders it does business with including UWM and Rocket Pro. It is thus important to note that there is no financial benefit for AML to send loans to UWM or Rocket Pro, or to any other wholesale lenders for that matter. The only advantages are to offer more products to more borrowers, coupled with lower interest rates for those consumers, which is the goal of the regulatory environment of mortgage brokerage.

### UWM's Unlawful, Unethical and Improper Ultimatum

18.     Although UWM and its primary owner, Mat Ishbia ("Ishbia"), hold themselves out as defenders and self-appointed protectors of the independent broker community, they in fact are untrustworthy bullies that only care about UWM's own market share and numbers, and who are obsessed with trying to damage the business

9

and reputation of their primary business rivals.

19.    On January 22, 2021, UWM's parent company, United Wholesale Mortgage Holdings Corporation ("UWM Holdings"), became a publicly traded company on the New York Stock Exchange.

20.    Since that time, the share price of UWM Holdings has been declining, and its largest competitor in the wholesale lending market, Rocket Pro, has expanded its market share in wholesale mortgage lending, including offering better pricing, expanded products and guidelines for clients with less than perfect credit and lower rates to mortgage brokers, which in turn led to lower rates for borrowers.

21.    An example of one significant difference between Rocket Pro and UWM' s offerings relates to borrowers with less than perfect credit. Rocket Pro provides funding options for potential borrowers that have credit scores between 580 to 600, whereas UWM has little, if any, actual options for such borrowers.

22.    A broker like AML is thereby losing the ability to provide financing to 5%-10% of the market of possible borrowers by excluding Rocket Pro from its lending options and would be failing to reach clients that UWM is not even pursuing.

23.    AML's client base is more than simply the top tier credit applicants. It also includes those with credit between 580-620, and thus AML needs competitive options for this segment of the borrower market.

24.    In an attempt to mitigate its loss of market share in the wholesale

10

mortgage lending channel, and in a desperate and improper attempt to stifle competition, UWM publicly announced an ultimatum on March 4, 2021 via a video by Ishbia posted on UWM's Facebook page.

25.     The ultimatum announced by Ishbia compelled mortgage brokers such as AML to sign a new, amended broker agreement with UWM that requires the mortgage brokers to boycott and cease doing business with two of UWM's competitors, including Rocket Pro, or face termination of their business relationship with UWM and/or exorbitant and unconscionable monetary penalties imposed by UWM (the "Ultimatum").

26.     Because UWM sought to restrict AML from accessing other options for the market segment of those with credit scores in the 580-620 range, UWM's Ultimatum impedes and restricts fair lending practices in that it reduces the ability of an independent mortgage broker, such as AML, to provide the full breadth of mortgage products and pricing to their clients which could further reduce opportunities for historically marginalized potential homeowners such as those with credits scores in the range of 580-620.

27.     Contrary to the public images UWM and Ishbia seek to convey as purported defenders of the broker community, UWM and Ishbia in fact sought to punish any independent brokers, and thereby the clients (the consumer) of these brokers, who refused to boycott UWM's primary competitors by imposing the

anticompetitive and underhanded Ultimatum, essentially steering all broker business UWM's and Ishbia's way.

28.   By virtue of requiring mortgage brokers to boycott UWM's largest competitor, brokers like AML will be unable to offer their clients potentially cost saving products to portions of the market segment and are thereby engaging in an unfair restriction on trade and commerce.

29.   UWM's conduct is a violation of antitrust laws, as the Ultimatum is a concrete and pure example of an attempt to agree to stifle competition, and UWM's exclusionary conduct is done intentionally to prevent competition between wholesale lenders resulting in less fair competition and increased lending pricing.

30.   AML believes that this restraint on competition and trade that precludes brokers from providing fair alternates to UWM' s products to home refinance and purchasing consumers results in a 20% loss in business, since UWM's products are in many cases more expensive and less competitive than various products that Rocket Pro and/or Fairway Independent Mortgage provide. As an example, UWM does not provide any lending options for potential borrowers with less than a 620 credit score, while Rocket Pro does offer financing options for these potential borrowers who comprise approximately 5%-10% of the market.

