UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED WHOLESALE
MORTGAGE, LLC,

        Plaintiff/Counter-Defendant,

v.

AMERICA'S MONEYLINE, INC.,

        Defendant/Counter-Plaintiff.

Case No. 22-10228
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING IN PART UNITED WHOLESALE MORTGAGE'S MOTION TO DISMISS COUNTERCOMPLAINT [11]

In 2021, United Wholesale Mortgage, a wholesale mortgage lender, issued an "ultimatum" forcing a number of mortgage brokers, including America's Moneyline, to choose between doing business with UWM or with two of its competitors, including Rocket Pro. AML—relying on UWM's alleged promises that it would not enforce the ultimatum against it—continued to do business with both UWM and Rocket Pro.

In time, UWM sued AML for breach of their Amended Wholesale Broker Agreement. AML countersued, alleging that (1) UWM's assurances were fraudulently made; (2) promissory estoppel should apply to enforce those assurances; and (3) the ultimatum is invalid and unenforceable for various reasons and that it is entitled to a declaratory judgment to that effect. (ECF No. 7, PageID.79–83.)

Believing the counterclaims to be without merit, UWM moved to dismiss them. (ECF No. 11.)  The Court agrees and will grant UWM's motion in large part. However, one declaratory-judgment subclaim will survive.

# I. Background

Because UWM seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the factual allegations in AML's countercomplaint as true and draws reasonable inferences from those allegations in its favor. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

## A.

UWM is a mortgage lender that works with many mortgage brokers who, in turn, work directly with borrowers. (ECF No. 7, PageID.60.) Brokers like AML typically enter into agreements with multiple lenders, and then they determine which lender's product is the best fit for each borrower. (*Id.*)

On April 14, 2020, AML executed a form Wholesale Broker Agreement with UWM. (*Id.*) As is apparently customary, the contract did not restrict AML from conducting business with other lenders. (*Id.*) So AML submitted loan applications to UWM and to its competitor, Rocket Pro (formerly known as Rocket Mortgage). (*Id.*)

Four portions of the original agreement are of interest here. First, the original agreement had some relevant definitions. Section 1.01 defined "Agreement" as "this Wholesale Broker Agreement and any written amendments or modifications hereto which are made in accordance with the terms of this Wholesale Broker Agreement." (ECF No. 1-1, PageID.11.) And section 1.28 defined "UWM Guide" as "all verbal procedures and requirements delivered by UWM or its representatives as well as those procedures and requirements contained on UWM's website and all links incorporated therein . . . as amended from time to time." (*Id.*)

2

Second, sections 7.01 and 7.08 detailed the contract modification process. Section 7.01 states the general rule that the original agreement "may not be amended except in writing executed by authorized representatives of both Broker and UWM." (ECF No. 1-1, PageID.16.) But section 7.08 states an exception to that rule. (*Id.* at PageID.17.) It says that "[t]his Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, including . . . those contained in the UWM Guide . . . may be amended by UWM from time to time." (*Id.*) And it clarifies that the broker "agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment will be Broker's agreement to the amendment without further signature or assent of any kind." (*Id.*)

Third, the original agreement had a merger clause. Specifically, section 7.12—which is titled "Entire Agreement"—reads in relevant part: "The arrangements and relationships contemplated in this Agreement and/or any document referred to herein constitute the sole understanding and agreement of the parties." (ECF No. 1-1, PageID.17.) It continued, "This Agreement supersedes all other agreements, covenants, representations, warranties, understandings and communications between the parties, whether written or oral, with respect to the transactions contemplated by this Agreement." (*Id.*)

Finally, the original agreement included instructions for contract interpretation and construction. Section 7.18 directs in relevant part that "in the event of any conflict, ambiguity or inconsistency between the terms and conditions

3

contained in this Agreement and those set forth in the UWM Guide, the terms and conditions of the UWM Guide shall be deemed to supersede and control." (*Id.*)

The original agreement governed the parties' relationship without issue for about a year. (ECF No. 7, PageID.60, 63.)

