# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE, LLC, a Michigan Limited Liability Company,

**DEMAND FOR JURY TRIAL**

      Plaintiff/Counter-Defendant,

v

Case No. 22-cv-10228
Hon. Laurie J. Michelson

AMERICA'S MONEYLINE, INC., a California Company,

      Defendant/Counter-Plaintiff.

---

WILLIAM E. McDONALD III (P76709)
ROGER P. MEYERS (P73255)
MAHDE Y. ABDALLAH (P80121)
LANE MORRISON
MOHEEB H. MURRAY (P63893)
BUSH SEYFERTH PLLC
Attorneys for Plaintiff/Counter-Defendant
100 W. Big Beaver Road, Suite 400
Troy, Michigan 48084
(248) 822-7800
mcdonald@bsplaw.com
meyers@bsplaw.com
abdallah@bsplaw.com
morrison@bsplaw.com
murray@bsplaw.com

JEFFREY B. MORGANROTH (P41670)
JASON R. HIRSCH (P58034)
MORGANROTH & MORGANROTH, PLLC
Attorneys for Defendant/Counter-Plaintiff
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000
jmorganroth@morganrothlaw.com
jhirsch@morganrothlaw.com

MATTHEW D. NOVELLO (P63269)
NOVELLO & ASSOCIATES, PC
Co-counsel for Defendant/Counter-Plaintiff
3542 Lakeview
Highland, Michigan 48356
mnovello@novellolawfirm.com

DAVID A. ETTINGER (P26537)
Co-Counsel for Defendant/Counter-Plaintiff
HONIGMAN LLP
660 Woodward Avenue, Suite 2290
Detroit, MI 48226
(313) 465-7368
DEttinger@honigman.com

---

# AMERICA'S MONEYLINE, INC.'S AMENDED COUNTERCLAIM AGAINST UNITED WHOLESALE MORTGAGE, LLC AND DEMAND FOR JURY TRIAL

Defendant/Counter-Plaintiff, America's Moneyline, Inc. ("AML"), by and through its attorneys, for its Amended Counterclaim against Plaintiff/Counter-Defendant, United Wholesale Mortgage, LLC ("UWM"), states as follows:

1.      This Amended Counterclaim is brought to challenge the Ultimatum and resulting group boycott initiated and coerced by UWM which cut off more than 9,000 mortgage brokers, including AML, from an opportunity to refer their customers to the mortgage lender of their choice. Brokers who participated in the boycott were harmed (and their customers were harmed) by the unavailability of lower priced, better-quality mortgages from Rocket Pro ("Rocket Pro") and Fairway.

2.      Brokers, including AML, who refused to participate in the boycott were harmed (and their customers were harmed) because they could no longer utilize the services of UWM, the dominant wholesale mortgage broker.

3.      The Ultimatum and boycott thereby harmed AML, other brokers, consumers and overall competition in the relevant wholesale mortgage lending submarket.

## JURISDICTION AND PARTIES

4.      AML is a California corporation which conducts business throughout the United States, serving lenders and competing for prospective lenders in California and Michigan, among other places. AML's principal place of business is in California.

5.      AML is a mortgage broker in the business of taking applications for residential mortgage loans, assisting borrowers in: (a) pre-qualifying for mortgage loans, (b) selecting a mortgage product, (c) completing an application, and (d) processing such applications on behalf of others.

6.      UWM is a Michigan limited liability company which has its principal place of business in Oakland County, Michigan. UWM's CEO and principal owner is Mat Ishbia ("Ishbia"). UWM transacts business in this district and is subject to personal jurisdiction therein. UWM's actions complained of herein and giving rise to this Amended Counterclaim originated in this district. Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391.

7.      UWM is engaged in the business of wholesale mortgage lending.

8.      The amount in controversy is in excess of $75,000, exclusive of interest, costs and attorney fees.

9.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and § 2. This Court has exclusive jurisdiction over the claims in this case brought pursuant to the Sherman Act and Clayton Act.

10.     This Court has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. §§ 1332(d) and 1367 because the claims arise from the same

nucleus of operative facts as the federal antitrust law claims, and as such, are so related that they form the same case or controversy.

## AFFECTED COMMERCE

11.     UWM markets, originates and sells its wholesale mortgages in interstate commerce in amounts of more than a billion dollars annually. Similarly, UWM's competitors, Rocket Pro (the wholesale lending division of Rocket Mortgage) and Fairway Mortgage ("Fairway"), market, originate and sell their wholesale mortgages in interstate commerce in amounts of at least hundreds of millions of dollars annually each.

12.     AML arranges for its clients to obtain mortgages predominantly from wholesale mortgage lenders located in other states, and therefore through interstate commerce. AML services at least 29 states, including its home state of California and Michigan. This involves at least tens of millions of dollars annually in loans. Prior to enforcement of the Ultimatum, AML had obtained millions of dollars of loans in interstate commerce from UWM. Those loans are now denied to AML.

13.     UWM's actions as described herein caused a shift in origination of mortgages in interstate commerce away from Rocket Pro and Fairway in some cases, and away from UWM in other cases, described more fully below, in the amount of at least hundreds of millions of dollars annually. These actions cost AML loans in the amounts of at least millions of dollars. In particular, the loans in AML's pipeline

that UWM refused to honor (as described below) involved millions of dollars in interstate commerce. AML also provides at least tens of millions of dollars of loans in interstate commerce to borrowers with credit scores below the minimums offered by UWM (as further described below). UWM's actions also caused consumers to pay higher prices and obtain lower quality mortgages in interstate commerce in amounts of at least tens of millions of dollars of mortgages annually.

14.     All of UWM's anticompetitive actions described herein were initiated from UWM's headquarters in Michigan. The anticompetitive effects described herein, were felt in, among other locations, Michigan, including effects on brokers and consumers in Michigan. AML has suffered damages through loss of business in Michigan.

## FACTUAL BACKGROUND

### The Wholesale Mortgage Broker Market

15.     A relevant market or relevant sub-market in this case is the national market for wholesale lending through mortgages sold through mortgage brokers.

16.     UWM is a Wholesale Mortgage Lender. Wholesale mortgage lenders offer mortgage loans through independent third parties, such as mortgage brokers. As such, wholesale mortgage lenders do not work directly with consumers/borrowers until after a loan has been funded, if at all. Wholesale mortgage lenders generally fund and, in some instances, service loans, including

4

collecting payments after funding. There is no substitute for mortgage lending for most consumers, who need to borrow money to be able to afford to buy a house and need to offer the home as security (in a mortgage) in order to obtain reasonable credit terms.

17.     By comparison, a Retail Mortgage Lender deals directly with consumers/prospective borrowers from the beginning of a transaction, including providing loan applications and collecting completed loan applications, performing income verification and collecting other required documentation, as well as quoting interest rates.

18.     For wholesale lending, third parties, such as mortgage brokers, provide loan applications to the consumer/prospective borrower, collect completed loan applications, perform income verification and collect other required documentation. Additionally, mortgage brokers advise the customer of available interest rates and loan terms and select a particular wholesale mortgage lender in order to find the best mortgage loan product and pricing for their client.

19.     The central pillar of the mortgage broker business is independence – the ability of the broker to choose from a variety of wholesale lenders to select the mortgage product and experience that best matches the specific needs of the broker's client (the consumer seeking a mortgage).

