## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE, LLC

        Plaintiff/Counter-Defendant        Case No. 22-cv-10228
                                          Hon. Laurie J. Michelson

    v.

AMERICA'S MONEYLINE, INC

        Defendant/Counter-Plaintiff
_____/

### UNITED WHOLESALE MORTGAGE, LLC'S MOTION TO DISMISS
### AMERICA'S MONEYLINE, INC.'S AMENDED COUNTERCLAIM

United Wholesale Mortgage, LLC ("UWM") moves, under Fed. R. Civ. P. 12(b)(6), to dismiss America's Moneyline, Inc.'s ("AML") Amended Counterclaim because it fails to state a claim for relief. In support, UWM submits the following Brief in Support of this Motion to Dismiss.

Under Local Rule 7.1(a), there was a conference between the attorneys for the parties in which UWM explained the nature of this Motion and its legal basis and requested, but did not obtain, concurrence in the relief sought.

WHEREFORE, UWM respectfully requests that the Court grant this Motion and dismiss AML's Amended Counterclaim.

                        Respectfully submitted,
                        By: */s/ Moheeb H. Murray*
                        Moheeb H. Murray (P63893)
                        Mahde Y. Abdallah (P80121)

**BUSH SEYFERTH PLLC**
100 West Big Beaver Road, Suite 400
Troy, MI 48084
T/F: (248) 822-7800
murray@bsplaw.com
abdallah@bsplaw.com
*Attorneys for United Wholesale Mortgage, LLC*

Dated: April 19, 2023

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE, LLC

       Plaintiff/Counter-Defendant      Case No. 22-cv-10228
                                     Hon. Laurie J. Michelson

     v.

AMERICA'S MONEYLINE, INC.

       Defendant/Counter-Plaintiff

_____/

## UNITED WHOLESALE MORTGAGE, LLC'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS AMERICA'S MONEYLINE, INC.'S AMENDED COUNTERCLAIM

# **Table of Contents**

**Page(s)**

I.    Introduction ................................................................................................ 1

II.    Summary of Factual Allegations .................................................. 3

    A.    AML Is a Mortgage Broker in a Vertical Relationship with Wholesale Mortgage Lenders Like UWM and Rocket. ....................... 3

    B.    The Alleged "Wholesale Mortgage Lending" Market. ....................... 4

    C.    UWM Announced the Amendment to Combat Practices Harmful to Wholesale Mortgage Brokers. ........................................ 4

    D.    Brokers and Trade Associations Engaged in a Robust Discussion of the Amendment Following Its Announcement. ............. 6

    E.    AML's Agreement to the Amendment and Repeated Breaches. .......... 6

    F.    AML's Allegations of "Anticompetitive" Effects. ............................. 7

    G.    AML's Prior Counterclaim and UWM's First Motion to Dismiss. ............................................................................................. 8

III.    Standard of Review ........................................................................... 9

IV.    Argument ........................................................................................... 9

    A.    AML's Claims Rest on a Legally Unsustainable Assertion That the Relevant Market Is "Wholesale Mortgage Lending." ................... 9

        1.    AML Has Not Plausibly Alleged That "Wholesale Mortgage Lending" Is the Relevant Market Under the Applicable Legal Standard of Interchangeability. ................... 10

        2.    AML's Allegations Demonstrate That the Actual Relevant Market Is All Residential Mortgages. ....................... 12

B.      AML Fails to State a Claim for a *Per Se* Illegal Group Boycott in Violation of Section 1 of the Sherman Act (Count I). ...................15

        1.      AML Does Not Plead a *Per Se* Illegal Group Boycott Based on a Horizontal Agreement Between UWM and Its Competitors. ...........................................................................15

        2.      AML's Allegations Do Not Demonstrate Market Power Sufficient to Support a *Per Se* Violation of Section 1. .............18

C.      AML Fails to State a Claim for Unreasonable Restraint of Trade in Violation of Section 1 of the Sherman Act (Count II). ........20

D.      AML Fails to State a Claim for Attempt to Monopolize in Violation of Section 2 of the Sherman Act (Count III).......................23

E.      AML's State Antitrust Claims and Declaratory Judgment Claim (Counts IV to XII) Fail in Tandem with the Federal Claims. .............25

V.      Conclusion ......................................................................................25

## Table of Authorities

**Cases**

*All Care Nsg. Ser. v. High Tech Staffing Serv.*,
  135 F.3d 740 (11th Cir. 1998) ............................................................. 25

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich*
  *Legal & Prof'l Publ'ns, Inc.*,
  108 F.3d 1147 (9th Cir. 1997) .............................................................. 24

*B & H Med., LLC v. ABP Admin., Inc.*,
  354 F. Supp. 2d 746 (E.D. Mich. 2005) ............................................... 14

*Bailey v. Allgas, Inc.*,
  284 F.3d 1237 (11th Cir. 2002) ............................................................ 24

*Bassett v. Nat'l Coll. Athletic Ass'n*,
  528 F.3d 426 (6th Cir. 2008) .................................................................. 9

*Betkerur v. Aultman Hosp. Ass'n*,
  78 F.3d 1079 (6th Cir. 1996) ................................................................ 16

*Blue Cross Blue Shield v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ................................................................ 24

*ComSpec Int'l, Inc. v. Uniface B.V.*,
  No. 2:20-cv-10067-TGB-EAS, 2021 WL 4169726
  (E.D. Mich. Sep. 14, 2021) .................................................................. 11

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ............................................................... 24

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001) .............................................................. 25

*Ehredt Underground v. Commonwealth Edison*,
  90 F.3d 238 (7th Cir. 1996) ................................................................. 22

*EnviroPak Corp. v Zenfinity Capital, LLC*,
  No. 4:14-CV-00754, 2015 WL 331807 (E.D. Mo. Jan. 23, 2015) ...................... 22

*Expert Masonry, Inc. v. Boone Cnty.*,
  440 F.3d 336 (6th Cir. 2006) ............................................................... 17

*Fed. Trade Comm'n v. Ind. Fed. of Dentists*,
  476 U.S. 447 (1986) ...................................................................... 16, 19

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art Sci.*,
   244 F.3d 521 (6th Cir. 2001) ...............................................................11

