IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED WHOLESALE MORTGAGE, LLC | |
| *Plaintiff/Counter-Defendant*, | Case No. 22-cv-10228 |
| v. | Hon. Laurie J. Michelson |
| AMERICA'S MONEYLINE, INC., | |
| *Defendant/Counter-Plaintiff*. | |

## <u>DEFENDANT/COUNTER-PLAINTIFF'S RESPONSE IN OPPOSITION TO PLAINTIFF/COUNTER-DEFENDANT'S MOTION TO DISMISS</u>

## <u>ORAL ARGUMENT REQUESTED</u>

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.      Do the factual allegations of the amended counterclaim plausibly allege a relevant market or submarket?

   Counterplaintiff America's Moneyline, Inc. ("AML") AML says yes.

   Counterdefendant United Whole Mortgage ("UWM") says no.

2.      Do the factual allegations of the amended counterclaim plausibly allege a per se illegal hub and spoke conspiracy to boycott?

   AML says yes.

   UWM says no.

3.      Do the factual allegations of the amended counterclaim plausibly allege an unreasonable restraint of trade?

   AML says yes.

   UWM says no.

4.      Do the factual allegations of the amended counterclaim plausibly allege a dangerous probability of monopolization?

   AML says yes.

   UWM says no.

5.      In light of these conclusions, does the amended counterclaim state a valid claim for relief under the Michigan Antitrust Reform Act and for declaratory relief?

   AML says yes.

   UWM says no.

48155804.21

# <u>MOST APPROPRIATE AUTHORITIES</u>

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)................................................................................7

*Brown Shoe Co. v. U.S.*,
 370 U.S. 294 (1962)...........................................................................8, 11

*FTC v. Indiana Fed'n of Dentists*,
 476 U.S. 447 (1986).........................................................................12, 20

*Realcomp II, Ltd. v. FTC*,
 635 F.3d 815 (6th Cir. 2011) ..........................................................12, 21

*United States v. Apple*,
 791 F.3d 290 (2d Cir. 2015) ..................................................................13

48155804.21

# <u>TABLE OF CONTENTS</u>

STATEMENT OF ISSUES PRESENTED.................................................................i

MOST APPROPRIATE AUTHORITIES .................................................. ii

TABLE OF CONTENTS................................................................... iii

TABLE OF AUTHORITIES ............................................................v

I.    INTRODUCTION ...................................................................1

II.    STATEMENT OF ALLEGED FACTS RELEVANT TO MOTION.............1

    A.    The Wholesale Mortgage Lending Market ...........................................1

    B.    Competition Among Mortgage Brokers...............................................1

    C.    The Boycott ....................................................................2

    D.    Effect of the Boycott ..........................................................4

    E.    UWM's Market Dominance.................................................5

    F.    Barriers to Entry ...............................................................6

    G.    Anticompetitive Effects....................................................6

III.    ARGUMENT ....................................................................6

    A.    Legal Standards ...............................................................6

    B.    AML Has Adequately Alleged a Relevant Market..............................7

    C.    The ACC Properly Alleges A *Per Se* Violation Of The Antitrust Laws ....................................................................12

        1.    The ACC's Allegations Plausibly Suggest A *Per Se* Illegal "Hub and Spoke" Conspiracy ...................................12

            a.    The ACC Plausibly Alleges Direct Evidence of An Agreement.............................................14

            b.    The ACC Plausibly Alleges A Conspiracy Under A "Plus Factor" Analysis..............................15

48155804.21

      i.     Interbroker Communications Are a Compelling "Plus Factor" ....................................15

      ii.    The Fact That the Brokers Reversed Course and Acted Against Their Individual Self-Interest is Another Strong Plus Factor ................17

    2.    AML Has Sufficiently Alleged Market Power ........................19

D.    AML Has Plausibly Alleged An Unreasonable Restraint Of Trade In Violation Of Section 1 Of The Sherman Act ......................20

E.    AML Has Plausibly Alleged An Attempted Monopolization Claim ...........................................................................................22

IV.    CONCLUSION...........................................................................................25

48155804.21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal &*
*Prof'l Publ'ns, Inc.*,
    108 F.3d 1147 (9th Cir. 1997) ........................................................................23, 24

*Arnold Pontiac-GMC, Inc. v. General Motors Corp.*,
    786 F.2d 564 (3d Cir. 1986) ...............................................................................17

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
    917 F.2d 1413 (6th Cir. 1990) ............................................................................23

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) ..........................................................................23

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................7

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
    974 F.2d 1358 (3d Cir. 1992) .............................................................................17

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
    203 F.3d 1028 (8th Cir. 2000) (*en banc*)...........................................................15

*Blue Cross Blue Shield v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ..............................................................................23

*Bon-Ton Stores, Inc. v. May Dept. Stores*,
    881 F. Supp. 860 (W.D.N.Y. 1994)....................................................................10

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294 (1962)........................................................................................8, 11

*Butler v. Jimmy John's Franchise, LLC*,
    331 F. Supp. 3d 786 (S.D. Ill. 2018)...................................................................13

*California Dental Ass'n v. FTC*,
    128 F.3d 720 (9th Cir. 1997), *rev'd on other grounds*, 526 U.S.
    756 (1999)............................................................................................................16

v

*In re Cardizem CD Antitrust Litigation,*
  105 F. Supp. 2d 618 (E.D. Mich. 2000) ............................................................7

*Carrier Corp. v. Outokumpu Oyj,*
  673 F.3d 430 (6th Cir. 2012) ...............................................................15