31.   UWM's use of the Ultimatum is an anticompetitive strategy, stifling the competitive process, reducing consumer choice, and interfering with the business

prospects and expectancies of AML.

32.    If UWM is successful in its strategy, independent mortgage brokers will be prevented from providing true fair and competitive options to their customer base, thereby creating an anticompetitive market.

33.    UWM's Ultimatum seeks to work exactly as UWM intended – to foreclose the possibility that independent mortgage brokers utilize UWM's primary competitors' lending alternative in an effort to damage its rivals and weaken them as competitive alternatives for consumers.

## UWM Demands that AML Agree to the Ultimatum

34.    On March 5, 2021, UWM sent an email to AML demanding that AML accept UWM's new, amended broker agreement which included the Ultimatum (the "Amended AML/UWM Agreement").

35.    Specifically, the Amended AML/UWM Agreement provided to AML included a provision that prohibited AML on behalf of its clients (borrowers) from conducting business with Rocket Mortgage and Fairway Independent Mortgage.

36.    Specifically, Section 3.03 of the Amended AML/UWM Agreement states:

> **Broker Warranties & Representations.** Broker hereby warrants, represents and covenants to UWM with regard to each Mortgage Loan submitted to UWM for underwriting, purchase and/or funding that the following are true, complete and correct in all material respects as of the date of such submission, as if such warranties, representations and covenants are again made

13

by Broker on those dates and shall continue to be valid and accurate throughout the entire lending process: …

(x) Broker will *not* submit a mortgage loan or mortgage loan application to *Rocket Mortgage* or Fairway Independent Mortgage for review, underwriting, purchase, and/or funding. This requirement is limited to Rocket Mortgage and Fairway Independent Mortgage. UWM will not add any other mortgage lender. If either Rocket Mortgage or Fairway Independent Mortgage acquire a mortgage lender (an "Acquired Lender"), this requirement applies only on a going forward basis as to the Acquired Lender, and is not effective as to the Acquired Lender until thirty (30) days after the acquisition is closed. (emphasis added).

37.    In addition, Section 7.30 of the Amended AML/UWM Agreement imposed a draconian and anticompetitive penalty of the greater of (a) $5,000.00 per loan closed with UWM; or (b) $50,000.00 without the need for any proof of damages (the "Liquidated Damages Provision").

38.    This provision is included in order to force independent mortgage brokers into becoming *de facto* arms of UWM or to significantly damage those who not comply.

39.    Specifically, Paragraph 7.30 of the Amended AML/UWM Agreement states:

**Liquidated Damages**. Broker and UWM agree that the measure of damages in the event of a breach of Broker's representation and warranty under Section 3.03(x) may be difficult, if not impossible, to ascertain. Accordingly, in the event of a violation of Section 3.03(x), Broker shall immediately pay to UWM the *greater* of: (i) *Five Thousand Dollars ($5,000.00) per loan closed with UWM, or (ii) Fifty Thousand Dollars ($50,000.00),*

14

*as liquidated damages for such breach without the need for proof of damages by UWM*. UWM's right to liquidated damages are in addition to (not in lieu of) any other monetary or other remedies UWM may have under this Agreement and/or applicable law. (emphasis added).

## UWM Assures AML that UWM Will *Not* Seek to Enforce the Ultimatum and Liquidated Damages Provision

40.     Pursuant to AML's regular interactions with UWM's Director of National Accounts, Bryan A. Miller ("Miller"), AML's Chief Executive Officer, Shawn Nevin ("Nevin"), sent Miller an email dated March 23, 2021 explaining why UWM's Ultimatum was harmful and damaging to AML and its clients, the broker community and consumers (borrowers) seeking mortgage loans. AML specifically noted that this demand by UWM would prevent sales opportunities and restrict AML from offering competitive pricing to its home purchasing and refinancing clientele.

41.     AML continued to have discussions with representatives of UWM, including Miller and UWM's Senior Key Account Executive, Scott Welty ("Welty"), regarding AML's concerns about, and disagreement with, the Ultimatum.