## B.

On March 4, 2021, things changed. UWM publicly announced an "ultimatum" to mortgage brokers on its Facebook page and website. (ECF No. 7, PageID.63); *see also* United Wholesale Mortgage, "United Wholesale Mortgage Reveals Trailblazing Move In Support Of Wholesale Channel Growth," https://perma.cc/8YDD-2JCS. According to AML, the ultimatum forced brokers to "boycott and cease doing business with two of UWM's competitors, including Rocket Pro, or face termination of their business relationship with UWM and/or exorbitant and unconscionable monetary penalties." (ECF No. 7, PageID.63.)

UWM simultaneously rolled out an Amended Wholesale Broker Agreement. The amended agreement included two new provisions. Section 3.03(x) stated that the "Broker will not submit a mortgage loan or mortgage loan application to Rocket Mortgage . . . for review, underwriting, purchase, and/or funding." (ECF No. 1-2, PageID.28.) And section 7.30, titled "Liquidated Damages," directed that "in the event of a violation of Section 3.03(x), Broker shall immediately pay" a monetary penalty to UWM. (*Id.* at PageID.38–39.) The remainder of the amended agreement tracked the original agreement. (*Compare* ECF No. 1-1, *with* ECF No. 1-2.)

The ultimatum presented a major problem for AML. (ECF No. 7, PageID.63.) AML wished to continue doing business with both UWM and Rocket Pro in order to "provide the full breadth of mortgage products and pricing to their clients." (*Id.*) So it refused to formally execute the amended agreement. (*Id.* at PageID.65.) But the next day, March 5, 2021, UWM sent an email to AML demanding that it formally execute the amended contract or cease doing business with UWM. (*Id.*)

In response, on March 23, 2021, AML's CEO sent UWM an email explaining why the ultimatum was harmful to AML and its clients. (*Id.* at PageID.67.) As discussions continued, AML informed UWM that Rocket Pro had been consistently providing better pricing for certain segments of the market and offered programs that UWM did not. (*Id.* at PageID.67–68.) But UWM "merely promise[d] to work . . . to improve the pricing it offered to AML." (*Id.* at PageID.68.)

As of June 1, 2021, AML continued submitting loan applications to both Rocket Pro and UWM while refusing to formally execute the amended agreement. (*Id.*) On that date—and apparently for the first time—UWM orally assured AML that it would not seek to enforce the ultimatum against AML if AML executed the amended agreement. (*Id.*) Despite these assurances, AML refused to sign. (*Id.* at PageID.68–69.) (As will be discussed, the refusal to sign did not impact AML's acceptance of the amended agreement by continuing to submit loans to UWM.)

Shortly thereafter, UWM began adding language to its conditional approval letters for AML's clients. (*Id.* at PageID.69.) The new language "require[d] . . . AML [to] execute the [amended agreement] before UWM would close any further loans

originated by AML." (*Id*.) When AML refused to do so, UWM ceased funding loans in AML's lending pipeline. (*Id*.)

Feeling "enormous and unconscionable economic pressure," AML executed the amended agreement on June 14, 2021, but it struck the ultimatum and penalty provisions. (*Id*. at PageID.69–70.) But UWM refused to accept the modified agreement and instead reiterated its promise not to enforce the ultimatum. (*Id*. at PageID.70.) So, again facing "pressure from the suspended loans in the pipeline," AML formally executed the amended agreement in its entirety. (*Id*.)

However, within a month, AML changed its mind and informed UWM that it was terminating the relationship. (*Id*.) But on August 12, 2021, UWM again promised not to enforce the ultimatum and repeated its intention to offer products that were more competitive with Rocket Pro's. (*Id*. at PageID.71.) And though AML acknowledges that UWM made efforts to improve its pricing, AML was still not satisfied. (*Id*. at PageID.73.) Relying on UWM's promises, AML continued to do business with both Rocket Pro and UWM for several more months. (*Id*.)

## C.

Then, says AML, UWM's "posture suddenly and inexplicably changed" in early December 2021. (*Id*. at PageID.74.) In a series of phone calls, UWM directly asked AML whether it was willing to end its relationship with Rocket Pro. (*Id*. at PageID.75.) And it indicated that AML "must stop doing business with Rocket Pro effective immediately because other brokers were calling UWM and demanding that

they also be allowed to do business with Rocket Pro." (*Id.*) AML told UWM that—if forced to choose—it would choose Rocket Pro. (*Id.* at PageID.76.)