20.     Buyers may opt to hire an independent mortgage advisor or broker to

search and match the buyer to a mortgage that satisfies the buyer's needs and preferences. The broker's value rests in his or her sophistication and knowledge of mortgage options that various wholesale lenders offer. The broker can often find mortgage options that are less expensive, but still meet the buyer's preferences, based on the broker's knowledge of which wholesale lenders' options are most suitable for each particular buyer. The mortgage broker can also choose among lenders with respect to the services (and quality of services) they offer. Brokers prefer to have more choices in wholesale lenders, and therefore more mortgage options available, because the larger the menu from which a broker can provide options, the more likely the broker can find a favorable mortgage for the broker's clients.

21.     Successful mortgage brokers need to have a variety of wholesale mortgage lenders available to them. As UWM stated in its most recent annual report, "Independent Mortgage Brokers are able to provide borrowers with multiple options on product structure and pricing rather than being rooted in a single platform offering, which we believe empowers borrowers and enhances their borrowing experience." That is because the wholesale mortgage lenders' prices vary significantly over time. The quality of their services can also vary significantly. Depending on how busy a wholesale mortgage lender is, at a particular moment in time, it may be more or less able to fund a loan in a short period of time. Therefore,

mortgage brokers need to be able to choose among different lenders on a day to day basis.

22.     Mortgage brokers compete for the business of consumers seeking mortgages, and attempt to solicit and develop client relationships with such consumers in order to place them with a wholesale lender to originate a mortgage loan that best matches with the consumer's needs. This competition occurs throughout the State of Michigan and the United States. All mortgage brokers thus operate at the same market level. Mortgage brokers engage in this competition through advertising, internet marketing, involvement in community activities, consumer mailings, and competition to obtain referrals from real estate brokers and agents.

23.     Other facts supporting the conclusion that wholesale mortgage lending is a separate submarket include the following:

    A. A distinct group of customers (those who choose to engage mortgage brokers and utilize wholesale lenders);

    B. The wholesale lending channel is recognized as separate and distinct by mortgage brokers and others within the mortgage industry;

    C. Mortgage brokers are specialized vendors focused on local marketing to consumers and on surveying, and selecting among, mortgage wholesale lenders;

    D. Wholesale mortgage lenders, unlike retail mortgage lenders, do not operate facilities for marketing directly to the consumer, and do not engage in direct marketing (unless they

also operate in the retail channel); and

E. UWM asserts that the typical borrower who uses a mortgage broker will save $9,400 over the life of the loan as compared to a borrower who uses a standard retail shop.

24. According to Ishbia, brokers are "dominant" in the wholesale mortgage market, and grow faster than the retail submarket. This is evidence of the distinct demand for brokers, and therefore for wholesale lending.

25. UWM is the largest wholesale mortgage lender, with a most recent approximate 54% share of the wholesale market. This share increased from 34% in 2020. UWM boasts that it has over 12,000 mortgage brokers under contract with it. This represents significantly more than 60% of the wholesale mortgage brokers in the United States.

26. Fairway offers retail mortgage lending through its retail mortgage lending division, as well as wholesale mortgage lending through its Fairway Wholesale Lending division. Fairway markets loans throughout the United States.

27. Rocket Mortgage offers retail mortgage lending through its retail mortgage lending division. Rocket Mortgage also offers wholesale mortgage lending through its wholesale mortgage lending division, Rocket Pro. Fairway and Rocket are direct competitors of UWM in the wholesale/broker channel. At the time of the boycott, Fairway and Rocket Pro had the largest market shares in the wholesale space other than UWM and were UWM's most significant rivals and closest

competitors.

28.     Rocket Mortgage, through Rocket Pro, offers a number of benefits to

mortgage brokers and their customers. For example:

> A. Rocket Mortgage is a very well-recognized national brand which is attractive to customers and therefore provides a benefit to the mortgage brokers who service those customers.
>
> B. Rocket Mortgage is less restrictive in the credit scores it requires than is UWM and therefore provides an opportunity for loans to consumers who would not be considered qualified by UWM. Ishbia has stated that FICO (credit) scores of UWM's borrowers are the "highest in the country," and that UWM's competitors are "doing riskier loans. [UWM] just [doesn't] do it." Ishbia has also stated that UWM will not offer loans to consumers with less than a minimum 620 FICO credit score. AML consistently used Rocket for mortgage loans to customers with credit scores which were too low to qualify for a UWM loan.
>
> C. Rocket Mortgage often offers lower cost, better mortgage insurance than does UWM. For example, Rocket Mortgage outranked UWM (and was second among all mortgage lenders) in J.D. Powers 2022 Mortgage Servicers Satisfaction study. Bankrate scored both Rocket Mortgage and Fairway higher than UWM in all three scoring components: (1) affordability; (2) availability; and (3) borrower experience.

29.     Fairway Mortgage also offers many benefits to consumers:

> A. Fairway is also a very well recognized national brand, identified as the best mortgage lender for USDA loans by the Ascent. Fairway states it was number one in FHA mortgage purchase volume in 2019 and number four in VA mortgage purchase units and volume in 2020; and
>
> B. Fairway has over 750 branch and satellite locations.

30.     Rocket frequently offers better prices than UWM. Ishbia has stated that

UWM is "not trying to be the best priced." One broker has stated that Rocket Pro "consistently beat[s] UWM in price across every product type offered." Another broker stated that UWM's "pricing is often higher than their competitors[.]" One broker identified an example where Rocket Pro's cost to borrow was less than 15% of that of UWM. While prices can vary from day to day, Rocket Pro's prices today are (and at the time of the commencement of the boycott, described below here) lower than UWM's prices are the majority of the time.

31.     UWM's parent has admitted that "[s]ome of our competitors may have . . . more operational flexibility in approving loans."

32.     AML began using Rocket Pro in 2020 after it was approached by Rocket Pro. AML found that Rocket Pro provided very good price and services, including by far the best service and best prices for loans involving consumers with low credit scores, typically poorer and more disadvantaged consumers. Other firms serving consumers with low credit scores commonly provide inconsistent service. Rocket Pro's low prices provided AML with a significant advantage which boosted its sales.

33.     Rocket Pro frequently provided the best prices overall in the market at the time AML began using it. The same is true today.

34.     From 2018 to 2021, Rocket Pro's wholesale business increased from 3,000 mortgage broker partners to 10,000 mortgage broker partners, reflecting the

fact that Rocket Pro's products and prices were especially attractive to mortgage brokers and their customers. Rocket Pro stated that it invested $100 million into the broker channel alone in 2021.

35.     During February, 2021, Rocket Pro originated as many wholesale mortgage loans as did UWM. This, in turn, led to lower rates for consumers/prospective borrowers.

## The Anticompetitive Scheme

36.     On January 22, 2021, UWM's parent company, United Wholesale Mortgage Holdings Corporation ("UWM Holdings"), became a publicly traded company on the New York Stock Exchange.

37.     In order to mitigate the risk of losing more market share to Rocket Pro and Fairway to react to declines in the share price of UWM Holdings, and to increase UWM's dominance in the wholesale market, on March 4, 2021, UWM orchestrated an anticompetitive scheme. At a virtual event hosted by UWM, UWM's CEO, Mat Ishbia publicly announced, via a video posted on UWM's Facebook page, an ultimatum by UWM to mortgage brokers (the "Ultimatum"). In the video, Ishbia demanded that mortgage brokers boycott Rocket Pro and Fairway. Ishbia stated that "if you work with them [Fairway Mortgage and Rocket Pro], you can't work with UWM, effective immediately."