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art Sci.*,
   73 F. Supp. 2d 829 (W.D. Mich. 1999)
   *aff'd*, 244 F.3d 521 (6th Cir. 2001) ....................................................13

*Found. for Interior Design*, 244 F.3d at 530 ..........................................21

*Hand v. Cent. Transp., Inc.*,
   779 F.2d 8 (6th Cir. 1985) ..................................................................23

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Stds. for Athletic Equip.*,
   48 F.4th 656 (6th Cir. 2022) ...............................................................25

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618 (E.D. Mich. 2000) ....................................... 11, 14

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
   588 F.3d 908 (6th Cir. 2009) ...................................................... 10, 11, 12

*Mich. Division-Monument Builders v. Mich. Cemetery Ass'n*,
   458 F. Supp. 2d 474 (E.D. Mich. 2006) .................................... 10, 11, 13

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ...........................................................................18

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
   419 F.3d 462 (6th Cir. 2005) ...............................................................21

*NHL Players' Ass'n v. Plymouth Whalers Hockey Club*,
   325 F.3d 712 (6th Cir. 2003) ...................................................... 10, 16

*Nw. Wholesale Stationers v. Pac. Stationery*,
   472 U.S. 284 (1985) ...........................................................................19

*NYNEX Corp. v. Discon*,
   525 U.S. 128 (1998) ..................................................................... 16, 18

*Okavage Grp., LLC v. United Wholesale Mortg.*,
   No. 3:21-CV-448, 2022 WL 17478298 (M.D. Fla. July 27, 2022) ............ passim

*Paddock Pubs., Inc. v. Chicago Tribune Co.*,
   103 F.3d 42 (7th Cir. 1996) .................................................................22

*PNY Techs., Inc. v. Sandisk Corp.*,
   No. 11-CV-04689, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) .....................22

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
   No. 8:12-CV-02102, 2013 WL 3936394 (C.D. Cal. July 30, 2013)....................22

*Prod. Sols. Int'l v. Aldez Containers, LLC,*
    46 F.4th 454 (6th Cir. 2022) ...................................................................9

*PSI Repair Servs., Inc. v. Honeywell, Inc.,*
    104 F.3d 811 (6th Cir. 1997) ...............................................................23

*Schuetz v. Banc One Mortg. Corp.,*
    292 F.3d 1004 (9th Cir. 2002) .............................................................21

*Smith Wholesale Co., Inc. v. Philip Morris USA, Inc.,*
    219 Fed. App'x 398 (6th Cir. 2007) ............................................. 23, 24

*Solo v. United Parcel Serv. Co.,*
    819 F.3d 788 (6th Cir. 2016) .................................................................3

*Spirit Airlines, Inc. v. Nw. Airlines,*
    431 F.3d 917 (6th Cir. 2005) ....................................................... 14, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ...............................................................................5

*Total Benefits Planning v. Anthem Blue Cross,*
    552 F.3d 430 (6th Cir. 2008) ....................................................... 16, 17

*United States v. Colgate & Co.,*
    250 U.S. 300 (1919) .............................................................................18

*Valley Prods. Co., Inc. v. Landmark,*
    128 F.3d 398 (6th Cir. 1997) ...............................................................21

*Worldwide Basketball & Sport Tours, Inc. v. Nat'l Coll. Athletic Ass'n,*
    388 F.3d 955 (6th Cir. 2004) ................................................. 10, 14, 20

*ZF Meritor, LLC v. Eaton Corp.,*
    696 F.3d 254 (3d Cir. 2012) ................................................................22

**Statement of the Issues Presented**

1.      Should AML's antitrust-based counterclaims (all counts) be dismissed where AML failed to plausibly allege the actual relevant market?

UWM answers:                    Yes.

The Court should answer:        Yes.

2.      Should AML's federal antitrust claims for *per se* illegality, unreasonable restraint of trade, and attempted monopolization (Counts I-III) be dismissed where AML does not allege a horizontal boycott between UWM and its competitors, sufficient market power by UWM, any anticompetitive effect, or any plausible risk of monopolization?

UWM answers:                    Yes.

The Court should answer:        Yes.

3.      Should AML's state antitrust claims (Counts IV-XI) be dismissed where all the asserted state laws follow federal antitrust law?

UWM answers:                    Yes.

The Court should answer:        Yes.

4.      Should AML's declaratory relief claim (Count XII) be dismissed where it seeks relief derived from the preceding antitrust claims?

UWM answers:                    Yes.

The Court should answer:        Yes.

## Controlling or Most Appropriate Authority

*All Care Nsg. Ser. v. High Tech Staffing Serv.*, 135 F.3d 740 (11th Cir. 1998)

*Am. Airlines, Inc. v. Sabre, Inc.*, 694 F.3d 539 (5th Cir. 2012)

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001)

*Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336 (6th Cir. 2006)

Fed. R. Civ. P. 12(b)(6)

*Fed. Trade Comm'n v. Ind. Fed. of Dentists*, 476 U.S. 447 (1986)

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art Sci.*, 244 F.3d 521 (6th Cir. 2001)

*Hand v. Cent. Transp., Inc.*, 779 F.2d 8 (6th Cir. 1985)

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Stds. for Athletic Equip.*, 48 F.4th 656 (6th Cir. 2022)

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908 (6th Cir. 2009)

*Mich. Division-Monument Builders v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474 (E.D. Mich. 2006)

*NYNEX Corp. v. Discon*, 525 U.S. 128 (1998)

*Okavage Grp., LLC v. United Wholesale Mortg.*, No. 3:21-CV-448, 2022 WL 17478298 (M.D. Fla. July 27, 2022)

*Prod. Sols. Int'l v. Aldez Containers, LLC*, 46 F.4th 454 (6th Cir. 2022)

*Smith Wholesale Co., Inc. v. Philip Morris USA, Inc.*, 219 Fed. App'x 398 (6th Cir. 2007)

*Spirit Airlines, Inc. v. Nw. Airlines*, 431 F.3d 917 (6th Cir. 2005)

*Total Benefits Planning v. Anthem Blue Cross*, 552 F.3d 430 (6th Cir. 2008)

*Worldwide Basketball & Sport Tours, Inc. v. Nat'l Coll. Athletic Ass'n*, 388 F.3d 955 (6th Cir. 2004)

## I.  <u>Introduction</u>

This is not an antitrust case. This case is about one mortgage broker that repeatedly breached the terms of its broker agreement and is now grasping for any rationale to evade liability. One well-reasoned ruling has already rejected these same antitrust claims. *See Okavage Grp., LLC v. United Wholesale Mortg.*, No. 3:21-CV-448, 2022 WL 17478298 (M.D. Fla. July 27, 2022), attached as **Exhibit A**. The claims lack any legal merit and should be dismissed.