*Chicago Bridge & Iron Co. N.V. v. F.T.C.,*
  534 F.3d 410 (5th Cir. 2008) ...............................................................24

*ComSpec International, Inc. v. Uniface B.V.,*
  2021 WL 4169726 (E.D. Mich. Sept. 14, 2021) ...............................................11

*Defiance Hosp. v. Fauster-Cameron, Inc.,*
  344 F. Supp. 2d 1097 (N.D. Ohio 2004) .........................................................19, 23

*In re Delta/Airtran Baggage Fee Antitrust Litig.,*
  245 F. Supp. 3d 1343 (N.D. Ga. 2017), *aff'd sub nom. Siegel v.
  Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018) (per
  curiam) ...............................................................16

*In re Disposable Contact Lens Antitrust Litig.,*
  215 F. Supp. 3d 1272 (M.D. Fla. 2016).........................................................17

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,*
  732 F.2d 480 (5th Cir. 1984) ...............................................................24

*E.I. du Pont de Nemours v. Kolon Indus.,*
  637 F.3d 435 (4th Cir. 2011) ...............................................................7

*Fishman v. Wirtz,*
  No. 78 C 3621, 1981 WL 2153 (N.D. Ill. Oct. 28, 1981)...................................16

*Fortner Enters., Inc. v. United States Steel Corp.,*
  394 U.S. 495 (1969)...............................................................20

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art &
  Design,*
  244 F.3d 521 (6th Cir. 2001) ...............................................................7

*FTC v. Indiana Fed'n of Dentists,*
  476 U.S. 447 (1986)...............................................................12, 20

vi

*FTC v. Staples*,
    970 F. Supp. 1066 (D.D.C. 1997)......................................................................10

*FTC v. Staples, Inc.*,
    190 F. Supp. 3d 100 (D.D.C. 2016)....................................................................8

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015)..................................................................8, 10

*FTC v. Whole Foods Market, Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008).........................................................................10

*HDC, LLC v. City of Ann Arbor*,
    675 F.3d 608 (6th Cir. 2012) ..............................................................................7

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ............................................................................17

*Hyland v. HomeServs. of Am., Inc.*,
    771 F.3d 310 (6th Cir. 2014) ............................................................................14

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ..........................................................................24

*In re Insurance Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) .............................................................................14

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ............................................................................10

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ............................................................................9

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
    201 F.3d 436, 1999 WL 691840 (4th Cir. 1999)..............................................17

*Mich. Div. Monument Builders v. Mich. Cemetery Ass'n*,
    458 F. Supp. 2d 474 (E.D. Mich. 2006) ...........................................................11

*MM Steel L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) ............................................................................17

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984) ...................................................................................14, 18

*Northern Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) ...............................................................................................19

*Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
    472 U.S. 284 (1985) ..........................................................................................19

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010) ..........................................................15

*In re Plywood Antitrust Litig.*,
    655 F.2d 627 (5th Cir. 1981) ............................................................................15

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
    2013 WL 3936394 (C.D. Cal. July 30, 2013) ...................................................22

*Realcomp II, Ltd. v. FTC*,
    635 F.3d 815 (6th Cir. 2011) .....................................................................12, 21

*In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ............................................................................10

*Shamrock Mktg., Inc. v. Bridgestone Bandag, LLC*,
    775 F. Supp. 2d 972 (W.D. Ky. 2011) ..............................................................19

*Silver v. New York Stock Exch.*,
    373 U.S. 341 (1963) ..........................................................................................20

*Smith Wholesale Co. v. Philip Morris USA, Inc.*,
    219 F. App'x 398 (6th Cir. 2007) ...............................................................23, 24

*Spirit Airlines, Inc. v. Northwest Airlines*,
    431 F.3d 917 (6th Cir. 2005) ............................................................................11

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue
    Shield*,
    552 F.3d 430 (6th Cir. 2008) ............................................................................18

*Toys 'R' Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ............................................................................13

48155804.21

*U.S. Anchor Mfg. v. Rule Indus., Inc.*,
    7 F.3d 986 (11th Cir. 1993) ..................................................................19

*United States v. Apple*,
    791 F.3d 290 (2d Cir. 2015) ...............................................................13

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)..............................................................................18

*United States v. Dairymen, Inc.*,
    660 F.2d 192 (6th Cir. 1981) ...............................................................10

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ...........................................................21, 22

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011)........................................8, 9, 12, 21

*Virgin Atl. Airways, Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001) .........................................................12, 21

*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
    388 F.3d 955 (6th Cir. 2004) ...............................................................11

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) .................................................................22

**STATUTES, RULES & REGULATIONS**

Federal Rule of Civil Procedure 8 ............................................................7

Federal Rule of Civil Procedure 12(b)(6) ................................................8

**OTHER AUTHORITIES**

Department of Justice/Federal Trade Commission Merger Guidelines ....................9

ix

## I.    <u>INTRODUCTION</u>

Defendant United Wholesale Mortgage, LLC's ("UWM") Motion to Dismiss significantly ignores the well-pleaded allegations of the Amended Counterclaim as well as established case law on the issues it addresses. The motion should be denied.

## II.    <u>STATEMENT OF ALLEGED FACTS RELEVANT TO MOTION</u>

### A.    <u>The Wholesale Mortgage Lending Market</u>

Wholesale mortgage lending is a relevant antitrust market or sub-market. Amended Counterclaim [ECF No. 24] ("ACC") ¶15, PageID.350. In this market, mortgage brokers advise the customer of available interest rates and loan terms and select a particular wholesale mortgage lender in order to find the best mortgage loan product and pricing for their clients. *Id.* ¶18, PageID.351. In contrast, retail lenders market directly to the consumer. *Id.* ¶17, PageID.351.