42.     Miller and Welty, on behalf of UWM, repeatedly downplayed and disregarded the issues and concerns raised by Nevin regarding AML and its clients, the broker community and consumers, and insisted that there was nothing Rocket Pro could do that UWM could not do. Nevin, on behalf of AML, reminded Miller and Welty that Rocket Pro had been more consistently providing better pricing than UWM provided as well alternative programs on its mortgage loans that UWM did

15

not offer. AML even sent Miller and Welty examples of pricing scenarios where Rocket Pro beat UWM's pricing on the same mortgage loans. In response to this evidence, UWM would merely promise to work with Ishbia to improve the pricing it offered to AML, but never did so.

43.     Rocket Pro has more programs and options for more customers with less than perfect credit whereas UWM does not provide any comparable product, meaning that, if AML went exclusively with UWM, then AML would lose the ability to service 5%-10% of the market.

44.     As of June 1, 2021, AML continued to do business with Rocket Pro and UWM, and had not signed the Amended AML/UWM Agreement containing the Ultimatum and Liquidated Damages Provision.

45.     On June 1, 2021, Miller requested a telephone call with AML's Chief Operating Officer, Dean Lob ("Lob"), wherein Miller expressly assured Lob that UWM would *not* seek to enforce the Ultimatum and Liquidated Damages Provision against AML if AML signed the Amended AML/UWM Agreement. Miller not only represented and assured Lob that the Ultimatum and Liquidated Damages Provision would not be enforced but went further and explained that UWM would do whatever it took to offer everything that Rocket Pro offered so that AML would not need to consider sending a single loan to Rocket Pro.

46.     Notwithstanding Miller's express assurances, AML still did not execute

16

the Amended AML/UWM Agreement because AML believed the Ultimatum and Liquidated Damages Provision were unfair, inappropriate and harmful to AML and its clients, the broker community and consumers (borrowers).

47.    Thereafter, in June 2021, UWM began adding language to its conditional approval letters for pending AML mortgage loans requiring that AML execute the Amended AML/UWM Agreement before UWM would close any further loans originated by AML. Unexpectedly and without prior discussion, UWM then ceased funding any existing loans in AML's lending pipeline since the Amended AML/UWM Agreement had not been executed by AML.

48.    AML was thus held hostage by UWM's behavior and was rightfully concerned about being in jeopardy of customer and regulatory complaints as a direct consequence of UWM refusing to fund over 100 loans in AML's lending pipeline with UWM.

49.    UWM therefore put enormous and unconscionable economic pressure on AML since many loans that were open and pending closing were now effectively suspended by UWM and potentially lost which would cause massive consequences to AML from its clients (the consumers) waiting for these loans to close.

50.    Under pressure from UWM, since UWM was not funding numerous pending loans that were close to closing, AML delivered an executed copy of the Amended AML/UWM Agreement to UWM on June 14, 2021, but with the

Ultimatum and Liquidated Damages Provision stricken.

51.    Welty informed AML that UWM refused to accept the Amended AML/UWM Agreement with the Ultimatum stricken and demanded that the unmodified Amended AML/UWM Agreement (*i.e.*, including the Ultimatum) be executed by AML before UWM would close any of the loans originated by AML including all loans in AML's lending pipeline with UWM.

52.    Once again, and with pressure from the suspended loans in the pipeline, Miller and Welty reiterated assurances that, if AML signed the Amended AML/UWM Agreement, UWM would not enforce the Ultimatum and Liquidated Damages Provision against AML.

53.    Having no choice, and in reliance upon UWM's repeated and ongoing promises and assurances of non-enforcement of the Ultimatum and Liquidated Damages Provision, AML was forced to execute the Amended AML/UWM Agreement so that AML's clients in AML's lending pipeline with UWM would not be harmed.

54.    Within a month after executing the Amended AML/UWM Agreement, AML informed UWM that it was cancelling and terminating the relationship with UWM because of being forced to sign the Amended AML/UWM Agreement.

55.    In response, UWM representatives again made repeated representations and assurances that the Ultimatum restricting against utilizing Rocket Pro would not

be enforced and UWM would not pursue the Liquidated Damages Provision against AML and would instead allow AML to utilize both Rocket Pro and UWM.

56.     AML relied upon these repeated representations and did not terminate the relationship with UWM or Rocket Pro in the summer of 2021.