On December 15, 2021, UWM sent AML a letter demanding $1.9 million in liquidated damages based on the business AML continued to conduct with Rocket Pro as provided for in the amended agreement. (*Id.* at PageID.77.)

Following unsuccessful negotiations, UWM sued AML for breach of contract in February 2022. (ECF No. 1.) AML countersued, alleging that (1) UWM's assurances were fraudulently made; (2) promissory estoppel should apply to enforce those assurances; and (3) the ultimatum is invalid and unenforceable for various reasons and that it is entitled to a declaratory judgment to that effect. (ECF No. 7, PageID.79–83.)

UWM moved to dismiss the counterclaims. (ECF No. 11.) Given the adequate briefing, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II. Standard

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable" to AML and determines whether its "[counter]complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Detailed factual allegations are not required to survive a motion to dismiss, *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012), but they

must "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### III. Analysis

UWM asks the Court to dismiss each of the claims in AML's coun025complaint. The Court will take each in turn. And, by the terms of the original and amended agreements, the Court will apply Michigan law. (ECF No. 1-1, PageID.17; ECF No. 1-2, PageID.35.)

### A. Fraud

AML presents its fraud claim in several different forms (ECF No. 12, PageID.141–152), but none state a claim.

### 1.

Start with AML's general claim that UWM's promises not to enforce the ultimatum were fraudulent.

"Michigan law is well-established that parties [generally] cannot sue in tort over relationships governed by contract." *See Miller v. Joaquin*, 431 F. Supp. 3d 906, 914 (E.D. Mich. 2019); *see also DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2015); *Hart v. Ludwig*, 79 N.W.2d 895, 897 (Mich. 1956). "In *Hart* [*v. Ludwig*], Michigan's highest court noted the distinction between the legal duty which arises by operation of a contract and the fundamental concept of a legal duty to avoid conduct which creates liability in tort. '[I]f a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise

not.'" *Brock v. Consol. Biomedical Lab'ys*, 817 F.2d 24, 25 (6th Cir. 1987) (quoting

*Hart*, 79 N.W.2d at 898)). In other words, as one court explained, the *Hart* rule[1]

directs that "if the alleged tort claim would not exist absent the contract, and the

harm claimed does not extend beyond the realm of the contract, no action in tort will

lie." *Marco Int'l, LLC v. Como-Coffee, LLC*, No. 17-CV-10502, 2018 WL 1790171, at

*4 (E.D. Mich. Apr. 16, 2018). To make that distinction, courts are to focus on

"whether the [counter-]plaintiff alleges violation of a legal duty separate and

distinct from the contractual obligation." *See Rinaldo's Const. Corp. v. Michigan Bell

Tel. Co.*, 559 N.W.2d 647, 658 (Mich. 1997) (dismissing tort claim for negligent

installation of phone lines that were installed pursuant to a contract because "there

is no allegation that this conduct by the defendant constitutes tortious activity in that

it caused physical harm to persons or tangible property; and plaintiff does not allege

violation of an independent legal duty distinct from the duties arising out of the

contractual relationship").

---

[1] UWM, understandably, refers to this as the "economic-loss doctrine[.]" (ECF No. 13, PageID.162). However, while they have similar functions, the *Hart* rule and the economic-loss doctrine have distinct origins and purposes. *See* Vincent A. Wellman, Assessing the Economic Loss Doctrine in Michigan: Making Sense Out of the Development of Law, 54 Wayne L. Rev. 791, 818–25 (2008) (contrasting the economic loss doctrine and the rule of *Hart v. Ludwig*). Perhaps inadvertently, the distinction seems to have faded in the caselaw in more recent years. *See, e.g., DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2015) (citing both *Hart* and *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612 (Mich. 1992), which established the economic-loss rule without reference to *Hart*, and referring to these rules generally as the "economic loss doctrine"); *Wellman, supra* at 821–23 (arguing that certain decisions have incorrectly conflated the two concepts).