38.     In order to implement the Ultimatum and coerce the boycott of Fairway

and Rocket Pro, UWM advised its broker clients who also did business with Fairway and Rocket Pro that they were required to consent to a contract addendum ("Addendum"). The Addendum sent to the mortgage brokers provided, in pertinent part that brokers who worked with UWM could not utilize Rocket Pro or Fairway, or face significant penalties.

39.     Ishbia stated on the video chat on Facebook that one purpose of the boycott related to efforts to prevent Fairway's and Rocket Mortgage's competition at retail. Ishbia stated that "[w]e don't need to fund Fairway Independent or Rocket Mortgage to try to put brokers out of business."

40.     Many brokers in attendance at the virtual event explicitly heeded Ishbia's clarion call to boycott UWM's closest competitors, providing public comments viewed by all other participating brokers as part of the live Facebook event. These communications included many expressions of agreement. The statements included:

- "We are ALL IN" "unstoppable together …";

- "We are all family! Brokers are better when we work together";

- "Brokers are family. We don't go against our family";

- "All in … with us or out";

- "You're either with the captain [UWM] or off the boat";

- "with us or against us"; and

- "all for one and one for all."

41.     Other comments reflecting an agreement to boycott were the following:

- "Team Broker!"; Let's kill it fam- --you know it's going to be good";

- "BROKERS---WAKE UP!!! Stop sending files to the enemy! Protect your book of business" "This is what we have been waiting for broker community";

- "We are ALL IN" "unstoppable together"; "Sign on the line that is dotted";

- "All in"; and

- "With us or out."

42.     Ishbia's statements, and these brokers' communications, took place in complete public view on a forum (a Facebook site) accessible to thousands of brokers. Ishbia repeatedly referred to this collective action as the "'all in' initiative." Ishbia stated that "all of our current clients are aligned" with respect to this initiative. Ishbia also stated that the participating brokers "have locked arms with us."

43.     Brokers also used UWM's Facebook page to discourage and disparage brokers who disagreed with the boycott. For example, Broker C joined the discussion to express his opposition to the boycott. Broker A castigated Broker C and accused Broker C: "[you] don't care about the [broker] channel as a whole."

44.     Brokers also facilitated and offered assistance to other brokers to sign

UWM's Addendum. Broker E asked other brokers, "Where do we get the form to sign[?]" and received a response from another broker with instructions on how to access the Addendum as well as advice for how to terminate his broker agreement with Rocket Pro.

45.     That same day, the Association of Independent Mortgage Experts ("AIME") issued its own letter voicing support for the boycott orchestrated by UWM. As part of the live chat, AIME stated during the Facebook video: "Work with TRUE lender partners. Let's strengthen the challenge!" AIME receives significant funding from UWM and routinely works with UWM on its marketing efforts. AIME states that its members "come from every region across the country."

46.     AIME describes itself as "a community" of "mortgage professionals" and says its members include "wholesale mortgage professionals", independent mortgage brokers and persons "affiliated with a company that does not underwrite its own loans." AIME says that it is "the only non-profit trade association dedicated exclusively to independent mortgage brokers." AIME encouraged its members, mortgage brokers, to join they boycott. AIME's actions reflected the collective agreement of its members, who it represents.

47.     UWM stated that brokers should take this action in order to retaliate against, and deter, retail competition. AIME referred to the initiative as "brokers rallying against whole-tail lending" or BRAWL. "Whole-tail lending" refers to

lenders, like Rocket Mortgage and Fairway, who operate in both the wholesale and retail segments. Ishbia stated that this initiative could deter retail lenders from competing aggressively in the wholesale space.

48.     Other than AIME, mortgage brokers belong to a number of trade groups and collective organizations, including the National Association of Mortgage Brokers, Mortgage Brokers United, and Brokers Are Better. All of these trade associations, which have regular meetings and, in the case of Brokers Are Better, had a private Facebook discussion page, have provided significant vehicles for communication and agreement between the mortgage brokers with regard to the boycott.

49.     Through its Facebook page, UWM hosted a digital forum where brokers could discuss, facilitate and organize the boycott. Brokers worked to persuade other brokers to join the boycott. In one conversation, Broker A urged Broker B to engage with Rocket Pro "no more! Sign the addendum." Broker B confirmed that she signed the addendum just one hour later, to which Broker A replied, "great job!"

50.     UWM further facilitated the boycott by providing forums for mortgage brokers to join the boycott in plain sight, assisting each other with terminating their relationships with Rocket Pro and Fairway. UWM joined in facilitating these terminations.

51.     Later in the day, following the Facebook Live announcement, Ishbia appeared in an interview conducted by mortgage news outlet HousingWire for its Spring Summit. This interview was broadcast live to registrants, many of whom were brokers. Ishbia repeated his announcement that UWM would cease working with any broker who continued to work with Rocket Pro and Fairway. When HousingWire's interviewer asked Ishbia how UWM intended to "enforce" this boycott, Ishbia replied: "[E]veryone's going to sign an addendum that says 'hey listen, we're not working with those two lenders.'"

52.     As is customary, HousingWire's real-time chat feature also displayed comments made by viewers during the broadcasted interview. Brokers signaled their agreement to join the boycott with statements, such as "Let's go!" and "Dominate!", which were visible to other brokers.

53.     UWM employees were not mere hosts of broker discussions and agreements on Facebook; they were active facilitators. A UWM employee responded to a broker who expressed concern about the boycott by stating that "every move we make is to protect UWM and the broker channel long term. Let's chat next week!" A different UWM employee, using Facebook's emoji feature, "liked" broker comments that indicated they had joined the boycott.

## Results of the Anticompetitive Scheme

54.     The boycott was highly successful. UWM announced "93% of the

brokers presented with the addendum agreed to join the boycott."

55.      UWM later stated that more than 11,000 of 12,000 brokers participated in the initiative. UWM stated that "not even 500" of its brokers declined to participate in the boycott. Ishbia stated to the press that "I couldn't have imagined it going so well." UWM also stated that after the boycott was initiated, UWM received more than 17,000 more loan applications in April than it had in the month prior to the boycott. Ishbia predicted on the video that Rocket Pro and Fairway would lose 70%-90% of their business.

56.      The success of the initiative, and UWM's plans for market domination, are reflected in Ishbia's June 2021 statement that it was "more than realistic" that UWM would pass Rocket Mortgage in total mortgage loan business. In significant part due to the boycott, this has now occurred. Ishbia recently said that "UWM is the largest mortgage company in America." UWM's share of the wholesale market increased from 34% in 2020 to 54% today, and Rocket's and Fairway's shares have dropped significantly. Consequently, AML is foreclosed from accessing more than 50% of the market as a result of UWM's Ultimatum and boycott.

57.      UWM now says (in its most recent annual report) that it has agreements with more than 12,000 individual brokers.

58.      During UWM's Q4 2022 earnings call, Ishbia indicated that 2022 was UWM's "eighth consecutive year as the number one wholesale lender". Ishbia has

repeatedly referred to UWM in recent interviews as "dominant" or as "dominat[ing]" the wholesale markets.

59.     In a February 2023 interview with the Detroit News, Ishbia explained why the boycott was successful:

>   A.  "The penalty of working with Rocket … is you don't get to work with UWM. And nobody is willing to take that chance."; and
>
>   B.  The lenders against whom UWM has filed lawsuits, including AML, "no longer work with UWM. That's the penalty. Once you have brokers that don't work [with] UWM, they lose out. That's why of the 12,000 brokers, 11,5000 all stayed with UWM."