Plaintiff/Counter-Defendant United Wholesale Mortgage, LLC ("UWM") is a wholesale mortgage lender. It works with and is committed to the vibrant, pro-consumer network of independent wholesale mortgage brokers. To that end, UWM announced its "All-In Initiative" on March 4, 2021, stating that it would end its relationship with brokers originating loans with Rocket Pro TPO ("Rocket") and Fairway Mortgage ("Fairway"). UWM believes Rocket and Fairway have eroded the mortgage broker channel by converting brokers' customers from wholesale lines to retail lines, thereby cutting out the brokers.

UWM asked Defendant/Counter-Plaintiff America's Moneyline, Inc. ("AML") to agree to an Addendum and amended Broker Agreement (the "Amendment"), committing not to originate loans with Rocket and Fairway. The Amendment (which AML falsely calls an "Ultimatum" and "boycott") did not require AML to originate loans with UWM. It was terminable at any time, with or

without cause, and AML could originate mortgages with Rocket or Fairway immediately upon notice of termination. AML alleges it agreed to the Amendment reluctantly and later terminated it. Now, faced with legal action because it closed numerous loans with Rocket in breach of the Amendment while it was in effect, AML seeks to rewrite its bargain by asserting facially defective antitrust claims.

But antitrust law is not a shield for contractual breach or a pen for courts to rewrite contracts on terms preferred by the breaching party. UWM is free to choose the terms on which it conducts business, and brokers like AML are free to accept or reject those terms. AML accepted UWM's terms, breached, and now attacks UWM for refusing to write the exact terms into its Amendment that AML prefers. AML's Amended Counterclaim ("Am. Cl.") is invalid and should be dismissed.

*First*, all of AML's claims rest on a legally unsustainable premise—that there is a separate wholesale mortgage lending market or sub-market distinct from the market for all residential mortgage loans. There is not, and AML's failure to plausibly allege the actual relevant market is fatal to each of its claims.

*Second*, AML's federal antitrust claims for *per se* illegality, unreasonable restraint of trade, and attempted monopolization (Counts I through III) fail to state a claim because, among other defects: AML does not allege a horizontal boycott between UWM and its competitors; AML does not allege sufficient market power by UWM; AML does not plausibly allege any anticompetitive effect; and AML

does not allege any plausible risk of monopolization.

*Third*, AML's state antitrust claims (Counts IV through XI) and declaratory relief claim (Count XII) fail to state a claim because they mirror or are derivative of the deficient federal antitrust claims and fail for the same reasons.

II.    **Summary of Factual Allegations**

   A.    **AML Is a Mortgage Broker in a Vertical Relationship with Wholesale Mortgage Lenders Like UWM and Rocket.**

AML is a mortgage broker. It executed a Broker Agreement with UWM on April 14, 2020. Am. Cl. at ¶¶ 5, 63, ECF No. 24, PageID.348, 365; Agmt., ECF No. 1-1, PageID.11-18.[1] AML alleges it also has a business relationship with Rocket and unspecified "other wholesale lenders" (it does not allege a relationship with Fairway). *Id.* ¶¶ 65, 67, PageID.365-66. UWM is a wholesale residential mortgage lender, as are the wholesale divisions of Rocket and Fairway. *Id.* ¶¶ 11, 16, 25-27, PageID.349-50, 354. Unlike UWM, Rocket and Fairway also have retail mortgage lending divisions. *Id.* ¶¶ 26-27, PageID.354. The relationship between mortgage brokers like AML and wholesale mortgage lenders like UWM is vertical: brokers act as commercial intermediaries between consumers and wholesale lenders. *Id.* ¶¶ 5, 16, 18, 20, PageID.348, 350-52.

---

[1] This Court may consider the Broker Agreement and Amendment on a motion to dismiss because they are incorporated into the Amended Counterclaim. *See Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 794 (6th Cir. 2016).

**B.      The Alleged "Wholesale Mortgage Lending" Market.**

AML attempts to define "wholesale mortgage lending" as the "relevant market" or "submarket" and asserts that retail lending is a separate submarket. *Id.* ¶¶ 3, 15, 23-24, PageID.347, 350, 353-54. The primary difference between wholesale and retail lending is that wholesale lenders do not work directly with consumers and offer mortgage loans through mortgage brokers, while retail lenders deal directly with consumers. *Id.* ¶¶ 16-22, PageID.350-53. AML asserts that wholesale mortgage lending entails distinct customers, separate industry recognition, specialized vendors, lack of direct marketing, and better savings to customers. *Id.* ¶ 23, PageID.353.

AML alleges that UWM is the largest wholesale mortgage lender with an approximate 54% share of the "wholesale market," up from 34% in 2020. *Id.* ¶¶ 25, 92, PageID.354, 372. AML alleges that UWM "boasts" of having more than 12,000 mortgage brokers under contract, purportedly representing more than 60% of domestic brokers. *Id.* ¶ 25, PageID.354. AML asserts that UWM has "dominance" of wholesale lending due to advantages of scale, volume, and control of its margins. *Id.* ¶¶ 92-100, PageID.372-75. AML also asserts there are "barriers to entry" into wholesale lending. *Id.* ¶ 101, PageID.375.

**C.      UWM Announced the Amendment to Combat Practices Harmful to Wholesale Mortgage Brokers.**

AML asserts claims based on UWM's March 4, 2021 announcement by its

President and CEO, Mat Ishbia, that UWM was amending its Broker Agreement to require a representation and warranty that mortgage brokers who submit loans to UWM will not also submit loans to Rocket or Fairway. *Id.* ¶ 37, PageID.357. Some brokers, including AML, were asked to sign an Addendum and Amendment. *Id.* ¶¶ 38, 69-73, PageID.357-58, 366-67. UWM had the contractual right to amend the Broker Agreement, and a broker's submission of any mortgage loan application to UWM after the date of the Amendment constitutes acceptance. Agmt. § 7.08, PageID.17.