The national wholesale lending market involves a distinct group of consumers (those who choose to work with mortgage brokers), and a specialized class of vendors (mortgage brokers). *Id.* ¶23 (C), PageID.353. The wholesale lending market is also widely recognized as a separate and distinct market by mortgage brokers and the mortgage industry as a whole. *Id.* ¶23(B), PageID.353. Unlike the retail channel, wholesale mortgage lenders do not operate facilities for marketing directly to consumers. *Id.* ¶23(D), PageID.353-354.

### B.    <u>Competition Among Mortgage Brokers</u>

1

UWM has a 54% share of the wholesale mortgage lending market—up from 34% in 2020. ECF No. 24 ¶25, PageID.354. UWM's wholesale competition includes Rocket Pro ("Rocket") and Fairway. *Id.* ¶27, PageID.354-355. These firms also provide loans directly to consumers at "retail." *Id.* ¶¶26-27, PageID.354-355. Rocket offers a number of benefits to mortgage brokers and their customers not available through UWM. *Id*. ¶28, PageID.355. Rocket is less restrictive in the credit scores it requires, and therefore provides loans to consumers who would be refused by UWM. *Id*. ¶28(B), PageID.355. Rocket also offers lower cost mortgage insurance than does UWM and is rated more highly by many firms that evaluate mortgage lenders. *Id*. ¶28(C), PageID.355; *id.* ¶30, PageID.355-356. UWM's CEO Mat Ishbia has stated that UWM is "not trying to be the best priced." *Id.*

By 2021, UWM's position was threatened by Fairway and Rocket. ECF No. 24 ¶¶34-35, PageID.356-357. Rocket's wholesale business had increased from 3,000 mortgage brokers to 10,000, reflecting the fact that Rocket's products and prices were especially attractive to brokers and their customers. *Id*. ¶34, PageID.356-357.

## C.   <u>The Boycott</u>

In response, Mr. Ishbia announced an ultimatum at a live virtual meeting with brokers on UWM's Facebook page. ECF No. 24 ¶37, PageID.357. UWM introduced an addendum to its agreements providing that its brokers would not submit loans to either Rocket or Fairway. *Id.* ¶¶38, 71, PageID.357-358, 366-367. Mr. Ishbia said

that "if you work with them [Fairway Mortgage and Rocket], you can't work with UWM, effective immediately." *Id*. ¶37, PageID.357.

Mr. Ishbia obtained agreement to the addendum by the vast majority of UWM's brokers. This involved a collective agreement by brokers, facilitated by UWM. Brokers who supported the boycott persuaded other brokers to join in it, advocating collective action by the brokers:

- "We are ALL IN" "unstoppable together …";
- "We are all family! Brokers are better when we work together";
- "Brokers are family. We don't go against our family";
- "All in … with us or out";
- "You're either with the captain [UWM] or off the boat";
- "with us or against us"; and
- "all for one and one for all."
- "Team Broker!"; Let's kill it fam- --you know it's going to be good";
- "We are ALL IN" "unstoppable together"; "Sign on the line that is dotted";
- "All in"; and
- "With us or out."

*Id*. ¶¶40-41, PageID.358-359. Brokers also used UWM's Facebook page to discourage other brokers who disagreed with the boycott and to encourage agreement. *Id*. ¶¶43, 49-50, PageID.359, 361.

Mr. Ishbia stated that "all of our current clients are aligned" on this initiative. *Id*. He also stated that the brokers "have locked arms with us." *Id*.

3

48155804.21

On the same day as the virtual meeting, the Association of Independent Mortgage Experts ("AIME") issued its own letter voicing support for the boycott. *Id*. ¶45, PageID.360. AIME describes itself as "a community" of "mortgage professionals," i.e. mortgage brokers. *Id*. ¶46, PageID.360. Other trade groups have also provided significant vehicles for communication and agreement between the mortgage brokers with regard to the boycott. *Id*. ¶48, PageID.361.

The boycott was a dramatic change in behavior by the boycotting brokers, who until that time had been utilizing Rocket and Fairway in increasing numbers because of their good prices and high quality service. *Id.* ¶61, PageID.364.

The decision to boycott Rocket and Fairway would have been contrary to the interests of individual brokers if they had not, in overwhelming numbers, agreed to the boycott. *Id.* ¶62, PageID.364-365. If an individual broker deprived itself of the availability of loans from Fairway and Rocket, it could expect to lose substantial business to other brokers who offered a broader range of lower priced, higher quality alternatives, unless the brokers had all agreed to be "all in." *Id.* This is reflected in the comments of brokers, discussed above, that they were "unstoppable together". *Id*. ¶¶40-41, PageID.358-359.

### D.   Effect of the Boycott

Mr. Ishbia predicted during the virtual meeting that Rocket and Fairway would lose 70%-90% of their business as a result of the boycott. ECF No. 24 ¶55,

PageID.363. Mr. Ishbia later indicated that the boycott exceeded his expectations, stating "I couldn't have imagined it going so well." *Id.* UWM announced "93% of the brokers presented with the addendum agreed to join the boycott." *Id.* ¶54, PageID.362-363. UWM later stated that more than 11,500 of its 12,000 brokers participated in the initiative. *Id.* ¶59(B), PageID.364. Since these 12,000 brokers represent significantly more than 60% of the wholesale mortgage brokers in the United States, *id.* ¶25, PageID.354, simple arithmetic indicates that more than 55% of the brokers (93% of 60%) in the market joined the boycott.