57.     On August 12, 2021, Welty visited AML's office unexpectedly with two or three other UWM employees. The purpose of the meeting was to assure AML that it was an important customer and, while UWM wanted more business, it would not enforce the Ultimatum or the Liquidated Damages Provision for using Rocket Pro. Welty made clear that UWM and Ishbia knew exactly how many loans AML was closing with Rocket Pro, reiterated UWM's intention to become more competitive with Rocket Pro and confirmed that UWM had no intention of damaging its "partners" with fines or penalties for doing business with Rocket Pro, especially AML.

58.     Welty's visit to AML on August 12, 2021 included one meeting solely with Lob and then another meeting with Lob and Nevin,  but  Welty's representations and assurances concerning the non-enforcement of the Ultimatum and Liquidated Damages Provision by UWM as to AML were consistent at both meetings. At both meetings, AML indicated that it felt that the Ultimatum limited its options. especially to certain market segments that UWM was not even pursuing, and felt reassured that UWM would not enforce the Ultimatum and Liquidated Damages Provision.

19

59.     Thereafter, Nevin and Lob continued to receive verbal assurances from Miller and Welty that AML could continue to do business with Rocket Pro *without any repercussions or negative consequences based on the Ultimatum or the Liquidated Damages Provision*. In reliance upon Miller's and Welty's promises and assurances, AML continued to do business with Rocket Pro and UWM.

## UWM Reneges Upon its Promises and Assurances that UWM Would Not Enforce the Ultimatum and Liquidated Damages Provision

60.     On September 19, 2021, Miller requested a quick call with Lob to see how things were going.

61.     During the September 19, 2021 telephone call, Miller told Lob that Ishbia was aware that AML had closed about 60 loans with Rocket Pro in the second quarter of 2021 and asked what it would take to move future AML loans away from Rocket Pro and over to UWM. Lob reiterated to Miller that Rocket Pro was offering lower interest rates and more product offerings for customers with less than perfect credit, as outlined, above, and UWM would have to offer lower rates in order to compete with Rocket Pro's better pricing. Lob further asked Miller to arrange a call with Ishbia about improving the VA and conventional mortgage pricing offered by UWM which, if done, would allow AML to send more business to UWM if UWM's pricing improved.

62.     Nothing was said or done during the September 19, 2021 telephone call that indicated that AML would be penalized or harmed for using both Rocket Pro

and UWM and instead the focus was on more competitive pricing.

63.     On October 13, 2021, Miller sent a text message to Lob requesting to have a call with Nevin regarding purportedly improved pricing by UWM.

64.     Subsequently, AML learned that UWM's purported pricing improvements were actually short-term pricing adjustments, such as an improved price on a Monday but a reversion to a higher price a few days later, which were not beneficial to the broker community, AML or consumers (borrowers).

65.     AML continued to do business with Rocket Pro and UWM over the next couple of months without any comment or objection from UWM despite UWM knowing full well and keeping track of every file that AML was sending to Rocket Pro.  In fact, Welty and Miller brought up AML's funded loan units with Rocket Pro down to exact numbers on multiple occasions. This occurred multiple times in the second quarter of 2021 and then again in the third quarter of 2021. Specifically, AML was told that UWM, and Ishbia himself, were aware of how many loans AML was placing with Rocket Pro. UWM indicated that it wanted to know what UWM needed to do for AML so that AML would send less business to Rocket Pro such that UWM's representatives could report back to Ishbia. UWM never suggested that it would renege upon its repeated representations and assurances that UWM would not enforce the Ultimatum and Liquidated Damages Provision against AML.

66.     UWM representatives also indicated that, not only was it acceptable for

21

AML to continue utilizing Rocket Pro, but that UWM would either provide products and services similar to those that Rocket Pro was providing which UWM was not providing, or alternatively would locate a separate lender that could also provide similar services. UWM never provided any alternate lender, and never provided products or services for customers with less than perfect credit, as it promised.

67.    Despite UWM's repeated and continuous promises and representations, in December 2021, UWM's posture suddenly and inexplicably changed.

68.    On December 9, 2021, Miller sent a text message to Lob wherein Miller stressed that Lob needed to get on a call with Miller even though Nevin was out of town and unavailable. Lob reluctantly agreed to participate in the call pursuant to Miller's request even though Nevin was not available.