*Hart* presents an obvious problem for AML. AML's fraud claim is essentially that UWM "misrepresent[ed] that the Ultimatum and Liquidated Damages Provision would not be enforced by UWM and assur[ed] AML that it could continue to conduct business with Rocket Pro without penalty." (ECF No. 7, PageID.79.) In other words, UWM's assurances "relate to obligations created under the [a]greement"—namely, whether AML must cease doing business with Rocket Pro or whether UWM waived that requirement. *See Marco Int'l*, 2018 WL 1790171, at *5. So the promises "cannot serve as the basis for a separate and independent tort claim." *Id.* And AML has not identified any duties that UWM violated that are separate and distinct from the agreement. *Cf. Cooper v. Auto Club Ins. Ass'n*, 751 N.W.2d 443, 448 (Mich. 2008) (permitting fraud claim to survive where allegations included "insurer's breach of its separate and independent duty not to deceive the insureds, which duty is imposed by law as a function of the relationship of the parties"). Accordingly, AML cannot state a *general* fraud claim.

That said, if the duty that forms the basis of AML's fraud claim existed at common law, then AML's fraud claim could exist absent the agreement. *See Marco Int'l, LLC v. Como-Coffee, LLC*, No. 17-CV-10502, 2018 WL 1790171, at *4–5 (E.D. Mich. Apr. 16, 2018). To this end, courts continue to recognize fraudulent inducement and bad-faith promises as viable tort claims, notwithstanding *Hart*. But the factual allegations in AML's countercomplaint do not establish these claims either.

10

**2.**

Consider a potential fraudulent-inducement claim. "Parties are entitled to bring a fraud-in-the-inducement action when they are induced into entering an agreement on the basis of false representations." *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 304 (6th Cir. 2008). Fraudulent inducement "addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort." *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 778 (E.D. Mich. 2014) (citing *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995)). And it "occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *LIAC, Inc. v. Founders Ins. Co.*, 222 F. App'x 488, 492 (6th Cir. 2007) (quoting *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 534 N.W.2d 217, 219 (Mich. Ct. App. 1995)).

For two reasons, AML has not adequately pled fraudulent inducement.

First, given the timeline in the countercomplaint, AML had already agreed to the ultimatum and associated damages before UWM made the assurances not to enforce those provisions. (*See* ECF No. 13, PageID.164, n.1.) Recall that section 7.08 of the amended agreement expressly says: "This Agreement . . . may be amended by UWM from time to time . . . Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind." (ECF

No. 1-1, PageID.17.) The counterclaim acknowledges the public announcement of the ultimatum on March 4, 2021, that AML received an email about the Amended agreement on March 5, 2021, and that it continued submitting loans to UWM after that date. AML does not explain why that was insufficient to constitute acceptance of the ultimatum by performance. (*See* ECF No. 12.) And, crucially, the counterclaim indicates that UWM's earliest promise not to enforce the ultimatum was made on June 1, 2021, well after the date of acceptance by performance. (ECF No. 7, PageID.68.) So AML could not have relied on a promise made on June 1 when it had already accepted the ultimatum weeks or months prior. *See Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 553 (Mich. Ct. App. 1999) ("[P]laintiff testified that the allegedly false information defendants gave him about commissions occurred *after* he signed the contract; thus, he could not have relied on the information in signing the contract.").

Second, even assuming that AML did not accept the ultimatum until it signed the amended agreement in June 2021, its fraudulent-inducement claim would fail. To bring such a claim, "a plaintiff must demonstrate that he or she reasonably relied on the defendant's representations." *Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F. App'x 493, 499 (6th Cir. 2014). But here, AML's reliance on UWM's promise would have been unreasonable because of the agreement's merger clause. "Michigan law . . . establishes that when a written contract, with a[ merger] clause, expressly contradicts a [party's] allegedly fraudulent representations not contained in the contract, a plaintiff's reliance on such representations cannot be reasonable." *Id.*

(cleaned up); *see also Novak*, 599 N.W.2d at 553 ("[T]he written contract, with its integration clause, expressly contradicted [certain alleged promises,] making plaintiff's alleged reliance on these statements unreasonable."); *UAW-GM Hum. Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 419 (Mich. Ct. App. 1998) ("[T]he merger clause made it unreasonable for plaintiff's agent to rely on any representations not included in the letter of agreement."). Here, AML claims that it relied on an oral promise not to enforce the ultimatum even after it executed a contract where it (1) agreed to be bound by the ultimatum and (2) agreed that the contract was the "Entire Agreement" between the parties. (ECF No. 1-2, PageID.35.) That was unreasonable. As one court succinctly put it, AML "should not be heard to complain that [it] relied on oral promises regarding additional or contrary contract terms when there is written proof, signed by both parties, to the contrary." *See Star Ins. Co. v. United Com. Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 930 (E.D. Mich. 2005). Indeed, claims like AML's "are precisely what merger clauses seek to avoid: courts . . . reading additional terms into contracts years after the fact." *See MY Imagination, LLC v. M.Z. Berger & Co.*, 726 F. App'x 272, 277–78 (6th Cir. 2018).