60.     Ishbia has directly linked UWM's growth and Rocket's decline to the success of the boycott, stating in his recent Detroit News interview that "[w]hen we announced the [Ultimatum], they [Rocket Mortgage] were more than twice my size overall, not wholesale, overall. Now I'm [UWM] bigger than them."

61.     The boycott resulted in a dramatic change in behavior by the boycotting brokers, who, until that time, had been utilizing Rocket Pro and Fairway in increasing numbers because of Rocket Pro's and Fairway's strong reputations, good prices and high-quality service. It was therefore contrary to the brokers' best interests to refuse to use Rocket Pro and Fairway, except for the facts of UWM's coercion and the brokers' agreement to collectively boycott Rocket Pro and Fairway based upon UWM's requirement that the brokers sign the Addendum.

62.     Notwithstanding UWM's coercion, individual mortgage brokers would

have suffered even greater harm through their agreement not to do business with Fairway and Rocket Pro had it not been for the collective decision of the vast majority of the brokers to together refuse to use those wholesale mortgage alternatives. If an individual broker deprived itself of the availability of alternative loans from Fairway and Rocket Pro, it could expect to lose substantial business to other brokers who did continue to offer these alternatives unless large numbers of competing brokers were collectively "all in." The brokers noted that they were "unstoppable together". Thus, when the brokers acted collectively, such action reduced the harm to individual brokers from the refusal to deal with Rocket Pro and Fairway, but greatly harmed the overall marketplace by reducing consumer choice. This concerted action, orchestrated by UWM, provided strong motivation for the brokers to act collectively.

### AML's Agreements with Wholesale Mortgage Lenders

63.      AML executed a Wholesale Broker Agreement with UWM on April 14, 2020 (the "Original AML/UWM Agreement").

64.      As is customary, the Original AML/UWM Agreement did not restrict AML from conducting business with wholesale mortgage lenders other than UWM.

65.      AML executed a Wholesale Broker Agreement with Rocket Pro on November 18, 2020 (the "AML/Rocket Pro Agreement").

66.      As is customary, the AML/Rocket Pro Agreement does not restrict or

19

prohibit AML from doing business with any wholesale mortgage lender including UWM.

67.     In addition to utilizing Rocket Pro and UWM, and in effort to provide the most competitive and cost-effective options to its home buying clients, AML has also entered into lending relationships with other wholesale lenders.

68.     AML has had the exact same compensation plan with all of the wholesale lenders with whom it does business, including UWM and Rocket Pro. There is no financial benefit for AML to send loans to UWM or Rocket Pro, or to any other wholesale lenders. The only advantages are to offer better products and service to more borrowers, coupled with lower interest rates for those consumers, which is the goal of the regulatory environment of mortgage brokerage.

## UWM Demands that AML Agree to the Ultimatum

69.     On March 5, 2021, UWM sent an email to AML demanding that AML accept UWM's new, amended broker agreement which included the Ultimatum and Addendum (the "Amended AML/UWM Agreement").

70.     Specifically, the Amended AML/UWM Agreement provided to AML included a provision that prohibited AML on behalf of its clients (borrowers) from conducting business with Rocket Mortgage and Fairway.

71.     Specifically, Section 3.03 of the Amended AML/UWM Agreement states:

**Broker Warranties & Representations.** Broker hereby warrants, represents and covenants to UWM with regard to each Mortgage Loan submitted to UWM for underwriting, purchase and/or funding that the following are true, complete and correct in all material respects as of the date of such submission, as if such warranties, representations and covenants are again made by Broker on those dates and shall continue to be valid and accurate throughout the entire lending process: …

(x) Broker will *not* submit a mortgage loan or mortgage loan application to *Rocket Mortgage* or Fairway Independent Mortgage for review, underwriting, purchase, and/or funding. This requirement is limited to Rocket Mortgage and Fairway Independent Mortgage. UWM will not add any other mortgage lender. If either Rocket Mortgage or Fairway Independent Mortgage acquire a mortgage lender (an "Acquired Lender"), this requirement applies only on a going forward basis as to the Acquired Lender, and is not effective as to the Acquired Lender until thirty (30) days after the acquisition is closed. (emphasis added).

72.     In addition, Section 7.30 of the Amended AML/UWM Agreement imposed a draconian and anticompetitive penalty of the greater of: (a) $5,000.00 per loan closed with UWM; or (b) $50,000.00, without the need for any proof of damages (the "Liquidated Damages Provision").

73.     The $5,000 sum is not a reasonable estimate of damages, but is a penalty imposed by UWM.

## AML's Interactions with UWM

74.     Pursuant to AML's regular interactions with UWM's Director of National Accounts, Bryan A. Miller ("Miller"), AML's Chief Executive Officer, Shawn Nevin ("Nevin"), sent Miller an email dated March 23, 2021 explaining why

UWM's Ultimatum was harmful and damaging to AML and its clients, the broker community and consumers (borrowers) seeking mortgage loans. AML specifically noted that UWM's demand that brokers execute the Ultimatum would eliminate sales opportunities and restrict AML from offering competitive pricing to its home purchasing and refinancing clientele.

75.     Nevin, on behalf of AML, reminded UWM senior executives that Rocket Pro had been more consistently providing better pricing than UWM provided, as well alternative programs on its mortgage loans that UWM did not offer. AML on several occasions sent Miller and Scott Welty ("Welty ") examples of pricing scenarios where Rocket Pro beat UWM's pricing on the same mortgage loans.

76.     Because Rocket Pro is the only wholesale mortgage lender that provides good service, high quality loans for consumers with poor credit scores, the Addendum requirement that AML cease using Rocket Pro would have eliminated AML's ability to effectively service this segment of the market.

77.     As of June 1, 2021, AML continued to do business with Rocket Pro and UWM, and had not signed the Amended AML/UWM Agreement containing the Ultimatum and Liquidated Damages Provision as demanded by UWM.

78.     After AML refused to execute the Amended AML/UWM Agreement, UWM began adding language to its conditional approval letters for pending AML

mortgage loans requiring that AML execute the Amended AML/UWM Agreement before UWM would close any further loans originated by AML. Unexpectedly and without prior discussion, UWM then ceased funding any existing loans in AML's lending pipeline. This included over 100 loans, which was indicative of UWM's market strength.

79.     In response, AML delivered an executed copy of the Amended AML/UWM Agreement to UWM on June 14, 2021, but with the Ultimatum and Liquidated Damages Provision stricken.

80.     Welty of UWM informed AML that UWM refused to accept the Amended AML/UWM Agreement with the Ultimatum stricken and demanded that the unmodified Amended AML/UWM Agreement (*i.e.*, the version including the Ultimatum) be executed by AML before UWM would close any of the loans originated by AML, including all loans in AML's lending pipeline with UWM.

81.     AML was forced to execute the Amended AML/UWM Agreement. It then ceased obtaining loans from Rocket and Fairway.

82.     However, this caused too much damage to AML. Within a month after executing the Amended AML/UWM Agreement, AML informed UWM that it was cancelling and terminating the relationship with UWM.

83.     During a September 19, 2021 telephone call, Miller of UWM told Dean Lob ("Lob") of AML that Ishbia was aware that AML had closed about 60 loans

with Rocket Pro in the second quarter of 2021. Lob explained to Miller that Rocket Pro was offering lower interest rates and more product offerings for customers with less than perfect credit, as outlined above, and UWM would have to offer lower rates in order to compete with Rocket Pro's better pricing. Lob further asked Miller to arrange a call with Ishbia about improving the VA and conventional mortgage pricing offered by UWM which, if done, would allow AML to send more business to UWM if UWM's pricing improved.