The Amended Counterclaim incorporates Mr. Ishbia's announcement and interviews. Am. Cl. ¶¶ 37, 39, 42, 51, 55-60, PageID.357-59, 362-64; *see also* Transcript of Mar. 4, 2021 Announcement, attached as **Exhibit B**.[2] Mr. Ishbia stated that one purpose of the Amendment was, "[w]e don't need to fund Fairway [] or Rocket [] to try to put brokers out of business." Am. Cl. ¶ 39, PageID.358. He explained UWM's view that Rocket and Fairway were "out there hurting the wholesale channel" by "soliciting loan officers," "talking negatively about brokers," "going after real estate agents," "trying to cut the loan officers," and "solicit[ing] your past clients." Ex. B at 12:14-16:11. Mr. Ishbia said there would be "no hard feelings" for those who declined the Amendment, and brokers could

---

[2] The Court may consider Mr. Ishbia's comments because they are incorporated into the Amended Counterclaim. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

"close out your loans" and "take care of consumers [e]ven if you [] decline[.]" *Id.* at 15:10-18. He noted there were "73 other lenders," and brokers would "have options" with or without the "two [lenders] that are out there hurting the channel[.]"*Id*. at 16:9-18.

### D. Brokers and Trade Associations Engaged in a Robust Discussion of the Amendment Following Its Announcement.

AML alleges that Mr. Ishbia's announcement took place in public view and drew widespread reactions. It cites numerous supportive public comments by brokers, such as "We are ALL IN," "unstoppable together," "Let's go!" and descriptions of brokers as "family," and also describes instances of brokers encouraging one another to sign the Addendum. Am. Cl. ¶¶ 40-44, 49-50, 52-53, PageID.358-62. Despite these many examples of brokers' enthusiasm, AML insists the Amendment is "coercion" reflecting UWM's "market power." *Id*. ¶¶ 61-62, 100, PageID.364-65, 374-75. AML alleges that other brokers expressed opposition to the Amendment and asserted opinions that it was anticompetitive. *Id*. ¶¶ 110-111, 114-115, PageID.378-80. AML alleges split views by trade associations reacting to the announcement. *Id*. ¶¶ 45-48, 112-113, PageID.360-61, 379-80.[3]

### E. AML's Agreement to the Amendment and Repeated Breaches.

AML alleges it sought to persuade UWM not to ask AML to sign the

---

[3] AML alleges that trade associations "have provided significant vehicles for communication and agreement between the mortgage brokers with regard to the boycott," but provides no examples. Am. Cl. ¶ 48, PageID.361.

Amendment, but UWM insisted. *Id.* ¶¶ 69-80, 84-88, PageID.366-72. AML states that it ultimately executed the Amendment, then changed its mind and stated it was terminating its relationship with UWM. *Id.* ¶¶ 81-82, PageID.369. AML closed numerous loans with Rocket while the Amendment was in force. *Id.* ¶¶ 83, 89-91, PageID.369-70, 372. UWM gave notice of AML's breach and filed this suit. *Id.* ¶¶ 89-91, PageID.372.

AML was always free to accept or decline the Amendment. *Id.* ¶¶ 81-82, PageID.369; Ex. B at 15:10–15:18. AML alleges that the Amendment imposes "a draconian and anticompetitive penalty" of $5,000 per loan for breach. Am. Cl. ¶¶ 72-73, PageID.367. But any broker contracting with UWM, including AML, could terminate the Amendment "for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice[.]" Agmt. §§ 7.05, 7.06, PageID.16-17. A notice of termination immediately releases the broker from its commitment not to submit loans to Rocket or Fairway. *See* Amendment § 3.05, ECF No. 1-2, PageID.28.

### F.    AML's Allegations of "Anticompetitive" Effects.

AML alleges that UWM's so-called "boycott" was "highly successful," because the majority of brokers presented with the Addendum agreed and UWM's market share has grown. Am. Cl. ¶¶ 54-62, PageID.362-65. AML asserts various "anticompetitive effects" and "injury and damages to AML." *Id.* ¶¶ 104-121,

PageID.376-83. It asserts increased costs for its mortgage loans and operations. *Id.* ¶ 104, PageID.376-77. It alleges that brokers agreeing to the Amendment cannot originate loans with Rocket or Fairway, while those refusing cannot originate loans with UWM. *Id.* ¶¶ 104, 108, PageID.376-78. AML alleges this has harmed brokers through reduced competition.[4] *Id.* ¶¶ 105-109, PageID.377-78. AML alleges that UWM's actions have also increased market concentration. *Id.* ¶¶ 116-117, PageID.380-81. AML asserts it has been injured through lost access to loans, lost business, lost revenue, and less fair lending. *Id.* ¶¶ 13, 28, 32, 76, 83, 93, 118, 120-121, PageID.349-50, 355-56, 368-70, 373, 381-83.

### G.    AML's Prior Counterclaim and UWM's First Motion to Dismiss.

UWM filed its Complaint on February 3, 2022. ECF No. 1. AML filed its Counterclaim on February 25, 2022, asserting claims for fraud, promissory estoppel, and declaratory judgment that the Amendment and its damages provision are invalid and unenforceable under federal antitrust law and Michigan public policy. ECF No. 7. UWM moved to dismiss the Counterclaim, and AML opposed dismissal. ECF Nos. 11, 12, 13. The Court granted UWM's motion in part on December 22, 2022, holding that the fraud and promissory estoppel counts failed to state a claim, but finding the declaratory count could proceed to the extent it

---

[4] Of course, many lenders (like major retail banks) have ceased working with mortgage brokers altogether and offer mortgages only through their own captive loan officer employees. AML does not allege these practices are anticompetitive.

seeks a declaration that the Amendment is anticompetitive under antitrust law. ECF No. 14. Nearly three months later, AML filed its Amended Counterclaim, expanding its one declaratory judgment count to twelve antitrust counts. ECF No. 24.