The success of the boycott is borne out by UWM's dramatic increase in market share from 34% in 2020 to 54% today. *Id.* ¶56, PageID.363. Meanwhile, Rocket's and Fairway's market shares have dropped significantly. *Id.* Mr. Ishbia directly linked this to the boycott: "When we announced the [Ultimatum], they [Rocket] were more than twice my size overall, not wholesale, overall. Now I'm bigger than them." *Id.* ¶60, PageID.364.

### E.    **UWM's Market Dominance**

UWM's market power is reflected not only in its share but also in its ability to demand burdensome terms from its brokers. This is reflected in the fact that 93% of its brokers agreed to accept its ultimatum, even though that deprived them of access to lower priced, innovative lenders. ECF No. 24 ¶54, PageID.362-363. In a February 2023 interview, Mr. Ishbia explained that the boycott was so successful

because "[t]he penalty of working with Rocket … is you don't get to work with UWM. And nobody is willing to take that chance." *Id.* ¶59(A), PageID.364. "That's why of the 12,000 brokers, 11,500 all stayed with UWM." *Id.* ¶59(B), PageID.364.

### F.   Barriers to Entry

There are substantial barriers to entry into the wholesale markets, including the need to develop (a) a sophisticated electronic platform that can take years to complete and cost millions of dollars, (b) hundreds, if not thousands, of qualified, trained personnel, (c) a substantial sales force, (d) a significant reputation, and (e) satisfaction of licensing requirements on a state by state basis, as well as compliance with federal guidelines. ECF No. 24 ¶101, PageID.375-376.

### G.   Anticompetitive Effects

The boycott harmed consumers by reducing their access to the lower price, higher quality products offered by Fairway and Rocket. ECF No. 24 ¶104, PageID.376-377. The boycott also prevented brokers from performing their stated function of reviewing all available sources of lending and providing their customers with the most suitable and lowest priced loans. *Id.* The boycott has effectively insulated UWM from the need to compete with Rocket and Fairway. *Id.* ¶106, PageID.377.

## III.   ARGUMENT

### A.   Legal Standards

6

The Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), requires only that "a complaint [present] enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. It is sufficient that a complaint offer "only enough facts to state a claim for relief that is plausible on its face." *Id*. at 570. The Sixth Circuit has not interpreted this standard "so narrowly as to be the death of notice pleading," but rather recognizes the "continuing viability of the 'short and plain' language of Federal Rule of Civil Procedure 8." *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012). Detailed factual allegations are not required to survive a motion to dismiss. *Id.* (citing *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009)).

### B.   <u>AML Has Adequately Alleged a Relevant Market</u>

UWM's argument on "relevant market" fails on multiple grounds. First, "[m]arket definition is a highly fact-based analysis that generally requires discovery." *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) (Cited by UWM). As a result, "dismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to certain types of glaring deficiencies, such as failing to allege a relevant market [altogether]." *E.I. du Pont de Nemours v. Kolon Indus*., 637 F.3d 435, 444 (4th Cir. 2011) (quotations and citation omitted). *In re Cardizem CD Antitrust Litigation*, 105 F. Supp. 2d 618, 681 (E.D. Mich. 2000), relied on by UWM, rejected a motion to

7

dismiss on relevant market grounds, stating that the issue "involves questions of fact not properly addressed in a Rule 12(b)(6) motion to dismiss."

Second, UWM tries to argue that wholesale and retail mortgage lending are "reasonably interchangeable." But UWM ignores the Supreme Court's holding in *Brown Shoe Co. v. U.S.*, 370 U.S. 294 (1962). The Supreme Court stated that "[t]he *outer boundaries* of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325 (emphasis added). But the Court also explained that the contours of a product market can be determined by examining such "practical indicia" as "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* Courts "routinely rely" on these factors as a "useful analytical tool" in defining the product market. *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 118, 118 n.11 (D.D.C. 2016) ("*Staples II*"); *see also FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27-33 (D.D.C. 2015); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51-60 (D.D.C. 2011).

Here, the ACC alleges facts that closely track the *Brown Shoe* criteria. *See* ECF No. 24 ¶¶23.A, PageID.353 (distinct group of customers, i.e. those who choose to utilize mortgage brokers); 23.B, PageID.353 (recognized as separate and distinct

channel); 23.C, PageID.353 (specialized vendors, i.e. mortgage brokers, provide substantial services to consumers); 23.D, PageID.353-354 (distinct marketing efforts utilized by wholesale and retail lenders); and 23.E, PageID.354 (UWM states that costs to consumers from wholesale lending are substantially lower than costs to retailers). *See also McWane, Inc. v. FTC*, 783 F.3d 814, 828-829 (11th Cir. 2015) (domestic fittings were a separate submarket due, in part, to the "higher prices for. . . domestic fittings"); *H&R Block*, 833 F. Supp. 2d at 55 (do-it-yourself and assisted tax returns were separate submarkets in light of the "significant price disparities" between the two).

Moreover, the ACC alleges substantial factual detail as to the unique services that mortgage brokers provide to consumers. *See* ECF No. 24 ¶¶17-20, PageID.351-352. Consumers desiring these services cannot obtain them through the retail channel, which does not involve brokers.

Third, UWM argues that consumers can obtain mortgages through either the retail or wholesale channel, and that means that both must be in the same market. But that is not the law. "[P]roperly defined antitrust markets often exclude some substitutes to which some customers might turn . . . ." Department of Justice/Federal Trade Commission Merger Guidelines § 4.0.[1] "[T]he mere fact that a [product] may

---

[1] Many courts, including the Sixth Circuit, have also recognized and applied the Guidelines' test for market definition even outside of the merger context. *See, e.g.*,

be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *See, e.g.*, *FTC v. Staples*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("*Staples I*").