69.    During the December 9, 2021 telephone call, Miller asked point blank whether AML was ready to end its relationship with Rocket Pro. Lob reiterated the sticking points that AML had previously explained to UWM regarding UWM's uncompetitive pricing and AML's need to offer its clients the best possible pricing.

70.    UWM's Senior Legal Counsel, Adam Wolfe ("Wolfe"), who was not initially identified as a participant on the December 9, 2021 telephone call, unexpectedly introduced himself halfway through the call and stated that he, on behalf of UWM, needed to know exactly what AML's decision was going to be (*i.e.*, whether AML would end its relationship with Rocket Pro and deal solely and

exclusively with UWM). Lob, surprised and ambushed at having UWM's senior legal counsel listening in and previously unannounced on the call, again reiterated to Wolfe everything he had previously expressed to Miller as to why AML was continuing to use Rocket Pro. Lob also reiterated that Miller and Welty had expressly represented, promised and assured Lob, Nevin and other representatives of AML on several occasions that UWM would not enforce the Ultimatum and no fines nor penalties would be imposed on AML for continuing to work with Rocket Pro. At that point, Miller indicated that AML must stop doing business with Rocket Pro effective immediately because other brokers were calling UWM and demanding that they also be allowed to do business with Rocket Pro inasmuch as the other brokers had heard that AML was using both UWM and Rocket Pro. Lob was taken aback by Miller's reversal especially inasmuch as others in the broker community had been working with both UWM and Rocket Pro notwithstanding the Ultimatum, and UWM and Ishbia did *not* seek to enforce the Ultimatum and Liquidated Damages Provision against other brokers in addition to AML. Lob indicated that he needed to confer with Nevin regarding the disturbing and disappointing telephone call.

71.    On December 13, 2021, Nevin had a telephone conversation with Miller. During the December 13, 2021 telephone call,

> a. Nevin expressed to Miller that he was extremely upset about the December 9, 2021 telephone call between Miller and Lob which Wolfe joined unannounced and in which Nevin was unable to participate. Nevin told Miller that he was extremely upset about

all the representations, promises and assurances that had been made by UWM that UWM would not enforce the Ultimatum or Liquidated Damages Provision upon which AML had been relying but which UWM apparently would not be honoring;

b. Miller told Nevin that AML needed to make a decision as to the Ultimatum and the choice had to be made between UWM and Rocket Pro;

c. Nevin told Miller that this was not a choice that AML wanted to make, but, if forced to do so, AML had to select Rocket Pro in light of UWM's abrupt pressure to make a decision, the underhandedness of an eavesdropped telephone call, overall dishonesty and the critical importance of being able to offer the best pricing to AML's clients which was more consistently provided by Rocket Pro, as well as UWM inability to offer programs for borrowers with less than perfect credit scores;

d. Nevin asked Miller to permit AML to close out AML's active loan pipeline with UWM and to provide 60 days in which to do so in order to avoid consumer harm;

e. Miller stopped Nevin and asked if this was AML's final decision and informed Nevin that, if it was AML's final decision, Miller could no longer protect AML from what would happen next;

f. Nevin indicated that he did not understand what Miller was implying. Miller explained that, as a result of AML's decision to maintain its relationship with Rocket Pro, there would likely be strong repercussions from UWM and specifically indicated that AML would likely be fined based on the Ultimatum and Liquidated Damages Provision in the Amended AML/UWM Agreement notwithstanding UWM's prior representations, promises and assurances that AML would not enforce the Ultimatum and Liquidated Damages Provision at all; and

g. Nevin told Miller that this threat was not only contrary to the promises and assurances made by UWM, including those made by Miller himself, but was also tantamount to extortion.

72.    On the morning of December 15, 2021, Nevin sent Miller an email informing Miller how distraught AML was about UWM's extortionate demand and the detrimental effect the extortionate demand was having on Nevin's health.

73.    Later on December 15, 2021, AML received a letter from UWM's counsel demanding a payment of liquidated damages in the exorbitant amount of $1.9 million purportedly based upon AML's breach of the Ultimatum.