AML tries to save its fraudulent-inducement claim in three ways. First, it argues that its reliance was reasonable because "others in the broker community had been working with both UWM and Rocket Pro notwithstanding the Ultimatum[.]" (ECF No. 12, PageID.146.) But AML cites no cases to support its contention that reasonableness can be determined by reference to the expectations of third parties. Without such support, it seems more likely that the other brokers were also acting

13

unreasonably or were willing to risk the consequences. *See Hamade v. Sunoco Inc.*, 721 N.W.2d 233, 250 (Mich. Ct. App. 2006) (holding that a "valid integration clause renders reliance on the representation [that Defendant would not permit a competing franchise to operate in the same area] unreasonable *as a matter of law*" (emphasis added)).

AML's next two arguments seek to avoid the effect of the merger clause. For one, it says that the "mere presence of [a merger clause] is insufficient to preclude a fraud in the inducement claim." (ECF No. 12, PageID.146–147.) For two, AML relies on *UAW-GM Human Resources Center v. KSL Recreation Corporation*, 579 N.W.2d 411 (Mich. Ct. App. 1998), to argue that UWM's fraud invalidates the whole contract, including the merger clause.

AML's first attempt starts off well enough. It is true that the mere presence of a merger clause does not defeat *all* fraudulent-inducement claims: a "distinction must be drawn between fraud claims based on 'collateral agreements' not expressed in the contract—which a merger clause invalidates—and claims stemming from 'representations of fact made by one party to another to induce that party to enter into the contract'—which a merger clause does *not* invalidate." *Ram Int'l*, 555 F. App'x at 499–500 (citing *Barclae v. Zarb*, 834 N.W.2d 100, 118 (Mich. Ct. App. 2013)). In other words, while it is unreasonable to rely on prior collateral agreements, a party could reasonably rely "upon representations made by another party regarding things outside the scope of the contractual terms, such as the other party's solvency, indebtedness, experience, clientele, client retention rate, business structure, etc." *See*

14

*Star Ins. Co. v. United Com. Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 930 (E.D. Mich. 2005).

This distinction precludes AML's position. As explained, this case clearly falls into the "collateral agreement" camp because AML allegedly relied on assurances that either contradicted or varied the explicit terms of the amended agreement. The merger clause, by its own terms, extinguishes such assurances.[2]   In contrast, the cases AML relies on fall into the "representations of fact" camp. *See, e.g.*, *L.A. Ins. Agency Franchising, LLC v. Montes*, No. CV 14-14432, 2016 WL 922948, at *9 (E.D. Mich. Mar. 11, 2016) (permitting claim for misrepresentation related to market conditions); *Jenson v. Gallagher*, No. 312739, 2014 WL 667790 (Mich. Ct. App. Feb. 18, 2014) (permitting claim for misrepresentation related to character of property sold); *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 779 (E.D. Mich. 2014) (permitting claim for misrepresentation related to condition of investment properties). These cases do not help AML.

AML's second attempt to avoid the merger clause is based on *UAW-GM Human Resources Center v. KSL Recreation Corporation*, 579 N.W.2d 411 (Mich. Ct. App.

---

[2] AML makes a related, equally untenable argument: that UWM's promise not to enforce the ultimatum "did *not* contradict the written agreement at all . . . *but UWM nonetheless confirmed that it would refrain from enforcing these provisions.*" (ECF No. 12, PageID.145 (emphasis in original).) This argument misses the point of merger clauses. When AML accepted the amended agreement, it acknowledged that the "arrangements and relationships contemplated in this Agreement . . . constitute the sole understanding and agreement of the parties. . . . [and it acknowledged that the agreement] supersedes all other agreements, covenants, representations . . . between the parties[.]" (ECF No. 1-2, PageID.35.) So it is irrelevant whether UWM's promise contradicted or simply varied the terms of the agreement. Either way, the merger clause extinguished the promise.