84.     In response, UWM purported to offer loans that were more competitive with Rocket. Subsequently, AML learned that UWM's purported pricing improvements were actually short-term pricing adjustments, such as an improved price on a Monday but a reversion to a higher price a few days later, which were not beneficial to the broker community, AML or consumers (borrowers).

85.     In December, 2021, UWM insisted that AML comply with the Ultimatum and cease doing business with Rocket.

86.     During a December 9, 2021 telephone call, Miller asked point blank whether AML was ready to end its relationship with Rocket Pro. Lob reiterated the sticking points that AML had previously explained to UWM regarding UWM's uncompetitive pricing and AML's need to offer its clients the best possible pricing.

87.     UWM's Senior Legal Counsel, Adam Wolfe ("Wolfe"), who was not initially identified as a participant on the December 9, 2021 telephone call,

unexpectedly introduced himself halfway through the call and stated that he, on

behalf of UWM, needed to know exactly what AML's decision was going to be (*i.e.*,

whether AML would end its relationship with Rocket Pro). Lob, surprised at having

UWM's senior legal counsel listening in and previously unannounced on the call,

again reiterated to Wolfe everything he had previously expressed to Miller as to why

AML was continuing to use Rocket Pro. At that point, Miller indicated that AML

must stop doing business with Rocket Pro effective immediately because other

brokers were calling UWM and demanding that they also be allowed to do business

with Rocket Pro, since they had heard that AML was using both UWM and Rocket

Pro.

88.    On December 13, 2021, Nevin had a telephone conversation with

Miller. During the December 13, 2021 telephone call:

   a.  Miller told Nevin that AML needed to make a decision as to the
       Ultimatum and the choice had to be made between UWM and
       Rocket Pro;

   b.  Nevin told Miller that this was not a choice that AML wanted to
       make, but, if forced to do so, AML had to select Rocket Pro in
       light of the critical importance of being able to offer the best
       pricing to AML's clients which was more consistently provided
       by Rocket Pro, as well as UWM inability to offer programs for
       borrowers with less than perfect credit scores.

   c.  Nevin asked Miller to permit AML to close out AML's active
       loan pipeline with UWM and to provide 60 days in which to do
       so in order to avoid consumer harm.

   d.  Miller stopped Nevin and asked if this was AML's final decision

and informed Nevin that, if it was AML's final decision, Miller could no longer protect AML from what would happen next.

e.  Nevin indicated that he did not understand what Miller was implying. Miller explained that, as a result of AML's decision to maintain its relationship with Rocket Pro, there would likely be strong repercussions from UWM and specifically indicated that AML would likely be fined based on the Ultimatum and Liquidated Damages Provision in the Amended AML/UWM Agreement.

89.    On December 15, 2021, AML received a letter from UWM's counsel demanding a payment of liquidated damages in the exorbitant amount of $1.9 million purportedly based upon AML's breach of the Ultimatum.

90.    On January 31, 2022, in the midst of negotiations as to possible methods to resolve this situation, UWM ceased funding any of AML's loans in AML's lending pipeline with UWM, thereby barring AML from moving forward with UWM.

91.    On February 3, 2022, UWM filed its Complaint against AML, replete with false and misleading factual allegations, and engaged in a false and misleading publicity campaign directed against AML in an attempt to damage and destroy AML.

**<u>Market Power and Barriers to Entry</u>**

92.    UWM has dominated the wholesale sub-market as the top wholesale lender for the past seven years. As described above, UWM now has a 54% share in that market.

93.     UWM's dominance is understated by its market share, because many of the smaller firms in the market provide poor service and are not good alternatives for brokers such as AML. For example, several of the firms that provide service to consumers with low credit scores are very slow in approving loans and often change their requirements to approve a loan in the course of the loan process. Smaller firms also tend to be higher priced. They are also very slow in closing loans, often taking as long as 8-10 weeks. Many smaller firms are not licensed in all states, do not have help desks to deal with problems and often do not offer all products. For example, some do not offer FHA-guaranteed loans, which are commonly used by first time homebuyers who cannot afford large down payments. Rocket does not have any of those deficiencies. Rocket Pro is the only firm in the market that provides loans to consumers with low credit scores that is able to do so through consistent rapid and high quality service (generally taking 30 days or less to close its loans).

94.     UWM's dominance and market power have also been enhanced by the exit of many wholesale lenders from the market. According to Jay Farner of Rocket, half of the top ten lenders have exited.

95.     Hundreds of firms have recently exited the wholesale market. Wells Fargo (which was at one time the market leader) has dramatically curtailed its role in the wholesale mortgage market, and now only serves existing customers and minority communities. Another very significant firm that exited the market,

loandepot, was frequently used by AML, but is no longer available to AML.

96.     Many of the firms exiting the market were smaller firms that were unable to compete effectively. According to Ishbia, UWM enjoys significant competitive advantages because of its "scale."

97.     UWM stated in its most recent annual report that: "[o]ur volume allows for significant investment in automating each step of the residential loan process, which in turn reduces error rates, improves customer service and enhances efficiency." Smaller wholesale lenders do not have the volumes to obtain these advantages.

98.     UWM is likely to maintain its market dominance. Many brokers who now exclusively or virtually exclusively utilize UWM, because the best available alternatives, Rocket Pro and Fairway, are not permitted under UWM's Ultimatum, have developed routines and processes that comport with UWM's procedures. As a result, there will be significant costs to these brokers from switching to other lenders. They are therefore unlikely to do so.

99.     UWM's market power is also evidenced by Ishbia's statements in UWM's most recent earnings call that UWM has "great control of our margins" and that "we do control the margins in this industry." Thus UWM is able to control price in the market.

100.     As a result of its market power, UWM was able to compel more than

10,000 brokers to agree to refuse to deal with Rocket Pro and Fairway when they had previously often chosen to use those mortgage lenders because of their competitive price quality and service. This reflects UWM's market power. These brokers could not afford to cease offering UWM, the leading broker in the market. Therefore, they were forced to collectively agree not to deal with Rocket Pro and Fairway, foregoing significant benefits to them and to their customers.

101.    There are significant barriers to entry into wholesale mortgage lending which further allows UWM to implement its plan of monopolization. To be an effective competitor in the wholesale mortgage loan market, a firm needs to achieve each of the following requirements:

A. Every successful competitor needs a sophisticated electronic platform that allows quick approval and closing of loans. This requires substantial technical expertise and software development that can take years to complete and cost millions of dollars.

B. Effective competitors need at least hundreds, if not thousands, of qualified personnel working for them. Since there is no such pool of personnel available in the economy, to be an effective competitor a wholesale mortgage lender needs to have its own training program to develop personnel with the requisite skills. This takes substantial time and resources to develop. There is a shortage of experienced professionals in the mortgage loan business.

C. In order to attract large numbers of mortgage brokers, a wholesale mortgage lender needs a substantial sales force and needs to develop a significant reputation. It also needs to overcome entrenched preferences among mortgage brokers and consumers. This also requires significant time and

substantial resources.

D. A successful wholesale mortgage lender needs to satisfy licensing requirements on a state-by-state basis, as well as compliance with Fannie Mae/Freddie Mac and VA guidelines for firms whose mortgages qualify for mortgage insurance. It requires substantial resources to meet all these requirements, which also takes substantial time to achieve.