## III.   <u>Standard of Review</u>

To survive a Rule 12(b)(6) motion, AML must "state a claim for relief that is 'plausible on its face.'" *Prod. Sols. Int'l v. Aldez Containers, LLC*, 46 F.4th 454, 458 (6th Cir. 2022).[5] The Court "may consider the Complaint and any exhibits attached thereto," as well as "exhibits … referred to in the Complaint and … central to the claims contained therein." *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## IV.   <u>Argument</u>

### A.   **AML's Claims Rest on a Legally Unsustainable Assertion That the Relevant Market Is "Wholesale Mortgage Lending."**

All of AML's federal and state antitrust claims depend upon the same facially defective premise that "wholesale mortgage lending" is a distinct market or submarket from all residential mortgage loans. *See* Am. Cl. ¶¶ 15-35, PageID.350-57. Each antitrust claim requires AML to plead the relevant market in which the putative violations occurred. If AML "lacks the ability to define the relevant market," no antitrust claim can proceed. *Ky. Speedway, LLC v. Nat'l Ass'n of Stock*

---

[5] Throughout, unless otherwise noted, all emphasis and alterations are added, and all internal quotation marks, citations, and footnotes are omitted.

*Car Auto Racing, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009) (collecting cases). "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003). AML asserts but has not plausibly alleged that wholesale mortgage lending is a separate market or sub-market.

> 1.  AML Has Not Plausibly Alleged That "Wholesale Mortgage Lending" Is the Relevant Market Under the Applicable Legal Standard of Interchangeability.

Defining the relevant market entails "the articulation of a ***legal*** test which is then applied to the ***factual*** circumstances of each case." *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Coll. Athletic Ass'n*, 388 F.3d 955, 959-60 (6th Cir. 2004) (emphases in original). This is "a matter of law" for the Court to decide. *Id*. If a plaintiff fails to adequately plead the relevant market, the Court should dismiss the claim as facially insufficient. *See Mich. Division-Monument Builders v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 482 (E.D. Mich. 2006) (holding that "whether a relevant market has been identified … may be determined as a matter of law" and dismissing antitrust claims for failure to properly allege the relevant market). AML bears the burden of pleading its asserted relevant market. *Ky. Speedway*, 588 F.3d at 916.

AML must satisfy the test of interchangeability to plead its asserted relevant market, meaning the market must include all ***interchangeable*** offerings. "To

determine th[e] relevant market, 'no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce, monopolization of which may be illegal." *Id.* "Reasonable interchangeability" is "[t]he essential test for ascertaining the relevant product market." *Id*. at 917. The test considers "(1) product uses (whether substitute products can perform the same function) and/or (2) consumer response (also known as cross-elasticity), defined as consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." *Id*. Relevant markets "are to be judged ***from the consumers' perspective***." *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 680 (E.D. Mich. 2000).

Here, AML has not even acknowledged the interchangeability test, much less attempted to plead the relevant market from the consumers' perspective. Because the Amended Counterclaim "contains no allegations whatsoever relating to the rule of interchangeability or to substitute products," it fails to plead a relevant market and should be dismissed on that basis alone. *Builders*, 458 F. Supp. 2d at 483; *see also Found. for Interior Design Educ. Research v. Savannah Coll. of Art Sci.*, 244 F.3d 521, 530 (6th Cir. 2001) (affirming dismissal of antitrust claims where market definition was not supported by factual allegations); *ComSpec Int'l, Inc. v. Uniface B.V.*, No. 2:20-cv-10067-TGB-EAS, 2021 WL 4169726, at *1 (E.D. Mich. Sep. 14, 2021) (dismissing antitrust claims where plaintiff "fails to

include any products which are reasonably interchangeable").

In particular, AML pleads no facts plausibly demonstrating why wholesale and retail residential mortgages are not reasonably interchangeable from the consumers' perspective. A retail mortgage certainly "perform[s] the same function" as a wholesale mortgage, and the two mortgages are unavoidably cross-elastic where a consumer can readily switch from one to the other. *Ky. Speedway*, 588 F.3d at 917. Thus, under the "essential test for ascertaining the relevant product market," wholesale mortgage lending is not plausibly separate. *Id.*

### 2.   AML's Allegations Demonstrate That the Actual Relevant Market Is All Residential Mortgages.

AML's own allegations further show that wholesale and retail mortgages are reasonably interchangeable and part of the same market of all residential mortgages. AML's allegations differentiate wholesale and retail mortgages primarily on the basis of who interfaces with the consumer: brokers or the lender directly. Am. Cl. ¶¶ 16-17, PageID.350-51. But as AML admits, from a consumer perspective, what is needed is a ***mortgage***, not a wholesale or retail mortgage specifically. *Id.* ¶ 16, PageID.350-51 ("There is no substitute for ***mortgage lending*** for most consumers, who need to borrow money to be able to afford to buy a house[.]") (emphasis added).

Indeed, AML acknowledges that Rocket and Fairway are both "whole-tail" lenders, that is, they lend both wholesale and retail loans, confirming their cross-

elasticity. *Id.* ¶¶ 26-27, 47, PageID.354-355, 360-61. AML also cites industry sources confirming that wholesale and retail lending are viewed as one market. AML cites the J.D. Power 2022 Mortgage Servicers Satisfaction study, which ranks wholesale lenders like UWM and retail lenders like Bank of America and Chase in one unified set of rankings. *Id.* ¶ 28.C, PageID.355.[6] AML also cites the Ascent rankings, which evaluate wholesale and retail lenders side-by-side. Am. Cl. ¶ 29.A, PageID.355.[7]

AML's attempt to exclude retail mortgages from the relevant market when its own allegations demonstrate their interchangeability is fatal to its claims. Because AML "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in [its] favor, the relevant market is legally insufficient, and a motion to dismiss may be granted." *Builders*, 458 F. Supp. 2d at 482. *See also Found. for Interior Design Educ. Research v. Savannah Coll. of Art Sci.*, 73 F. Supp. 2d 829, 837-38 (W.D. Mich. 1999) (rejecting plaintiff's proposed "relevant market" definition and dismissing plaintiff's claims as inconsistent with its "own pleadings and arguments"), *aff'd*, 244 F.3d 521 (6th Cir. 2001).