Numerous cases have, like AML has here, defined markets consisting of only some of the distribution channels for a product or service. *See Staples I*, 970 F. Supp. at 1073-1075 ("the sale of consumable office supplies through office superstores" was a relevant market, even though "all sellers . . . at some level, compete with one another"); *Sysco*, 113 F. Supp. 3d at 27 (relevant market was "broadline foodservice distribution," not including other distribution channels in food service); *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1040 (D.C. Cir. 2008) (relevant market was premium natural and organic supermarkets, not all food retailers); *Bon-Ton Stores, Inc. v. May Dept. Stores*, 881 F. Supp. 860, 869 (W.D.N.Y. 1994) (finding a distinct submarket of traditional department stores, as opposed to all general merchandise, apparel, and furniture sales: "the fact that two vendors both sell a particular type of merchandise does not necessarily mean that they are in the same product market"). *See also United States v. Dairymen, Inc.*, 660 F.2d 192, 195 (6th Cir. 1981) (recognizing the relevance of geographic submarkets).

---

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014).

UWM's cases are not to the contrary. In *Mich. Div. Monument Builders v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 483 (E.D. Mich. 2006), the court explained that the relevant market issue "is typically a fact-based analysis that generally requires discovery[.]" The claim was dismissed only because "plaintiffs' complaint contains no allegations whatsoever" that supported its market definition, *id.*, numerous other courts had already rejected plaintiffs' assertion, *id.* at 484, and its proposed market "blatantly ignore[d] economic and commercial reality and the facts in the record before the Court," *id.* at 483. Similarly, in *ComSpec International, Inc. v. Uniface B.V.*, 2021 WL 4169726, at *5 (E.D. Mich. Sept. 14, 2021), plaintiffs attempted to define a market limited to the defendant's own products, without any supporting factual allegations.

In *Spirit Airlines, Inc. v. Northwest Airlines*, 431 F.3d 917, 933-935 (6th Cir. 2005), the Sixth Circuit endorsed the use of submarkets under *Brown Shoe*, and found that the narrow market alleged by the plaintiff was proper. In *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 961-962 (6th Cir. 2004), the court also cited to *Brown Shoe*. Plaintiff's market definition was rejected based on the inadequacy of an expert's testimony, not based on the allegations of the complaint. *Id.* at 963.

Fourth, contrary to UWM's arguments, successful allegation of a relevant market is not essential to AML's claims. Market definition is necessary only "[w]hen

11

restraints are not per se unlawful, and their net impact on competition not obvious[.]" *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 825 (6th Cir. 2011). Even in the absence of *per se* liability, an unreasonable restraint of trade can be proven through direct evidence of effects on consumers without proof of a relevant market. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986) (no need to examine "market definition and market power" where there is evidence of "actual detrimental effects"). Here, both exceptions apply. Detrimental effects on price and quality are alleged here through the exclusion of low price, high quality alternatives. *See* ECF No. 24 ¶¶28-35, 104, PageID.355-357, 376-377. Courts recognize harm to competition where a low price competitor is excluded, since that reduces pricing pressure on the other competitors. *See H&R Block*, 833 F. Supp. 2d at 79-80. The reduction of high quality alternatives is also an anticompetitive effect. *Virgin Atl. Airways, Ltd. v. British Airways PLC*, 257 F.3d 256, 264-265 (2d Cir. 2001).

For all these reasons, UWM's arguments should be rejected.

### C.   The ACC Properly Alleges A *Per Se* Violation Of The Antitrust Laws

#### 1.   The ACC's Allegations Plausibly Suggest A *Per Se* Illegal "Hub and Spoke" Conspiracy

UWM's arguments against *per se* treatment here ignore both the overwhelming case law and the substantial allegations of the ACC. Contrary to UWM's assertion, a "hub and spoke" conspiracy, involving agreement between

12

competing brokers to sign the addendum, coordinated by UWM, is a *per se* antitrust violation. *See Toys 'R' Us, Inc. v. FTC*, 221 F.3d 928, 936-937 (7th Cir. 2000); *United States v. Apple*, 791 F.3d 290, 324-325 (2d Cir. 2015) (*per se* violation found; "A horizontal conspiracy can use vertical agreements to facilitate coordination[.]"); *see also Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 795 (S.D. Ill. 2018) ("The idea here is that since the hub orchestrated the horizontal wheel, it can be held *per se* liable for that horizontal agreement—even though the hub did not enter into a horizontal agreement itself.").

The facts alleged here clearly fit the "hub and spoke" paradigm. In *Apple*, the Second Circuit noted that "Apple coordinated phone calls between the publishers who had agreed and those who remained on the fence." *Id.* at 319. Similarly, the ACC alleges that UWM responded to brokers with concerns, ECF No. 24 ¶43, PageID.359, and established a digital forum for broker discussions, *id.* ¶49, PageID.361.