74.    Nevin called Ishbia on December 15, 2021 and left a detailed message objecting to, and requesting a resolution of, the extortionate and unfounded demand, but never received a return telephone call from Ishbia.

75.    From and after December 15, 2021, AML through its legal counsel attempted to resolve the unfair and extortionate demands made in UWM's demand letter, but UWM refused to be honorable or reasonable.

76.    To make matters worse, on January 31, 2022, in the midst of negotiations as to possible methods to resolve this situation, UWM ceased funding any of AML's loans in AML's lending pipeline with UWM, thereby foreclosing AML from moving forward with UWM.

**UWM Files its Meritless Complaint Against AML**

77.    On February 3, 2022, UWM filed its Complaint against AML, replete with false and misleading factual allegations, and engaged in a false and misleading publicity campaign directed against AML in an attempt to damage and destroy AML

78.    Contrary to UWM's express promises and representations that it would *not* seek to enforce the Ultimatum and Liquidated Damages Provision of the Amended AML/UWM Agreement, UWM seeks to do exactly that in its Complaint and publicity campaign.

79.    UWM's Complaint is an example of UWM's billionaire owner, Ishbia, seeking to gain unfair advantage over UWM's competition and increase UWM's market share, and hence improve Ishbia's personal financial position, by putting fear and apprehension into the hearts of independent mortgage brokers like AML.

80.    Independent mortgage brokers have always wanted independence in order to be able to provide the best available mortgage rates and products to their clients/borrowers. This allows borrowers to evaluate and obtain the most competitive price options and loan programs by being able to compare the offerings of multiple lenders with the assistance of an independent mortgage broker.

81.    UWM's claim that its unfair, exclusionary and anticompetitive Ultimatum somehow benefits independent mortgage brokers is a complete sham and fabrication. In truth, the Ultimatum and Liquidated Damages Provision were created for a singular purpose – solely to benefit and line the pockets of Ishbia and UWM at the detriment of independent mortgage brokers and their clients/borrowers.

82.    As a result of UWM's wrongful, improper and unethical practices and its misrepresentations and false promises and assurances, AML asserts this Counter-

Complaint seeking relief from the unfair, exclusionary and anticompetitive Ultimatum and draconian Liquidated Damages Provision.

## COUNT I – FRAUD AND MISREPRESENTATION

83.    AML hereby incorporates by reference and realleges Paragraphs 1 through 82 of this Counter-Complaint as if fully restated herein.

84.    UWM fraudulently induced AML to enter into the Amended AML/UWM Agreement by misrepresenting that the Ultimatum and Liquidated Damages Provision would not be enforced by UWM and assuring AML that it could continue to conduct business with Rocket Pro without penalty.

85.    Specifically, Miller and Welty, on behalf of UWM, made false, malicious and willful misrepresentations to AML and/or intentionally concealed and hid material facts from AML in an effort to deceive and defraud AML by convincing AML to execute the Amended AML/UWM Agreement.

86.    UWM knew that the representations as to whether UWM would seek to enforce the Ultimatum and Liquidated Damages Provision against AML were false when made to AML.

87.    UWM knew that its concealment and omission of material facts would deceive AML into executing the Amended AML/UWM Agreement.

88.    UWM made the aforementioned misrepresentations and false assurances to AML in bad faith without any present intention of performance at the

27

time UWM made the misrepresentations and false assurances.

89.     UWM intentionally and maliciously made the aforementioned misrepresentations and false assurances to AML, and concealed and hid material facts from AML, in an effort to deceive and induce AML to rely upon such misrepresentations and false assurances to its detriment, which in fact occurred.

90.     AML reasonably relied to its detriment upon the fraudulent misrepresentations and false assurances made by UWM, and was misled and deceived by UWM's concealment and omissions, which induced AML to execute the Amended AML/UWM Agreement and continue to do business with UWM.

91.     As noted above, AML even sought to cancel the Amended AML/UWM Agreement within weeks after signing, but UWM once again made promises and representations that the Ultimatum and Liquidated Damages Provision would not be enforced, and such provisions were included solely to attract more business, *not* to actually damage the independent mortgage broker market.