1998). There, the court stated that "when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause." *Id.* at 419. Relying on this language, AML says it "would not have entered into the [amended agreement] *at all* had it not been for UWM's fraud." (ECF No. 12, PageID.144.) So, says AML, the fraud would "invalidate the entire [amended agreement]." (*Id.*)

But *UAW-GM* itself explains why this argument fails. In that case, a union wished to hold a convention at a hotel, and it wanted the hotel to employ only union workers for the event. 579 N.W.2d at 412. Though the hotel representative orally promised to provide union workers for the event, the contract did not include such a provision but did contain a merger clause. *Id.* Between the execution of the contract and the convention, the hotel was sold, and the union workers were dismissed. *Id.* at 413. So the union cancelled its contract and sued the hotel for fraudulent inducement. *Id.* at 414. The court rejected this claim, concluding that the union's reliance on the promise of a union workforce was unreasonable in light of the merger clause. *Id.* at 419. And the court rejected the union's argument that fraud vitiated the whole contract: "There is no allegation that [the union representative] was defrauded regarding the [merger] clause or defrauded into believing that the written contract included a provision requiring the hotel to use [union workers] when it did not." *Id.* at 420. So the oral promise could not survive the merger clause. The same is true here: AML makes no allegation that it was led to believe that there was no merger

16

clause or that the contract did not include the ultimatum. Indeed, AML's repeated attempts to avoid the ultimatum before formally executing the amended agreement underscores its knowledge of its terms. So fraud does not invalidate the whole contract.

In short, to the extent that AML attempts to plead fraud in the inducement, that claim is not plausible because AML assented to the ultimatum before UWM made any assurances. And even if that were not true, the merger clause would preclude AML's fraudulent-inducement claim.

### 3.

Next consider AML's allegation that "UWM made the aforementioned misrepresentations and false assurances to AML in bad faith without any present intention of performance at the time UWM made the misrepresentations and false assurances." (ECF No. 7, PageID.79–80.) As noted, broken contractual promises are actionable in tort if the promises were "made in bad faith without intention of performance." *See Gage Prod. Co. v. Henkel Corp.*, 393 F.3d 629, 645 (6th Cir. 2004) (quoting *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976)). And as AML hints, "evidence of fraudulent intent, to come within the exception [that fraud cannot be based on a promise of future conduct], must relate to conduct of the actor at the very time of making the representations, or almost immediately thereafter." *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 156 (Mich. Ct. App. 2004).

AML has not plausibly pled a bad-faith promise. Beyond citing conclusory statements in the countercomplaint to suggest that certain UWM representatives made "false, malicious, and willful misrepresentations," AML makes no allegations that UWM made these promises in bad faith. (ECF No. 12, PageID.144); *cf. Foreman v. Foreman*, 701 N.W.2d 167, 178 (Mich. Ct. App. 2005) (finding sufficient evidence of bad faith where Defendant promised his soon-to-be-ex-wife that he had no intention to sell their business when he made contemporaneous, contradictory statements to others that he did plan to sell it). And the countercomplaint acknowledges that UWM made efforts to compete with Rocket Pro, suggesting that UWM tried to keep AML's business in good faith. (ECF No. 7, PageID.73); *DBI Invs.*, 617 F. App'x at 383 (finding that allegations of partial performance defeated inference of bad faith). Without more, "evidence of a broken promise is not evidence of fraud." *See Blackward Properties, LLC v. Bank of Am.*, 476 F. App'x 639, 643 (6th Cir. 2012) (citing *Derderian*, 689 N.W.2d at 156).

### 4.

AML makes one final argument to save this claim; this time relying on an untenable interpretation of the "UWM Guide."