E. A wholesale mortgage lender needs substantial funds in order to provide loans at a sufficient scale to be an effective competitor. It also needs to possess sufficient funds to advance funds when borrowers do not make payments. This requires tens of millions of dollars of capital.

102. For all these reasons, firms cannot enter and become successful competitors in the wholesale mortgage loan market without the expenditure of substantial resources and efforts over a substantial period of time, generally several years.

103. But for UWM's enormous market power, UWM would not have been able to demand that brokers execute the Ultimatum and/or participate in the boycott at all.

## Anticompetitive Effects of UWM's Conduct and Harm to AML, Other Brokers and Consumers

104. The boycott and Ultimatum have had the effect of increasing the costs of mortgage loans and has increased the cost of operations of AML. Those acquiescing in the Ultimatum are now prohibited from making application for and obtaining better-suited and/or lower-priced mortgage loan products from Fairway

and Rocket Pro. While there are other alternatives in the wholesale mortgage market, elimination of two of the leading and largest wholesale mortgage lenders, who are very highly rated and offer very competitive prices, significantly reduced competition in the relevant market. Brokers like AML who have refused to comply with the Addendum have lost the opportunity to provide UWM loans.

105.    The boycott also harmed consumers utilizing terminated brokers such as AML because those consumers did not have the opportunity to consider a UWM mortgage.

106.    The boycott diminished competition with Rocket Pro and Fairway on innovation, price and quality of product. The Ultimatum prevented mortgage brokers and prospective home buyers from achieving the lowest price and often better quality products. The boycott insulated UWM from the need to compete with Rocket Pro or Fairway's wholesale products on price or quality in a free, fair and competitive market.

107.    On its website, AIME states that brokers "are the wholesale lender's valued client. They compete for your business by providing top of the line service to make sure you are a repeat customer." AIME further states on its website that mortgage brokers "work for the borrower, not the bank. Independent mortgage brokers have flexibility to shop rates from multiple lenders[.]" That flexibility, and that service to the borrower, rather than any particular lender, was seriously

disrupted by the boycott.

108.     The Ultimatum, Addendum and the boycott caused serious injury to AML and other independent mortgage brokers. All of those brokers were denied an opportunity to offer the full range of mortgage lending alternatives in the market to their clients. All were deprived of the ability to offer all the leading mortgage lenders to their clients. Those who refused the Ultimatum were unable to offer UWM loans. Those who accepted the Ultimatum and joined the boycott were unable to offer lower priced, higher quality Rocket Pro and Fairway loans to their customers. All these brokers were unable to satisfy their duties as agents of their customers who do their best to provide their customers with the best alternative in the market. This interfered with the traditional role of the mortgage broker, as described by mortgage brokers and by their trade associations. The Ultimatum and boycott interfered with that competition, and reduced incentives for UWM to provide "top line service" since it no longer had to fear competition from its primary rivals, Rocket Pro and Fairway.

109.     AML and other brokers who refused the Ultimatum were further injured because of the large number of brokers who accepted the Ultimatum and boycotted Rocket Pro and Fairway. As a result, most of AML's competitors can offer UWM products, and this can potentially provide them with an advantage in the marketplace for customers who desire to utilize a UWM product.

110.     These facts are further reflected in the comments of a number of

brokers. Some brokers who viewed UWM's Facebook Live broadcast were opposed to the boycott and believed it would harm brokers and result in worse loan offerings for consumers. As one commenter noted:

> Just like Thanos, Matt thinks *eliminating competition through force* will create a utopia. *As a broker, it's tough to work with a lender who wants to dictate the other lenders you can work with* ... Consider that today for a 30YR Fixed Refinance with a $320,000 loan amount at 80 LTV with an 800 Score, SFR, Primary, Lender Fee buyout, at a 2.75% Lender paid comp: UWM is at 2.99 with a 2.31 Cost to the borrower, while Rocket Pro is at a .43 Cost to the borrower. *If UWM wants to prevent us from using the best priced lender, maybe they should offer competitive pricing so we can compete for refis*. (emphasis added).

111.    Other commenters also complained about UWM's attempt to eliminate their free choice and reduce competition:

> Love UWM. Very happy with them. But change is too abrupt does not give us time to adjust. *Having competition keeps everyone honest. Concerned that if they have no competition, we The Brokers lose*. It's a tough one.
>
> ***
>
> No. Please reconsider the quicken fee. *We need option! Do not restrict!!!! We need to stay open to give clients good competition good options!* (emphasis added).

112.    Bob Broeksmit, President of the Mortgage Bankers Association, said it "does not condone activities designed to thwart competition in the mortgage market and limit loan options available to borrowers."

113.    Kimber White, president of the National Association of Mortgage

Brokers, concurred, calling the move "counter to the spirit of freedom and independence that is the very foundation of our broker business. You should be allowed to work with whomever you want, and who offers the best product and customer service, not a company who dictates your business model to you."

114. Other brokers recognized that, "[a]s independent brokers we need to be able to shop for the best terms and best programs for our clients, the American people." Brokers recognized that UWM's actions involve "bullying" and "tyranny". Brokers stated that the "mortgage broker channel is being harmed as a result of this UWM mandate." Another broker stated that "UWM's true goal [is] seeking to control independent brokers to such an extent that they ultimately become effective arms of UWM."

115. Several commenters went further and recognized that the boycott was a plain violation of antitrust laws. For example, a commenter on the live chat responded, "Good luck with the antitrust lawsuits," while another joked: "I would love to see the legal team's notes on that addendum!" and another said: "So much for free markets." One put it succinctly: "having brokers sign this addendum is an Anti Trust violation."

116. The Ultimatum and boycott also harmed competition because it increased UWM's market dominance and thereby harmed the competitive structure of the market. Under the Herfindahl-Hirschman Index ("HHI") test, a measure of

market concentration set forth by the federal antitrust agencies in their Horizontal Merger Guidelines, competition is assessed by summing the squares of the market shares of the competitors.

117.    The Ultimatum and boycott increased UWM's market share in the services market from 34% to 54%, likely increasing the HHI by more than 1,500 points to more than the 2,500 level assessed as "highly concentrated." The transaction thus increased UWM's share by an amount that is presumed to be anticompetitive under the FTC/DOJ Merger Guidelines.

### Injury and Damages to AML

118.    AML has been damaged by UWM's anticompetitive actions in each of the following ways:

> A. During the period when AML ceased using Rocket Pro in response to UWM's coercion, AML lost its primary source of reliable, high service loans for consumers with low credit scores. This cost it the ability to service a number of such loans.

> B. Since AML ceased complying with UWM's Ultimatum, and began to utilize Rocket Pro again, UWM has refused to provide loans to AML. As a result, AML is unable to offer loans through UWM at those times when UWM is lower priced or is able (because of its capacity at the time) to service loans more quickly. As a result, AML has lost many bids for loans to brokers who were able to offer UWM loans at those advantageous times.

> C. When AML has lost loans, this has also cost it repeat and referral business. Repeat and referral business are critical to the success of any mortgage broker.

D. When AML lost loans that were in its pipeline that were to be originated by UWM, as described above, that cost AML the revenues from those loans as well as the costs it had incurred on those loans that would no longer be reimbursed by the consumer. The loss of those loans also hurt AML's reputation and its ability to obtain repeat and referral business.

119.    These damages are continuing and will continue to accrue unless UWM's conduct is enjoined.

120.    Because UWM sought to restrict AML from accessing other options for the market segment of those borrowers with credit scores in the 580-620 range (which Rocket Pro could accommodate but UWM refuses to service), UWM's Ultimatum impedes and restricts fair lending practices in that it reduces the ability of an independent mortgage broker, such as AML, to provide the full breadth of mortgage products and pricing to their clients. That significantly reduces opportunities for historically marginalized potential homeowners such as those with credits scores in the range of 580-620.