---

[6] *See* J.D. Power, *Mortgage Servicer Satisfaction Study, Profiled Brands*, available at https://www.jdpower.com/business/mortgage-servicer-satisfaction-study#profiled-brands (last accessed Apr. 2, 2023).

[7] *See* Christy Bieber, *The Ascent*, "Best Mortgage Lenders of April 2023," available at https://www.fool.com/the-ascent/mortgages/best-mortgage-lenders/#offer_list_ (last accessed Apr. 2, 2023).

AML's efforts to divert the inquiry to a "submarket" is likewise unavailing. Am. Cl. ¶¶ 3, 23, 133, 147, 168, 174, PageID.347, 353-54, 385, 387, 390-91. The assertion of a submarket does not do away with the essential test of interchangeability; it "merely provides several new factors" for the inquiry. *Basketball*, 388 F.3d at 962; *see also Spirit Airlines, Inc. v. Nw. Airlines*, 431 F.3d 917, 933 (6th Cir. 2005) (discussing several "practical indicia" considered in evaluating submarkets). Here, AML's "[o]ther facts" supposedly supporting a submarket do nothing to suggest a lack of interchangeability between wholesale and retail mortgages; they simply reiterate that wholesale mortgages go through brokers while retail mortgages do not. Am. Cl. ¶ 23, PageID.353-54. But the relevant market cannot be defined "as a tautological fact" merely by asserting it to be what AML says it is. *B & H Med., LLC v. ABP Admin., Inc.*, 354 F. Supp. 2d 746, 749 (E.D. Mich. 2005). It is "the consumers' perspective" that matters. *Cardizem*, 105 F. Supp. 2d at 680. AML's allegations suggest no plausible reason why consumers cannot readily switch from wholesale to retail mortgages. The fact that borrower experiences differ across channels is not indicative of separate markets or submarkets. To the contrary, it is "improper 'to require that products be fungible to be considered in the relevant market.'" *Basketball*, 388 F.3d at 962.

In sum, because AML has "failed to define the relevant market," and it "cannot prevail" without doing so, the analysis ends here. *Id.* at 963-64. All of

AML's claims should be dismissed with prejudice.

    **B.**    **AML Fails to State a Claim for a *Per Se* Illegal Group Boycott in Violation of Section 1 of the Sherman Act (Count I).**

Count I of the Amended Counterclaim asserts that the "conduct of UWM and its mortgage brokers constitute a *per se* illegal group boycott" violating Section 1 of the Sherman Act. Am. Cl. ¶ 123, PageID.383. AML does not state a claim for a *per se* violation of Section 1 because: (1) AML does not allege a *per se* illegal agreement between UWM and its horizontal direct competitors; and (2) AML does not allege adequate market power to support a *per se* violation of Section 1. *See Okavage*, 2022 WL 17478298, at *13-16 (rejecting claim that UWM's "ultimatum" was a *per se* illegal boycott because, *inter alia*, "there is no plausible allegation of a horizontal agreement between UWM and its direct competitors" and because plaintiff did not allege sufficient "market power or exclusive access").

    1.    <u>AML Does Not Plead a *Per Se* Illegal Group Boycott Based on a Horizontal Agreement Between UWM and Its Competitors.</u>

The crux of AML's *per se* claim is that UWM's so-called "boycott" amounted to "a coerced, concerted refusal to deal" with Rocket or Fairway "by the vast majority of UWM's brokers." Am. Cl. ¶ 123, PageID.383. But AML has not alleged a *per se* illegal group boycott because "[l]abels and buzzwords notwithstanding," it "has not pleaded factual matter" suggesting "a horizontal

agreement between UWM and its direct competitors[.]" *Okavage*, 2022 WL 17478298, at *14. The only agreement AML alleges is vertical between UWM and its brokers.

All Section 1 claims are evaluated under one of two analytical approaches: the *per se* rule or the rule of reason. *NHL Players' Ass'n*, 325 F.3d at 718. The *per se* rule applies only to practices that "are entirely void of redeeming competitive rationales." *Id*. It is a "demanding" standard "that should be applied only in clear cut cases." *Id*. at 718-19.

The U.S. Supreme Court has limited "the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon*, 525 U.S. 128, 135 (1998). It has warned against the "indiscriminate[]" expansion of the group boycott label. *Fed. Trade Comm'n v. Ind. Fed. of Dentists*, 476 U.S. 447, 558 (1986). In particular, it has refused to "force" a "concerted refusal to deal" into "the 'boycott' pigeonhole and invoking the *per se* rule." *Id*. at 458. Mere allegations that a practice "has diminished consumer choice" will not suffice. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1090 (6th Cir. 1996). "Only a group boycott through horizontal agreement can constitute a *per se* violation[.]" *Total Benefits Planning v. Anthem Blue Cross*, 552 F.3d 430, 435 (6th Cir. 2008). Vertical restraints involving "entities that are upstream or downstream of one another" do not meet this stringent standard. *Expert Masonry, Inc. v. Boone*

16

*Cnty.*, 440 F.3d 336, 344 (6th Cir. 2006).

Although AML repeatedly invokes the buzzwords "group boycott" and "concerted refusal to deal," the only agreement AML factually alleges is the *vertical* Addendum and Amendment between UWM and its brokers. *See* Am. Cl. ¶¶ 38, 44, 49, 51, 54, 61, 69-71, 76-82, 104, 108, 121, PageID.357-64, 366-69, 376-78, 382-83. These vertical agreements cannot support *per se* treatment; they must be analyzed under the rule of reason. *See Total Benefits*, 552 F.3d at 435; *Expert Masonry*, 440 F.3d at 344-45.

To the extent AML is attempting to assert a "hub and spoke" conspiracy, with UWM purportedly organizing brokers into a horizontal boycott, its allegations still fail. "There is *no special exception* for applying *per se* status just because there is a hub and spoke conspiracy; the complaint still must show *some horizontal relationship*." *Total Benefits*, 552 F.3d at 435. Even if the Court were to assume *arguendo* that AML has identified UWM as a "hub" and its brokers as "spokes," the "rim holding everything together is missing" because "[n]o agreements are identified between competitors[.]" *Id.* at 435-36. AML has not alleged how the brokers are connected to each other in a horizontal agreement. *See id.* at 436 (the "critical issue for establishing a *per se* violation within the hub and spoke system is how the spokes are connected to each other"). Indeed, AML's own allegations make clear the only "connection" is brokers' shared enthusiasm for the *vertical*

17

agreement with UWM. *See* Am. Cl. ¶¶ 38, 44, 49, 51, 54, 61, PageID.357-59, 361-64; *see also Okavage*, 2022 WL 17478298, at *14-18 (holding plaintiff failed to allege a hub and spoke conspiracy between UWM and its brokers).