The Second Circuit also noted that Apple "endeavored to assure the publishers that they weren't going to be alone[.]" *Apple*, 791 F. 3d at 319 (quotations and brackets omitted). The ACC similarly alleges that Mr. Ishbia said publicly that "all our current clients are aligned," that all the brokers "have locked arms with us," *id.* ¶42, PageID.359, and that "everyone's going to sign[.]" *Id.* ¶51, PageID.362.

a.     **The ACC Plausibly Alleges Direct Evidence of An Agreement**

Alleged facts plausibly suggesting a horizontal agreement are certainly present here, either as direct evidence or as "plus factors." As described above, acquiescence in UWM's ultimatum was proposed at a virtual meeting at which the brokers communicated at length with one another. Statements such as "we are ALL IN," "unstoppable together," and "all for one and one for all," ECF No. 24 ¶¶40-41, PageID.358-359, are all statements providing direct evidence that numerous brokers agreed on a common course of action. This evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Hyland v. HomeServs. of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014). "All in" is no different than "we agree." Such statements more than plausibly suggest "a conscious commitment to a common scheme" or a "meeting of minds," which is all that is required. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 768 (1984) (quotations and citations omitted).

The Third Circuit in *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010), explained that "evidence implying a traditional conspiracy" requires only "'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan[.]'" Here, the statements regarding the brokers being "all in," "unstoppable together," "all family" and "all for one" are certainly "assurances of common action" and "a common plan." *See id.*

14

**b.      The ACC Plausibly Alleges A Conspiracy Under A "Plus Factor" Analysis**

Even if these allegations were not viewed as direct evidence, the alleged facts circumstantially support a plausible horizontal agreement between brokers. The first element is parallel conduct. *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1004 (E.D. Mich. 2010). Here, the signing of an agreement by more than 90% of UWM's brokers certainly qualifies.

While parallel conduct alone is not sufficient, "[i]f the Court can discern some 'factual enhancement' pointing toward, or suggesting a basis for inferring, an illegal agreement, the motion to dismiss must be denied." *Id.* (citing *Twombly*, 550 U.S. at 556-557); *see also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 444 (6th Cir. 2012). Several such "plus factors" are present here.

**i.      Interbroker Communications Are a Compelling "Plus Factor"**

Numerous courts have held that the presence of parallel behavior coupled with competitor communications are sufficient to prove a conspiracy. *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (*en banc*) ("[A] high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy."); *In re Plywood Antitrust Litig.*, 655 F.2d 627, 634 (5th Cir. 1981) ("The parallel pricing conduct clearly demonstrated in the record plus the numerous items of direct

48155804.21

evidence of communication between high-level personnel on pricing policy adequately support the jury's verdict").

The communications alleged here are especially compelling because they involved (at the very least) explicit invitations to collude. *See* ECF No. 24 ¶¶40-41, 43, 59, 50, PageID.358-359, 364, 361 ("Work together," "don't go against our family," "all in . . . with us or out," "you're either with the captain or off the boat," and "with us or against us."). *See In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1372 (N.D. Ga. 2017), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018) (per curiam) ("Numerous cases have recognized that an invitation to collude can serve as evidence of a conspiracy."); *Fishman v. Wirtz*, No. 78 C 3621, 1981 WL 2153, at *59 (N.D. Ill. Oct. 28, 1981) ("One of the strongest circumstantial indicators of a conspiracy is the existence of a common invitation or request to join into a concerted plan of action.").

The allegations of statements by AIME and other trade associations plausibly suggest an agreement by their members, on behalf of whom they speak. ECF No. 24 ¶¶45-48, PageID.360-361. *See, e.g., California Dental Ass'n v. FTC*, 128 F.3d 720 (9th Cir. 1997), *rev'd on other grounds*, 526 U.S. 756 (1999) ("Professional associations are 'routinely treated as continuing conspiracies of their members'" (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500, (1988)).

16

ii.   **The Fact That the Brokers Reversed Course and Acted Against Their Individual Self-Interest is Another Strong Plus Factor**

The "further factual enhancement" also arises from the abrupt about-face by 93% of UWM's brokers after their increasing use of Rocket and Fairway. ECF No. 24 ¶34, PageID.356-357. In *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1365 (3d Cir. 1992) (discussing the holding in *Arnold Pontiac-GMC, Inc. v. General Motors Corp.*, 786 F.2d 564 (3d Cir. 1986)), evidence was found sufficient to defeat summary judgment, where "GM had favorably viewed Arnold Pontiac's franchise application until after the GM dealers collectively expressed disapproval and threatened non-cooperation." *See also MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663 (7th Cir. 2002).

Notwithstanding UWM's pressure, the conduct that occurred here also would have been contrary to the individual brokers' self-interests if not undertaken by most brokers. *See* ECF No. 24 ¶62, PageID.364-365; *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1296 (M.D. Fla. 2016) (a new pricing policy would only make sense if a manufacturer "can be confident that other manufacturers will be taking similar action, and won't be taking a competitive advantage."). This "is perhaps the strongest plus factor indicative of conspiracy." *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436, 1999 WL 691840, at \*10 (4th

17

Cir. 1999). As the brokers also said, they are "unstoppable together." *Id.* ¶¶40-41, 62, PageID.358-359, 364-365. The implication was that they were *not* unstoppable individually, and therefore collective action was necessary.

UWM argues that its orchestration of the boycott could not constitute a *per se* antitrust violation because it "has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." ECF No.27 at PageID.428 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)); *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). But UWM's thousands of agreements with brokers and orchestration of a group boycott were in no sense done "independently." In *Monsanto*, the Supreme Court concluded that there was sufficient evidence of an agreement to support a valid antitrust claim. *Monsanto*, 465 U.S. at 768.

The other cases cited by UWM, including *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008), are not to the contrary. They stand only for the uncontroversial proposition that vertical agreements alone are insufficient to establish a horizontal conspiracy. *See, e.g.*, *Total Benefits*, 552 F.3d at 436 ("[T]he critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other.").