92.     UWM continued to make promises, representations and assurances to AML that UWM would not enforce the Ultimatum and the Liquidated Damages Provision even after AML had executed the Amended AML/UWM Agreement.

93.     As a result, AML continued its relationship with UWM and continued doing business with Rocket Pro based upon UWM's continued promises, representations and assurances that UWM would not seek to enforce the Ultimatum

or the Liquidated Damages Provision.

94.     By virtue of the intentional, malicious and willful misconduct of UWM, AML is entitled to recover exemplary damages.

95.     As a direct, natural, proximate, and foreseeable consequence of the foregoing, AML has suffered damages for which it is entitled to recover, including, but not limited to, compensatory damages, consequential damages, exemplary damages, interest, costs and attorney fees.

WHEREFORE, AML demands that Judgment be entered in favor of AML and against UWM as follows:

     a.  Compensatory damages in an amount in excess of $75,000;

     b.  Consequential damages in an amount in excess of $75,000;

     c.  Exemplary damages in excess of $75,000;

     d.  Interest, costs and attorney fees;

     e.  An order striking the Ultimatum and Liquidated Damages Provision contained in the Amended AML/UWM Agreement and/or rescission of the Amended AML/UWM Agreement; and

     f.  Such other and further relief as is warranted and appropriate.

## COUNT II – PROMISSORY ESTOPPEL

96.     AML hereby incorporates by reference and realleges Paragraphs 1 through 95 of this Counter-Complaint as if fully restated herein.

97.    UWM, by and through its representatives, Miller and Welty, made clear, definite and unambiguous promises and representations that UWM would not enforce the Ultimatum and Liquidated Damages Provision, and that AML could continue to do business with Rocket Pro without penalty or negative consequence.

98.    UWM made the aforementioned promises and representations with the knowledge, understanding and expectation that AML would rely thereupon.

99.    AML did in fact reasonably rely upon the promises and representations of UWM to its substantial detriment.

100.    In reliance upon UWM's promises and representations that UWM would not enforce the Ultimatum and Liquidated Damages Provision, AML executed the Amended AML/UWM Agreement and continued to do business with UWM.

101.    UWM continued to make promises and assurances that it would not enforce the Ultimatum and Liquidated Damages Provision after AML signed the Amended AML/UWM Agreement which AML relied upon as it continued to do business with, and submit loans to, UWM.

102.    In December 2021, UWM reneged on its promises and assurances repeatedly made to AML, upon which AML had been relying, and sought to enforce the Ultimatum and Liquidated Damages Provision.

103.    As a direct, natural, proximate and foreseeable consequence of the

foregoing, AML has suffered damages for which it is entitled to recover, including, but not, limited to, compensatory damages, consequential damages, interest, costs and attorney fees.

WHEREFORE, AML demands that Judgment be entered in favor of AML and against UWM as follows:

a. Compensatory damages in an amount in excess of $75,000;

b. Consequential damages in an amount in excess of $75,000;

c. Interest, costs and attorney fees;

d. An order striking the Ultimatum and Liquidated Damages Provision contained in the Amended AML/UWM Agreement and/or rescission of the Amended AML/UWM Agreement; and

e. Such other and further relief as is warranted and appropriate.

## COUNT III – DECLARATORY JUDGMENT THAT THE ULTIMATUM AND LIQUIDATED DAMAGES PROVISIONS ARE INVALID AND UNENFORCEABLE AS A MATTER OF LAW

104. AML hereby incorporates by reference and reallege Paragraphs 1 through 103 of this Counter-Complaint as if fully restated herein.

105. The Ultimatum, Liquidated Damages Provision and Amended AML/UWM Agreement were procured through fraudulent misrepresentations as set forth in the General Allegations.

106. The Ultimatum is improper and unconscionable. Specifically, the

Ultimatum is: (a) procedurally unconscionable because it is oppressive due to unequal bargaining power and the exorbitant penalties for non-compliance; and (b) substantively unconscionable because it provides overly harsh, one-sided results to UWM, illegally restrains trade and fair lending practices, violates anti-steering statutes and attempts to monopolize the wholesale mortgage lending market, all of which violate public policy.