Recall that the UWM Guide is defined as "all verbal procedures and requirements delivered by UWM or its representatives as well as those procedures and requirements contained on UWM's website and all links incorporated therein . . . as amended from time to time." (ECF No. 1-1, PageID.11; ECF No. 1-2, PageID.22.) And recall that section 7.18 directs that "in the event of any conflict,

ambiguity or inconsistency between the terms and conditions contained in this Agreement and those set forth in the UWM Guide, the terms and conditions of the UWM Guide shall be deemed to supersede and control." (*Id.*) Reading these clauses together, AML argues that UWM's verbal promises not to enforce the ultimatum were incorporated into the UWM Guide, and that the terms of the UWM Guide control its relationship with UWM. (ECF No. 12, PageID.143.) So, says AML, the promise became part of the amended agreement itself.  (*Id.*)

There are a number of problems with this argument. For one, the countercomplaint makes no mention of the UWM Guide and does not suggest that UWM's promise became part of the amended agreement. (*See* ECF No. 7.) That is reason enough for this argument to fail. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014) ("Whether [plaintiff] *could* allege some facts to support a claim is not important; what is paramount at the motion-to-dismiss stage is whether [plaintiff] *did* allege sufficient facts in the Complaint."). And AML's failure to plead these facts is underscored by the nature of the claims it did make. If AML believed that the promise not to enforce the ultimatum became part of the amended agreement, it would likely have brought a breach-of-contract claim rather than a fraud claim. (*See* ECF No. 13, PageID.163.) Indeed, it makes little sense to say that UWM's promise not to enforce the ultimatum fraudulently induced AML into executing the amended agreement if that very promise was incorporated into the amended agreement through the UWM Guide.

But even if UWM had pled facts related to the UWM Guide, its argument would fail. To be incorporated into the amended agreement through the UWM Guide, the promise not to enforce the ultimatum must have been a "verbal procedure[] and requirement[] delivered by UWM." (ECF No. 1-2, PageID.22.) AML does not explain how a promise not to enforce the ultimatum is a procedure or requirement. (*See* ECF No. 12.) And the Court does not see how it could be.

When read in context, the phrase "procedures and requirements" in the definition of UWM Guide refers to the procedures and requirements for brokers submitting loan applications. *See Bodnar v. St. John Providence, Inc.*, 933 N.W.2d 363, 373 (Mich. Ct. App. 2019) ("A court's primary obligation when interpreting a contract is to determine the intent of the parties. . . . The parties' intent is discerned from the contractual language as a whole according to its plain and ordinary meaning." (internal citation omitted)). Indeed, the agreement links the terms "procedures," "requirements," and "UWM Guide" to brokers' submissions of loans in several places. Section 1.19 defines "Mortgage Loan Application" as "an application for a Mortgage Loan processed by Broker in accordance with the lending requirements of UWM, including but not limited to those contained in the UWM Guide[.]" (ECF No. 1-2, PageID.21.) And section 2.02, called "UWM Loan Requirements," defines the types of loans UWM will purchase and fund, and then says, "Broker agrees to follow all practices and procedures required by UWM, as modified from time to time, including but not limited to those contained in the UWM Guide[.]" (*Id.* at PageID.22.) And the contract-modification provision itself makes this

20

connection: "This Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, including but not limited to those contained in the UWM Guide, may be amended by UWM from time to time[.]" (ECF No. 1-2, PageID.34.) Given this language, the "verbal procedures and requirements" in the definition of the UWM Guide means the procedures and requirements for loan applications. And that phrase does not speak to UWM's general contractual relationship with its brokers or to its competitive strategy. So AML's efforts to incorporate the promise into the amended agreement fail.

\* \* \*

In conclusion, AML's fraud claim fails because UWM's promise not to enforce the ultimatum is not actionable in fraud, because AML accepted the amended agreement by performance before any promises were made, and because any reliance on the promises was unreasonable. Given this conclusion, the Court need not consider UWM's arguments related to damages. (*See* ECF No. 11, PageID.113–115.)

### B. Promissory Estoppel

AML's promissory-estoppel claim fails for similar reasons.

"The Michigan Supreme Court has held that a party may not premise a promissory estoppel claim on pre-contractual representations where the parties reduce their agreement to a written contract." *See DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 386–87 (6th Cir. 2015) (internal citations and quotations omitted). In other words, promissory estoppel is not "designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract." *See*

*Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990). Because the parties here reduced their agreement to a writing, the claim for promissory estoppel fails.