121.    AML's injury and damages are directly linked to UWM's anticompetitive conduct, boycott, and the market power of UWM and the boycotters. If UWM had not had market power, it would not have had the ability to impose the Ultimatum and Addendum on mortgage brokers, and therefore would not have insisted that AML comply with the Ultimatum and refuse to deal with Rocket Pro or Fairway. If the boycott had not succeeded, similarly, UWM would not have been in

a position to enforce the Addendum. The success of the boycott also meant that the vast majority of brokers did have access to UWM's mortgages, which has placed AML at a significant competitive disadvantage in the circumstances where UWM is able offer lower prices or (on some occasions because of its capacity at that immediate time) better service.

## COUNT I
## PER SE VIOLATION OF ANTITRUST LAW
## (SECTION 1 OF THE SHERMAN ACT)

122.    AML hereby incorporates by reference and realleges Paragraphs 1 through 121 of this Amended Counterclaim as if fully restated herein.

123.    The conduct of UWM and its mortgage brokers constitute a per se illegal group boycott in violation of Section 1 of the Sherman Act. UWM is liable for this conduct. The boycott amounted to a coerced, concerted refusal to deal with Rocket Pro or Fairway by the vast majority of UWM's brokers. These brokers represented the clear majority (more than 60%) of brokers in the wholesale mortgage loan market, and therefore involved a dominant portion of the market.

124.    As a direct and proximate result of UWM's violation of Section 1 of the Sherman Act, AML has been injured in its business and property by the reduction in choice, lost customers and commissions and has been injured (and will continue to be injured) in its business and property in the millions of dollars prior to trebling.

125.    These violations will continue unless enjoined.

**COUNT II**
**UNREASONABLE RESTRAINT OF TRADE**
**IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

126.     AML hereby incorporates by reference and realleges Paragraphs 1 through 125 of this Amended Counterclaim as if fully restated herein.

127.     As described above, UWM has substantial market power.

128.     The Addendum, entered into by AML and others, unreasonably restrained trade in the relevant market, in violation of Section 1 of the Sherman Act.

129.     The Addendum caused substantial anticompetitive effects and increased prices and reduced quality, as described above. UWM is liable for this conduct.

130.     As a direct and proximate result of UWM's violation of Section 1 of the Sherman Act, AML has been injured in its business and property by the reduction in choice, lost customers and commissions and has thereby been injured (and will continue to be injured) in its business and property in the millions of dollars prior to trebling.

131.     These violations will continue unless enjoined.

**COUNT III**
**ATTEMPT TO MONOPOLIZE IN VIOLATION OF**
**SECTION 2 OF THE SHERMAN ACT**

132.     AML hereby incorporates by reference and realleges Paragraphs 1 through 131 of this Amended Counterclaim as if fully restated herein.

133.     By each of its actions described above, UWM specifically sought to attain monopoly power. Based on UWM's high and growing market share and its market power, as demonstrated by UWM's ability to coerce and compel compliance with its Ultimatum, the high barriers to entry described above, and UWM's anticompetitive actions, and in light of the exit of hundreds of wholesale lenders from the market, there is a dangerous probability that UWM will achieve its goals and attain monopoly power. Such actions constitute unlawful attempted monopolization of the relevant wholesale mortgage lending market or submarket in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

134.     The actions of UWM substantially harmed competition through its effects on mortgage rates, consumer choice and quality, as described above.

135.     As a direct and proximate result of UWM's violation of Section 2 of the Sherman Act, including its enforcement of its illegal agreement, AML has been injured in its business and property by the reduction in choice, lost customers and commissions and has thereby been injured (and will continue to be injured) in its business and property in the millions of dollars prior to trebling.

136.     These violations will continue unless enjoined.

**COUNT IV**
**PER SE VIOLATION OF MARA, MICH.**
**COMP. LAWS § 445.772**

137.     AML hereby incorporates by reference and realleges Paragraphs 1

through 136 of this Amended Counterclaim as if fully restated herein.

138.     UWM's actions caused substantial harm to AML in Michigan through their impact on AML's ability to obtain customers and close loans in Michigan. AML originated approximately $10 million in loans in Michigan in 2021 and would have been more successful in doing so but for UWM's anticompetitive actions.

139.     UWM's and its brokers' actions were a per se violation of the Michigan Antitrust Reform Act ("MARA") Mich. Comp. Laws § 445.772.

140.     UWM's actions have caused significant competitive harm in, and have had substantial effects on, wholesale mortgage competition in Michigan.

141.     These violations will continue unless enjoined.

## COUNT V
## UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF MARA, MICH. COMP. LAWS § 445.772

142.     AML hereby incorporates by reference and realleges Paragraphs 1 through 141 of this Amended Counterclaim as if fully restated herein.

143.     UWM's and its brokers' actions as described above are an unreasonable restraint of trade in violation of MARA, Mich. Comp. Laws § 445.772.

144.     UWM's actions have caused significant competitive harm in, and have had substantial effects on, wholesale mortgage competition in Michigan.

145.     These violations will continue unless enjoined.

## COUNT VI
## ATTEMPT TO MONOPOLIZE IN VIOLATION OF MARA,
## <u>MICH. COMP. LAWS § 445.773</u>

146.     AML hereby incorporates by reference and realleges Paragraphs 1
through 145 of this Amended Counterclaim as if fully restated herein.

147.     In violation of the MARA, Mich. Comp. Laws § 445.773, UWM has
willfully, knowingly and with specific intent attempted to monopolize the wholesale
mortgage lending market or submarket.

148.     UWM's actions have caused significant competitive harm in, and have
had substantial effects on, wholesale mortgage competition in Michigan.

149.     These violations will continue unless enjoined.

## <u>COUNT VII</u>
## <u>VIOLATION OF CARTWRIGHT ACT</u>

150.     AML hereby incorporates by reference and realleges Paragraphs 1
through 149 of this Amended Counterclaim as if fully restated herein.

151.     The boycott and Ultimatum are an illegal combination in violation of
the California Cartwright Act, California Bus. & Prof. Code, §§ 1600-16770.

152.     The purpose of the Ultimatum and the boycott were to restrict
competition in commerce, and cause such restrictions, as described above.

153.     These actions were a per se violation of the Cartwright Act. In the
alternative, the Ultimatum and resulting Addendum amounted to an unreasonable
restraint of trade.

154.    These actions have caused substantial effects, and substantially harmed wholesale mortgage competition, in California. Since AML is based in California, all injuries to AML caused by UWM (involving hundreds of millions of dollars in loans) were ultimately felt by AML in California. Additionally, UWM's actions caused substantial harm to AML in California through their impact on AML's ability to obtain customers and close loans in California. AML originated more than $400 million in loans in California in 2021, and would have originated more such loans but for UWM's anticompetitive actions.

155.    UWM's actions have caused significant competitive harm in, and have had substantial effects on, wholesale mortgage competition in California.

156.    These violations will continue unless enjoined.

## COUNT VIII
## PER SE VIOLATION OF FLORIDA ANTITRUST ACT,
## FLA. STAT. § 542.18

157.    AML hereby incorporates by reference and realleges Paragraphs 1 through 156 of this Amended Counterclaim as if fully restated herein.

158.    The conduct of UWM and its mortgage brokers constitute a per se illegal group boycott in violation of Fla. Statute § 542.18.

159.    UWM's actions caused substantial harm to AML in Florida through their impact on AML's ability to obtain customers and close loans in Florida. AML originated loans in Florida in the amount of approximately $80 million in 2021 and

would have been more successful in doing so but for UWM's anticompetitive actions.

160.    UWM's actions have caused significant competitive harm in, and have had substantial effects on, wholesale mortgage competition in Florida.

161.    These violations will continue unless enjoined.

## COUNT IX
## RESTRAINT OF TRADE IN VIOLATION OF FLORIDA ANTITRUST ACT, FLA. STAT. § 542.18

162.    AML hereby incorporates by reference and realleges Paragraphs 1 through 161 of this Amended Counterclaim as if fully restated herein.

163.    UWM's and its brokers' actions as described above are an unreasonable restraint of trade in violation of Florida Statute § 542.18.

164.    UWM's actions caused substantial harm to AML in Florida through their impact on AML's ability to obtain customers and close loans in Florida. AML originated loans in Florida in the amount of approximately $80 million in 2021 and would have been more successful in doing so but for UWM's anticompetitive actions.

165.    UWM's actions have caused significant competitive harm in, and have had substantial effects on, wholesale mortgage competition in Florida.

166.    These violations will continue unless enjoined.

**COUNT X**
**ATTEMPT TO MONOPOLIZE IN VIOLATION OF FLORIDA**
**ANTITRUST ACT, FLA. STAT. § 542.19**

167.     AML hereby incorporates by reference and realleges Paragraphs 1 through 166 of this Amended Counterclaim as if fully restated herein.

168.     In violation of the Florida Antitrust Act, Fla. Stat. § 542.19, UWM has willfully, knowingly and with specific intent, attempted to monopolize the wholesale mortgage lending market or submarket.

169.     UWM's actions caused substantial harm to AML in Florida through their impact on AML's ability to obtain customers and close loans in Florida. AML originated loans in Florida in the amount of approximately $80 million in 2021 and would have been more successful in doing so but for UWM's anticompetitive actions.

170.     UWM's actions have caused significant competitive harm in, and have had substantial effects on, wholesale mortgage competition in Florida.

171.     These violations will continue unless enjoined.

**COUNT XI**
**VIOLATION OF TEXAS FREE ENTERPRISE**
**AND ANTITRUST ACT**

172.     AML hereby incorporates by reference and realleges Paragraphs 1 through 171 of this Amended Counterclaim as if fully restated herein.

173.     The boycott and Ultimatum also are an illegal conspiracy in restraint of

trade in violation of the Title 2, Section 15.05 of the Texas Business and Commerce Code, under the Texas Free Enterprise and Antitrust Act (the "Texas Act").

174.     These actions were a per se violation of the Texas Act. In the alternative, the Ultimatum and resulting Addendum amounted to an unreasonable restraint of trade. UWM's actions constituted an attempt to monopolize the relevant market or submarket, in violation of the same statutory section.

175.     These actions have caused substantial effects, and substantially harmed wholesale mortgage competition, in Texas. UWM's actions caused substantial harm to AML in Texas through their impact on AML's ability to obtain customers and close loans in Texas. AML originated approximately $60 million in loans in Texas in 2021, and would have originated more such loans but for UWM's anticompetitive actions.

176.     UWM's actions have caused significant competitive harm in, and have had substantial effects on, wholesale mortgage competition in Texas.

177.     These violations will continue unless enjoined.

**COUNT XII**
**DECLARATORY RELIEF, 28 U.S.C. §§ 2201-2202**

178.     AML hereby incorporates by reference and realleges Paragraphs 1 through 177 of this Amended Counterclaim as if fully restated herein.

179.     An actual controversy now exists between AML Plaintiff and UWM regarding the validity and enforceability of the Addendum, and rights and liabilities

related thereto.

180.     The Addendum is unenforceable because it violates federal and state laws. Enforcement of the Addendum by the Court would amount to an enforcement of an antitrust violation.

181.     The "liquidated damages" imposed by UWM under the Addendum are not proper liquidated damages, but are in fact a penalty. The amount at issue, $5,000 per loan placed with Rocket Pro or Fairway, is grossly disproportionate to the actual harm UWM was likely to suffer if loans were placed with Rocket Pro or Fairway, and does not represent a reasonable estimate of these damages, for several reasons. First, the placement of a loan with Rocket Pro or Fairway did not necessarily deprive UWM of a loan, since the loan could have, alternatively, been placed with another vendor. UWM at the time had a 34% share of the wholesale loan market. In particular, loans for consumers with low credit scores, who were not served by UWM, would never have been placed with UWM, and therefore UWM was not damaged in any way by the placement of such loans with Rocket Pro or Fairway. Second, the amount of profit UWM earned on each mortgage loan it placed was a small fraction of the $5,000 figure included as a "liquidated damages" amount.

## REQUEST FOR RELIEF

WHEREFORE, AML respectfully requests that this Honorable Court:

> A. Issue a declaratory judgment finding that the Addendum is unenforceable and violates federal, and state antitrust laws;

B. Issue a declaratory judgment that the so-called "liquidated damages" portion in the Addendum is an unenforceable penalty;

C. Grant AML three times its damages suffered as a result of the anticompetitive actions by UWM, both now and in the future;

D. Issue an order permanently enjoining UWM's anticompetitive behavior described above, and (in particular) requiring that UWM not condition its loans on the broker foregoing the use of Rocket or Fairway;

E. Award AML its taxable costs and reasonable attorneys' fees; and

F. Grant such other relief as this Court finds just.

Respectfully submitted,

/s/ Jeffery B. Morganroth
JEFFREY B. MORGANROTH (P41670)
JASON R. HIRSCH (P58034)
MORGANROTH & MORGANROTH, PLLC
Attorneys for AML
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000
jmorganroth@morganrothlaw.com
jhirsch@morganrothlaw.com

/s/ Matthew D. Novello
MATTHEW D. NOVELLO (P63269)
NOVELLO & ASSOCIATES, PC
Co-counsel for AML
3542 Lakeview
Highland, Michigan 48356
mnovello@novellolawfirm.com

/s/ David A. Ettinger
DAVID A. ETTINGER (P26537)
Co-Counsel for AML
HONIGMAN LLP
660 Woodward Avenue, Suite 2290
Detroit, MI 48226
(313) 465-7368
DEttinger@honigman.com

Dated: March 8, 2023

47

## DEMAND FOR JURY TRIAL

Defendant/Counter-Plaintiff, America's Moneyline, Inc., by and through its attorneys, hereby demands a trial by jury in the above-entitled matter.

Respectfully submitted,

/s/ Jeffery B. Morganroth
JEFFREY B. MORGANROTH (P41670)
JASON R. HIRSCH (P58034)
MORGANROTH & MORGANROTH, PLLC
Attorneys for AML
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000
jmorganroth@morganrothlaw.com
jhirsch@morganrothlaw.com

/s/ Matthew D. Novello
MATTHEW D. NOVELLO (P63269)
NOVELLO & ASSOCIATES, PC
Co-counsel for AML
3542 Lakeview
Highland, Michigan 48356
mnovello@novellolawfirm.com

/s/ David A. Ettinger
DAVID A. ETTINGER (P26537)
Co-Counsel for AML
HONIGMAN LLP
660 Woodward Avenue, Suite 2290
Detroit, MI 48226
(313) 465-7368
DEttinger@honigman.com

Dated: March 8, 2023