A vertical agreement between UWM and brokers that the brokers like but are free to terminate at will is not a horizontal group boycott. To the contrary, the "freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage." *NYNEX*, 525 U.S. at 137. Antitrust law "does not restrict the long recognized right of [a party] engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). A party "has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Here, UWM announced its Amendment, and brokers were and are free to accept or decline. AML has not alleged a horizontal group boycott, and its *per se* claim fails.

> ### 2. AML's Allegations Do Not Demonstrate Market Power Sufficient to Support a *Per Se* Violation of Section 1.

AML's *per se* claim also fails because it has not alleged market power in the relevant market sufficient to support a *per se* violation. To guard against "indiscriminate" misuse of the "boycott" label to invoke the *per se* rule, the

Supreme Court limits its application to "cases in which firms with market power boycott suppliers or customers" to discourage doing business with a competitor. *Ind. Fed'n of Dentist*, 476 U.S. at 458. This requires the alleged conspirators to "possess[] market power or exclusive access to an element essential to effective competition." *Nw. Wholesale Stationers v. Pac. Stationery*, 472 U.S. 284, 296 (1985). AML has not satisfied the market power requirement. *See* § IV.D, *infra*.

AML asserts that UWM has market power because it has a 54% share of the wholesale lending "market," and its brokers purportedly represent "more than 60%" of wholesale mortgage brokers. Am. Cl. ¶¶ 25, 92, PageID.354, 372. But as discussed in § IV.A, *supra*, AML has failed to allege that wholesale lending is the relevant market, so its allegations of market power are facially deficient from the start. Even accepting AML's 60% claim *arguendo*, that does not satisfy "market power" for purposes of evaluating an alleged group boycott, because AML does not "plead or estimate" what percentage of mortgage brokers in the putative wholesale market as a whole actually "joined the boycott," or "what the effect of the boycott was vis-à-vis the relevant market." *Okavage*, 2022 WL 17478298, at *17. AML only alleges that UWM "boasts" of "over 12,000 mortgage brokers," and "announced" that that "93% of the brokers presented with" the Addendum agreed to sign it. Am. Cl. ¶¶ 25, 54, PageID.354, 362-63. AML's careful efforts to avoid alleging the actual percentage of brokers participating in the All-In Initiative

is indicative of its inability to allege market power within this group.

### C. AML Fails to State a Claim for Unreasonable Restraint of Trade in Violation of Section 1 of the Sherman Act (Count II).

Count II of the Amended Counterclaim asserts AML's "rule of reason" claim under Section 1 of the Sherman Act, alleging in conclusory terms that UWM "has substantial market power," that it "unreasonably restrained trade in the relevant market," and that it "caused substantial anticompetitive effects[.]" Am. Cl. ¶¶ 127-129, PageID.384. AML has not met its burden of pleading "that the conduct complained of 'produces significant anticompetitive effects within the relevant product and geographic markets.'" *Basketball*, 388 F.3d at 959; *see also Okavage*, 2022 WL 17478298, at *18-19 (holding that plaintiff failed to state a claim under the rule of reason because it failed to allege that UWM's actions have either "the potential for genuine adverse effects on competition" or "an actual detrimental effect on competition"). AML's claim has three facial deficiencies requiring dismissal.

First, AML has not adequately alleged the relevant market. *See* § IV.A, *supra*. Failing "to adequately define a relevant market" makes it "impossible to assess" the alleged anticompetitive effects of the conduct complained of. *Basketball*, 388 F.3d at 961.

Second, AML has "failed to sufficiently identify anti-competitive effects" of UWM's Addendum and Amendment. *Nat'l Hockey League Players Ass'n v.*

*Plymouth Whalers Hockey Club*, 419 F.3d 462, 473 (6th Cir. 2005). To satisfy the rule of reason analysis, AML must allege that UWM's actions "may suppress or even destroy competition." *Found. for Interior Design*, 244 F.3d at 530. This requires AML to allege "more than its own damages," because the antitrust laws "are designed for 'the protection of competition, not competitors[.]'" *Id*. AML must allege an "antitrust injury," meaning "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Valley Prods. Co., Inc. v. Landmark*, 128 F.3d 398, 402 (6th Cir. 1997).

AML does not allege antitrust injury. Its allegations focus almost exclusively on purported injury ***to AML*** and other mortgage brokers, but not injury to ***competition***. Am. Cl. ¶¶ 104-121, PageID.376-83. The crux of AML's alleged "anticompetitive effects" is that ***brokers*** must now choose between UWM on the one hand, or Rocket and Fairway on the other, which limits to some degree the options a particular broker may offer to a particular client—even as AML acknowledges that there are "other alternatives." *See id*. ¶¶ 104-117, PageID.376-81. Mortgage brokers, however, are "intermediaries who bring borrower and lender together"; they are not the lender or the consumer. *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1006 (9th Cir. 2002). AML does not allege that ***consumers*** have experienced fewer choices, higher prices, reduced output, or less competition

among wholesale and retail lenders for their mortgage business as a result of UWM's initiative—the hallmarks of competitive harm. *See EnviroPak Corp. v Zenfinity Capital, LLC*, No. 4:14-CV-00754, 2015 WL 331807, at *13-14 (E.D. Mo. Jan. 23, 2015). AML's grievances pertain only to its preferred business practices and its loan volume. But antitrust law "is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business." *Ehredt Underground v. Commonwealth Edison*, 90 F.3d 238, 240 (7th Cir. 1996).

Competition also is not harmed where, as here, the Amendment is "of relatively short duration and, crucially, can be terminated upon short notice"; such terms thus "do not—by themselves—sustain the Sherman Act claims." *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. 8:12-CV-02102, 2013 WL 3936394, at *4 (C.D. Cal. July 30, 2013).[8] The Amendment includes no minimum obligation to submit loans to UWM and permits brokers to submit loans to dozens of other wholesale lenders while under contract with UWM. That is a facially lawful relationship that "generally pose[s] little threat to competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).

Third, AML has failed to allege that UWM has the requisite market power in

---

[8] *See also Paddock Pubs., Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 44 (7th Cir. 1996); *PNY Techs., Inc. v. Sandisk Corp.*, No. 11-CV-04689, 2014 WL 1677521, at *8 (N.D. Cal. Apr. 25, 2014).

the relevant market sufficient "to have an adverse effect on competition," as required under the rule of reason analysis. *Hand v. Cent. Transp., Inc.*, 779 F.2d 8, 11 (6th Cir. 1985); *see also PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997) ("The market power requirement is important because, without market power, a seller cannot engage in the forcing necessary to establish a Section(s) 1 violation."). As discussed below with regard to AML's monopolization claim, AML has not alleged market power. *See* § IV.D, *infra*.

### D. AML Fails to State a Claim for Attempt to Monopolize in Violation of Section 2 of the Sherman Act (Count III).

Count III of the Amended Counterclaim asserts in wholly conclusory terms that UWM "sought to attain monopoly power" and has a "dangerous probability" of achieving its goals. Am. Cl. ¶ 133, PageID.385. AML's recitation of these elements does not come close to satisfying its burden to plead facts establishing: (1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success. *Smith Wholesale Co., Inc. v. Philip Morris USA, Inc.*, 219 Fed. App'x 398, 409 (6th Cir. 2007); *see also Okavage*, 2022 WL 17478298, at *19-21 (holding that plaintiff failed to allege sufficient market power to comprise a "dangerous probability of success"). AML's monopolization claim should be dismissed for three reasons.

First, AML has not alleged the relevant market. *See* § IV.A, *supra*. Like its other claims, AML's monopolization claim cannot proceed without a properly

defined relevant market. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002) (holding that claim under Section 2 of the Sherman Act requires "possession of monopoly power *in a relevant market*").

Second, AML has not alleged anti-competitive conduct. *See* § IV.C, *supra*.

Third, AML has not alleged a dangerous probability of success. "Market strength that approaches monopoly power" is "a necessary element for showing a dangerous probability of achieving monopoly power," and "requires that the court focus on the ability of a single seller to unilaterally raise prices and restrict output." *Smith Wholesale*, 219 Fed. App'x at 409. AML's allegation that UWM has 54% market share (Am. Cl. ¶¶ 25, 92, PageID.354, 372) is insufficient to plead market strength. *See id.* (finding 56% market share insufficient).[9]

Monopoly power is "the ability of a single seller to raise price and restrict output." *Spirit Airlines*, 431 F.3d at 935. AML does not allege, and cannot allege, that UWM has the power or a dangerous likelihood of acquiring the power to force borrowers to accept its loans, or otherwise to raise prices or restrict output unilaterally. Thus, AML has failed to allege attempted monopolization.

---

[9] *See also Blue Cross Blue Shield v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) (collecting cases) ("50 percent is below any accepted benchmark for inferring monopoly power from market share"); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) (similar); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("[a] mere showing of substantial or even dominant market share alone cannot establish market power...").

**E.    AML's State Antitrust Claims and Declaratory Judgment Claim (Counts IV to XII) Fail in Tandem with the Federal Claims.**

Counts IV through XI of the Amended Counterclaim assert mirror-image antitrust claims under the Michigan, California, Florida, and Texas antitrust statutes. Because these statutes all follow federal antitrust law, the claims fail in tandem. *See Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Stds. for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022) (Michigan); *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (California); *All Care Nsg. Ser. v. High Tech Staffing Serv.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) (Florida); *Am. Airlines, Inc. v. Sabre, Inc.*, 694 F.3d 539, 543-44 (5th Cir. 2012) (Texas). Count XII seeks declaratory relief derived from the preceding antitrust claims, and thus also fails in tandem with those claims. Am. Cl. ¶ 178, PageID.391.

## V.    <u>Conclusion</u>

For the foregoing reasons, UWM respectfully requests that the Court dismiss AML's Amended Counterclaim with prejudice.

Dated: April 19, 2023              Respectfully submitted,
                                                By: */s/ Moheeb H. Murray*
                                                Moheeb H. Murray (P63893)
                                                Mahde Y. Abdallah (P80121)
                                                **BUSH SEYFERTH PLLC**
                                                100 West Big Beaver Road, Suite 400
                                                Troy, MI 48084
                                                T/F: (248) 822-7800
                                                murray@bsplaw.com
                                                abdallah@bsplaw.com
                                                ***Attorneys for United Wholesale Mortgage, LLC***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED WHOLESALE MORTGAGE, LLC

        Plaintiff/Counter-Defendant        Case No. 22-cv-10228
                                      Hon. Laurie J. Michelson

    v.

AMERICA'S MONEYLINE, INC.

        Defendant/Counter-Plaintiff

_____/

**BRIEF FORMAT CERTIFICATION FORM**

    I, <u>Moheeb H. Murray</u>, hereby certify that the foregoing brief complies with Eastern District of Michigan Local Rules 5.1(a), 5.1.1, and 7.1 and Judge Michelson's Case Management Requirements. In particular, I certify that each of the following is true (click or check box to indicate compliance):

    ☒ the brief contains a statement regarding concurrence, *see* LR 7.1(a);

    ☒ the brief, including footnotes, uses 14-point font, *see* LR 5.1(a)(3);

    ☒ the brief contains minimal footnotes and, in all events, no more than 10, *see* Case Management Requirements § III.A;

    ☒ the brief and all exhibits are searchable .pdfs, *see* Case Management Requirements § III.A;

    ☒ the brief is double spaced (except for footnotes and necessary block quotes) with one-inch margins, *see* LR 5.1(a)(2);

    ☒ deposition transcripts have been produced in their entirety and not in minuscript, *see* Case Management Requirements § III.A;

    ☒ if the brief and exhibits total 50 pages or more, a courtesy copy with ECF headers will be sent to chambers, *see* Case Management Requirements § III.B.

    I also acknowledge that if the Court later finds that these requirements are not met, my brief will be stricken.

Dated: April 19, 2023                      */s/ Moheeb H. Murray*