### 2.    AML Has Sufficiently Alleged Market Power

The ACC's allegations meet the standards in *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) for *per se* boycotts, *i.e.*, that "the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete . . . and frequently the boycotting firms possessed a dominant position in the relevant market." The boycotting brokers clearly represented a dominant force in the market: more than 55%. Statement of Alleged Facts ("SOF"), *supra* at II.D. UWM also possessed a dominant (54%) market position. SOF, *supra* at II.B, II.D. Even "a dangerous *probability* of achieving monopoly power may be established by a 50% share." *U.S. Anchor Mfg. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993); *see also Shamrock Mktg., Inc. v. Bridgestone Bandag, LLC*, 775 F. Supp. 2d 972, 983 (W.D. Ky. 2011) (finding a 50% market share sufficient to "to meet the market power requirements" of a Section 1 claim); *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1116-1117 (N.D. Ohio 2004) (50% sufficient for attempt to monopolize).

Moreover, market share is not the only way to prove market dominance. The ability to exclude competition is sufficient to establish market power. For example, the Supreme Court found market power was shown when the conduct brought about an "appreciable restraint," *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 11 (1958), as well as where the defendant "has the power to raise prices or impose other

burdens and terms such as a tie-in, with respect to any appreciable number of buyers," *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 503-504 (1969). The ACC alleges that UWM had sufficient power to successfully impose its burdensome ultimatum on 93% of its brokers, many of whom had previously chosen to utilize Rocket and Fairway. ECF No. 24 ¶¶54, 100, PageID.362-363, 374-375.

The competitive necessity of the brokers is revealed by the allegations that according to Mr. Ishbia, UWM's wholesale market share increased, and Rocket's and Fairway's shares dropped significantly, due to the boycott. SOF, *supra* at II.D. In *Silver v. New York Stock Exch.*, 373 U.S. 341, 348 (1963), cited by the *Northwest Stationers* court with regard to this requirement, the Supreme Court found that the denied services were important because a party without them would be "hampered substantially in [their] crucial endeavor," and they provided "important business advantages[.]" The ACC's allegations meet this standard.

### D.   AML Has Plausibly Alleged An Unreasonable Restraint Of Trade In Violation Of Section 1 Of The Sherman Act

Even if the Court rejected *per se* treatment here, the ACC plausibly alleges an unreasonable restraint of trade. Either "actual detrimental effects" or market power plus "the potential for genuine adverse effects on competition" are sufficient. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986). As described above, market power is adequately alleged here. UWM's assertion that the ACC does not adequately allege anticompetitive effects completely ignores the detailed allegations

20

in the ACC. It explains that UWM's actions "caused consumers to pay higher prices and obtain lower quality mortgages," ECF No. 24 ¶¶13, 74, 108, PageID.349-350, 367-368, 378, restricted access to loans by economically disadvantaged consumers with lower credit scores, *id.* ¶¶28(B), 32, 76, PageID.355, 356, 368, and "reduc[ed] consumer choice," *id.* ¶62, PageID.364-365. *See also id.* at ¶108, PageID.378 ("Those who accepted the Ultimatum and joined the boycott were unable to offer lower priced, higher quality Rocket Pro and Fairway loans to their customers."). This is sufficient to plausibly suggest anticompetitive effects. *See generally H&R Block, supra*, *Virgin Atl., supra*.

Restrictions on choice can also constitute anticompetitive effects. The "anticompetitive nature of the restraint" in *Realcomp II*, was the "reduction in competitive brokerage options available to home sellers"—circumstances quite analogous to the restriction of consumers' lender options instigated by the conduct of UWM and Mr. Ishbia. *See Realcomp II*, 635 F.3d at 827, 829.

Moreover, restrictions on mortgage brokers, who represent the interests of their clients, are plainly harmful to consumers. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191-193 (3d Cir. 2005) (condemning exclusive arrangements imposed on dealers). The *Dentsply* court recognized that consumers derived a substantial benefit from dealers, "which as a class traditionally carries the products of multiple vendors," and facilitate "one stop shopping" across multiple competing

21

products. *Id.* at 192. The ACC alleges the very same facts as to brokers. ECF No. 24 ¶¶17-20, PageID.351-352. Restrictions placed on brokers effectively limit consumer choice, and necessarily cause anticompetitive effects. *Dentsply*, 399 F.3d at 194.

UWM argues that its agreement could not harm competition because it is "of relatively short duration" and "can be terminated upon short notice." ECF No. 27 at PageID.432. But the ACC explains that brokers can *never* opt out of the Ultimatum if they ever want to do business with UWM. As Mr. Ishbia stated, "The penalty of working with Rocket … is you don't get to work with UWM. *And nobody is willing to take that chance.*" ECF No. 24 ¶59(A), PageID.364 (emphasis added). As the *Dentsply* court explained, the restraint on dealers in that case "imposes an 'all-or-nothing' choice on the dealers. The fact that dealers have chosen not to drop Dentsply teeth in favor of a rival's brand demonstrates that they acceded to heavy economic pressure." *Dentsply*, 399 F.3d at 196. The same is alleged here.

Thus, the facts here are nothing like the "facially lawful relationship" contemplated by *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012). Similarly, *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 3936394, at *2 (C.D. Cal. July 30, 2013), involved *free competition* for exclusive dealing contracts.

### E.   AML Has Plausibly Alleged An Attempted Monopolization Claim

UWM also asserts that its 54% market share cannot establish a "dangerous probability of success" necessary to state an attempted monopolization claim. But in

addition to conflating proof and plausibility, UWM conflates the market-share inquiry relevant to a would-be monopolist's "dangerous probability of success" with actual "monopoly power" relevant to claims of monopolization. *Defiance Hosp., supra*, 344 F. Supp. 2d at 1112, 1116-17 (holding that while "*monopoly power* requires proof of more than sixty percent market power . . . courts will generally find a *dangerous probability of success* where the defendant has a market share of fifty percent or more . . . [and firms] with market shares between thirty and fifty percent may be found to have a dangerous probability of success if other factors are present" (emphasis added)); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1443 n.29 (6th Cir. 1990) (finding an average market share over a seven-year period of 58% sufficient to support an attempted monopolization claim).

UWM's cases are not to the contrary. *Blue Cross Blue Shield v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) and *Bailey v. Allgas, Inc.*, 284 F.3d 1237 (11th Cir. 2002) involved a claims of actual monopolization, not attempted monopolization.

The two cases that UWM cites that actually do concern attempted monopolization stand for nothing more than the unremarkable proposition that a dominant market share *alone* may not demonstrate a "dangerous probability of success," on a full factual record. *Smith Wholesale Co. v. Philip Morris USA, Inc.*, 219 F. App'x 398, 410 (6th Cir. 2007); *Am. Prof'l Testing Serv., Inc. v. Harcourt*

*Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997). But the ACC alleges many additional facts beyond market share to support its conclusions. It alleges that many of UWM's supposed competitors provide inferior service and are therefore inadequate alternatives for brokers like AML. ECF No. 24 ¶93, PageID.373. UWM's market dominance is also entrenched and solidified by substantial consolidation in the wholesale lending market. *Id.* ¶¶94-96, PageID.373-374. According to Mr. Ishbia, UWM enjoys significant competitive advantages over smaller competitors because of its "scale." *Id.* ¶¶94-97, PageID.373-374. UWM's dramatic growth in market share (from 34% to 54%) as a result of the boycott also supports an inference of dangerous probability. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984). Additionally, unlike in *Smith* and *Harcourt*, multiple barriers to entry are specifically alleged in detail. SOF, *supra* at II.F. Numerous cases have found entry barriers of the sort alleged here to be sufficient to sustain an antitrust claim. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997); *Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 438 (5th Cir. 2008). And there is no "countervailing evidence" (present in *Smith*) alleged in the ACC. These allegations are far more than sufficient to plausibly suggest a dangerous probability of success.

48155804.21

## IV.   <u>CONCLUSION</u>

UWM's arguments on the state antitrust laws and declaratory judgment claim

rely on its arguments above. They fail for the same reasons.

For the foregoing reasons, UWM's motion should be denied in its entirety.

Respectfully submitted,

<table>
<tr><td>Dated: June 7, 2023</td><td>By: /s/David A. Ettinger_____<br>David A. Ettinger (P26537)<br><b>HONIGMAN LLP</b><br>660 Woodward Avenue, Suite 2290<br>Detroit, MI 48226<br>(313) 465-7368<br>DEttinger@honigman.com<br><br>Jeffrey B. Morganroth (P41670)<br>Jason R. Hirsch (P58034)<br><b>MORGANROTH & MORGANROTH, PLLC</b><br>344 North Old Woodward Avenue, Suite 200<br>Birmingham, Michigan 48009<br>(248) 864-4000<br>jmorganroth@morganrothlaw.com<br>jhirsch@morganrothlaw.com<br><br>Matthew D. Novello (P63269)<br><b>NOVELLO & ASSOCIATES, PC</b><br>3542 Lakeview<br>Highland, Michigan 48356<br>mnovello@novellolawfirm.com<br><br><i>Attorneys for Defendant/Counter-Plaintiff, AML</i></td></tr>
</table>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED WHOLESALE MORTGAGE, LLC | |
| *Plaintiff/Counter-Defendant*, | Case No. 22-cv-10228 |
| v. | Hon. Laurie J. Michelson |
| AMERICA'S MONEYLINE, INC., | |
| *Defendant/Counter-Plaintiff*. | |

## BRIEF FORMAT CERTIFICATION FORM

I, David A. Ettinger, hereby certify that the foregoing brief complies with Eastern District of Michigan Local Rules 5.1(a), 5.1.1, and 7.1 and Judge Michelson's Case Management Requirements. In particular, I certify that each of the following is true (click or check box to indicate compliance):

- ☒ the brief contains a statement regarding concurrence, *see* LR 7.1(a);
- ☒ the brief, including footnotes, uses 14-point font, *see* LR 5.1(a)(3);
- ☒ the brief contains minimal footnotes and, in all events, no more than 10, *see* Case Management Requirements § III.A;
- ☒ the brief and all exhibits are searchable .pdfs, *see* Case Management Requirements § III.A;
- ☒ the brief is double spaced (except for footnotes and necessary block quotes) with one-inch margins, *see* LR 5.1(a)(2);
- ☒ deposition transcripts have been produced in their entirety and not in minuscript, *see* Case Management Requirements § III.A;
- ☒ if the brief and exhibits total 50 pages or more, a courtesy copy with ECF headers will be sent to chambers, *see* Case Management Requirements § III.B.

I also acknowledge that if the Court later finds that these requirements are not met, my brief will be stricken.

Dated: June 7, 2023                          /s/David A. Ettinger
                                             David A. Ettinger (P26537)

2

48155804.21

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 7, 2023, a true and accurate copy of AML's Response in Opposition to UWM's Motion to Dismiss was served upon counsel of record via the CM/ECF electronic filing system.

Dated: June 7, 2023                          /s/David A. Ettinger_____
                                             David A. Ettinger (P26537)

48155804.21