107.   As noted above, AML only signed the Amended AML/UWM Agreement after UWM ceased funding AML's pipeline of loans with UWM without prior notice or discussion, leaving AML in serious financial and regulatory jeopardy, which is fundamentally unconscionable and amounts to economic duress.

108.   The Ultimatum is an anticompetitive practice in violation of MCL 445.773, Section 1 of the Sherman Antitrust Act (15 USC § 1) and the Clayton Antitrust Act (15 USC § 14).

109.   UWM is seeking to create a monopoly in the wholesale mortgage lending industry with its anti-competitive and exclusionary lending agreements that lock up independent mortgage brokers with UWM, and prevent these independent mortgage brokers, like AML, from engaging in open and fair competition with UWM's primary market competitors.

110.   Because the Ultimatum is invalid and unenforceable as a matter of Michigan and Federal law, the Ultimatum should be stricken from the Amended

AML/UWM Agreement.

111.   The exorbitant and unconscionable financial penalties called for in connection with the Ultimatum have been labelled by UWM as "Liquidated Damages" and implemented as a penalty upon AML for failing to acquiesce to the Ultimatum notwithstanding UWM's promises and assurances that UWM would not enforce the Ultimatum or Liquidated Damages Provision.

112.   The Liquidated Damages Provision is clearly designed as a penalty that bears no relationship to actual damages that may be incurred by UWM even if the Ultimatum itself were enforceable (which it is not).

113.   The amount of the liquidated damages set forth in the Liquidated Damages Provision was arbitrarily and solely determined by UWM as a coercive punishment and is therefore an unenforceable penalty that violates Michigan and Federal law.

114.   Michigan law requires that the amount of liquidated damages be a reasonable estimate of the actual damages and such damages could not be predicted with accuracy at the time of formation of the contract.

115.   Here, the Liquidated Damages Provision does not meet either requirement of Michigan law because: (a) the amount of liquidated damage set forth in the Amended AML/UWM Agreement has no reasonable relationship to any purported damages actually suffered by UWM (of which there are none); and (b) the

amount of any such alleged damages suffered by UWM (of which there are none) could have been predicated with reasonable accuracy at the time of formation of the Amended AML/UWM Agreement.

116.   Because the Liquidated Damages Provision is invalid as a matter of Michigan law, the Liquidated Damages Provision is invalid and unenforceable and should be stricken from the Amended AML/UWM Agreement.

WHEREFORE, AML respectfully requests that this Court enter an order declaring that the Ultimatum and Liquidated Damages Provision contained in the Amended AML/UWM Agreement are invalid and unenforceable as a matter of law and of no force and effect, and grant such other and further relief as is warranted and appropriate.

Respectfully submitted,

/s/ Jeffery B. Morganroth
JEFFREY B. MORGANROTH (P41670)
JASON R. HIRSCH (P58034)
MORGANROTH & MORGANROTH, PLLC
Attorneys for Defendant/Counter-Plaintiff
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000
jmorganroth@morganrothlaw.com
jhirsch@morganrothlaw.com

/s/ Matthew D. Novello
MATTHEW D. NOVELLO (P63269)
NOVELLO & ASSOCIATES, PC
Co-counsel for Defendant/Counter-Plaintiff
3542 Lakeview
Highland, Michigan 48356
mnovello@novellolawfirm.com

February 25, 2022

## DEMAND FOR JURY TRIAL

Defendant/Counter-Plaintiff, America's Moneyline, Inc., by and through its attorneys, hereby demands a trial by jury in the above-entitled matter.

Respectfully submitted,

<table>
<tr>
<td>

/s/ Jeffery B. Morganroth
JEFFREY B. MORGANROTH (P41670)
JASON R. HIRSCH (P58034)
MORGANROTH & MORGANROTH, PLLC
Attorneys for Defendant/Counter-Plaintiff
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000
jmorganroth@morganrothlaw.com
jhirsch@morganrothlaw.com

</td>
<td>

/s/ Matthew D. Novello
MATTHEW D. NOVELLO (P63269)
NOVELLO & ASSOCIATES, PC
Co-counsel for Defendant/Counter-Plaintiff
3542 Lakeview
Highland, Michigan 48356
mnovello@novellolawfirm.com

February 25, 2022

</td>
</tr>
</table>