And even if that were not the case, UWM's promise not to enforce the ultimatum is not the type of promise that can form the basis of a promissory-estoppel claim. Among other things, promissory estoppel requires reasonable reliance. *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 761 N.W.2d 151, 166 (Mich. Ct. App. 2008). And reliance on a promise is not reasonable if the "oral promise expressly contradicts the language of a binding contract." *Id.* As explained at length above, that is the case here. So AML's reliance on the promise was unreasonable. *See Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999). Thus, the Court will dismiss AML's promissory-estoppel claim.

## C. Declaratory Judgment

Finally, AML seeks a declaratory judgment "that the contract was procured by fraud, that the Ultimatum and Liquidated Damages Provision are unconscionable, that the Ultimatum represents an anticompetitive practice in violation of antitrust statutes, and that the Liquidated Damages Provision is an unenforceable penalty which is impermissible as a matter of law." (ECF No. 12, PageID.155.) UWM asks the Court to dismiss this claim as it is "redundant of UWM's claims and AML's putative defenses." (ECF No. 11, PageID.118.) The Court agrees, with one exception.

The Declaratory Judgment Act is "an enabling Act, which confers discretion on the courts rather than an absolute right upon the litigant." *AmSouth Bank v. Dale*,

386 F.3d 763, 784 (6th Cir. 2004). A district court will typically examine "whether a declaratory judgment will 'serve a useful purpose' and if it will 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *See Malibu Media, LLC v. Redacted*, 705 F. App'x 402, 405 (6th Cir. 2017) (quoting *Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)). Some courts have found that a declaratory-judgment counterclaim serves no useful purpose if it is a "mirror image" of the complaint. *Id.* (collecting cases). These courts reason that mirror-image counterclaims serve no purpose because they "would be rendered moot by the adjudication of corresponding claims in the complaint." *See Hardiman v. McKeen*, No. 19-12949, 2020 WL 1821025, at *4 (E.D. Mich. Apr. 10, 2020). But the mirror-image rule applies "only to claims that exactly correspond such that resolution of one claim would entirely dispose of the other claim." *Stryker Corp. v. Ridgeway*, No. 13-1066, 2014 WL 3704284, *1 (W.D. Mich. July 24, 2014) (internal quotation marks omitted). Otherwise, the Court should deny a request to dismiss a counterclaim. *See Orleans Int'l, Inc. v. Mistica Foods, L.L.C.*, No. 15-13525, 2016 WL 3878256, at *2-3 (E.D. Mich. Jul. 18, 2016).

The Court agrees that most of the subclaims in AML's claim for declaratory judgment are a mirror-image of UWM's breach-of-contract claim. For example, given the defenses asserted, the trier of fact will necessarily have to determine whether the contract was procured by fraud, whether the ultimatum is unconscionable, and whether the damages provision is an unenforceable penalty in order to adjudicate UWM's claim. And determination of these issues will turn on the facts and legal

issues in UWM's complaint. So these declaratory-judgment subclaims are mirror images of UWM's claim and serve no useful purpose in this litigation. *See Orleans Int'l, Inc.*, 2016 WL 3878256, at *4. They will be dismissed.

But AML's request for a declaration that "the Ultimatum represents an anticompetitive practice in violation of antitrust statutes" raises a more difficult question. (ECF No. 12, PageID.155.) True, AML did state "antitrust violations" as one of its affirmative defenses. (ECF No. 7, PageID.58.) And illegality is a viable contract defense in Michigan. *See Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 699–702 (6th Cir. 2017). But the disposition of an "antitrust defense" is much narrower than the disposition of an antitrust claim generally. *See id.* at 698–702 (noting that the antitrust defense only applies if the promise to be enforced is illegal "in and of itself," but not if the promise is "part of an agreement containing a separate, illegal provision"). So resolution of the antitrust defense would not necessarily moot a corresponding declaratory-judgment subclaim such that the two are mirror images. So the Court will not dismiss this declaratory-judgment subclaim on that ground.

And because UWM did not propose any other basis to dismiss this counterclaim, the antitrust subclaim will survive.

## IV. Conclusion

Accordingly, the Court GRANTS IN PART UWM's motion to dismiss. (ECF No. 11.) The Court GRANTS UWM's motion to dismiss the fraud claim, the promissory-estoppel claim, and all declaratory-judgment subclaims but one. The request for a

declaration that the ultimatum violated antitrust law is the only surviving counterclaim.

SO ORDERED.

Dated: December 22, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE