IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED WHOLESALE MORTGAGE, LLC<br><br>    *Plaintiff/Counter-Defendant*,<br><br>v.<br><br>AMERICA'S MONEYLINE, INC.,<br><br>    *Defendant/Counter-Plaintiff*. | Case No. 22-cv-10228<br><br>Hon. Laurie J. Michelson<br>Magistrate Judge Elizabeth A. Stafford |

## DEFENDANT/COUNTER-PLAINTIFF'S MOTION FOR RECONSIDERATION OF OPINION AND ORDER GRANTING UNITED WHOLESALE MORTGAGE'S MOTION TO DISMISS AMENDED COUNTERCOMPLAINT [27]

Defendant/Counter-Plaintiff America's Moneyline, Inc. ("AML") moves this Court to reconsider its Opinion and Order Granting United Wholesale Mortgage's Motion to Dismiss Amended Countercomplaint [27] (ECF No. 35) pursuant to Local Rule 7.1(h)(2). AML respectfully believes the Opinion and Order is based on mistakes of law and fact, because it relied upon the Report and Recommendation in *The Okavage Group, LLC v. United Wholesale Mortgage, LLC, and Matthew Ishbia* (USDC, Middle District of Florida, Case No. 3:21-cv-00448, doc. 112) ("Report"). But the Report's conclusions were directly contrary to controlling Sixth Circuit precedent, and failed to address critical factual allegations. Under an analysis that

corrects these errors, the Amended Counterclaim should be sustained, and the Motion to Dismiss denied.

This Court's statement that it could reconsider the issue if the Objections to the Report were sustained or the decision was overturned on appeal cannot cure this error, because the Objections and any appeal will necessarily be decided based on Eleventh Circuit law, not Sixth Circuit law.

This Motion is based upon the pleadings in this case as well as the accompanying Memorandum of Law in Support of Motion for Reconsideration of Opinion and Order Granting United Wholesale Mortgage's Motion to Dismiss Amended Countercomplaint [27].

Under Local Rule 7.1(a), there was a conference between the attorneys for the parties in which AML explained the nature of this Motion and its legal basis and requested, but did not obtain, concurrence in the relief sought.

WHEREFORE, America's Moneyline, Inc. prays this Court to reconsider its Opinion and Order, and to deny United Wholesale Mortgage, LLC's Motion to Dismiss America's Moneyline, Inc.'s Amended Counterclaim.

Respectfully submitted,

Dated: April 12, 2024

By: /s/Jeffrey Morganroth (w/permission)
Jeffrey B. Morganroth (P41670)
Jason R. Hirsch (P58034)
**MORGANROTH & MORGANROTH, PLLC**
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000
jmorganroth@morganrothlaw.com
jhirsch@morganrothlaw.com

David A. Ettinger (P26537)
**HONIGMAN LLP**
660 Woodward Avenue, Suite 2290
Detroit, MI 48226
(313) 465-7368
DEttinger@honigman.com

Matthew D. Novello (P63269)
**NOVELLO & ASSOCIATES, PC**
3542 Lakeview
Highland, Michigan 48356
mnovello@novellolawfirm.com

*Attorneys for Defendant/Counter-Plaintiff, AML*

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, a true and accurate copy of the forgoing

was served upon counsel of record via the CM/ECF electronic filing system.

Dated: April 12, 2024          /s/David A. Ettinger         
                                    David A. Ettinger (P26537)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED WHOLESALE MORTGAGE, LLC | |
| *Plaintiff/Counter-Defendant*, | Case No. 22-cv-10228 |
| v. | Hon. Laurie J. Michelson |
| AMERICA'S MONEYLINE, INC., | Magistrate Judge Elizabeth A. Stafford |
| *Defendant/Counter-Plaintiff*. | |

**<u>DEFENDANT/COUNTER-PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF OPINION
AND ORDER GRANTING UNITED WHOLESALE MORTGAGE'S
MOTION TO DISMISS AMENDED COUNTERCOMPLAINT [27]</u>**

55562377.11

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................ i

STATEMENT OF ISSUES PRESENTED ............................................................. ii

CONTROLLING AUTHORITIES ........................................................................ iii

I.    INTRODUCTION ........................................................................................1

II.   THE REPORT'S CONCLUSIONS ON THE *PER SE* CLAIM CONSTITUTED CLEAR ERROR UNDER SIXTH CIRCUIT LAW ..........2

    A.    Conclusions on Horizontal Conspiracy Issue .......................................2

    B.    The Cutoff of Access to the Market ...................................................10

    C.    Dominance Requirement ....................................................................12

III.  THE REPORT'S ANALYSIS OF COMPETITIVE EFFECTS IS CONTRARY TO SIXTH CIRCUIT LAW ................................................20

IV.   THE REPORT'S CONCLUSIONS ON ATTEMPTED MONOPOLIZATION FAIL FOR THE SAME REASONS .......................23

V.    CONCLUSION .........................................................................................24

## STATEMENT OF ISSUES PRESENTED

1.      Whether the Opinion and Order Granting United Wholesale Mortgage's Motion to Dismiss Amended Countercomplaint [27] ("Opinion and Order") was based on mistakes of law in adopting the conclusions of the Report and Recommendation in *The Okavage Group, LLC v. United Wholesale Mortgage, LLC, and Matthew Ishbia* (USDC, Middle District of Florida, Case No. 3:21-cv-00448, doc. 112) ("Report") in light of controlling Sixth Circuit case law.

        AML answers:               Yes.

        The Court should answer:     Yes.

2.      Whether the Opinion and Order Granting United Wholesale Mortgage's Motion to Dismiss Amended Countercomplaint [27] was based on mistakes of fact in adopting the conclusions of the Report, because the Report failed to address well pleaded factual allegations in Defendant/Counter-Plaintiff America's Moneyline, Inc.'s Amended Counterclaim.

        AML answers:               Yes.

        The Court should answer:     Yes.

3.      Whether these mistakes of law and fact, if corrected, would change the outcome of the Opinion and Order.

        AML answers:               Yes.

        The Court should answer:     Yes.

## CONTROLLING AUTHORITIES

**Sixth Circuit Cases**                                                                   **Page(s)**

*Byars v. Bluff City News Co., Inc.*,
    609 F.2d 843 (6th Cir. 1979) .................................................................18

*Erie County, Ohio v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) ...................................................4, 5, 11, 19

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art &
    Design*,
    244 F.3d 521 (6th Cir. 2001) .................................................................13

*HDC, LLC v. City of Ann Arbor*,
    675 F.3d 608 (6th Cir. 2012) .................................................................12

*Hyland v. HomeServs. of Am., Inc.*,
    771 F.3d 310 (6th Cir. 2014) ...................................................................6

*Jones v. City of Cincinnati*,
    521 F.3d 555 (6th Cir.2008) .....................................................................3

*Mediacom Southeast LLC v. BellSouth Telecommunications, Inc.*,
    672 F.3d 396 (6th Cir. 2012) .........................................................3, 4, 17

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
    173 F.3d 995 (6th Cir. 1999) .........................................................7, 8, 9

*Spirit Airlines, Inc. v. Northwest Airlines*,
    431 F.3d 917 (6th Cir. 2005) .......................................................13, 15, 17

*Tarrant Service Agency, Inc. v. American Standard, Inc.*,
    12 F.3d 609 (6th Cir. 1993) ...................................................................18

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue
    Shield*,
    552 F.3d 430 (6th Cir. 2008) ...................................................................8

*United States v. Dairymen, Inc.*,
    660 F.2d 192 (6th Cir. 1981) .................................................................14

*Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*,
    648 F.3d 452 (6th Cir. 2011) ...........................................................................5, 17

*White & White, Inc. v. Am. Hosp. Supply Corp.*,
    723 F.2d 495 (6th Cir. 1983) ......................................................................10, 22

iv

## I.   __INTRODUCTION__

Defendant/Counter-Plaintiff America's Moneyline, Inc. ("AML") moves for reconsideration of this Court's Opinion and Order Granting United Wholesale Mortgage's Motion to Dismiss Amended Countercomplaint [27] ("Opinion and Order") (ECF No. 35, PageID.620.), pursuant to Local Rule 7.1(h)(2)[1]. Respectfully, AML believes that the Opinion and Order was based on mistakes of law and fact in relying upon the Report and Recommendation ("Report") by Magistrate Judge Lambert in the Middle District of Florida in *The Okavage Group, LLC v. United Wholesale Mortgage, LLC, and Matthew Ishbia*. That is because the Report failed to comply with Sixth Circuit standards applicable to AML's antitrust claims. As explained below, the Report contravenes numerous Sixth Circuit holdings related to the application of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), as well as Sixth Circuit decisions on the substantive antitrust principles at issue in this case. Additionally, the Report ignored several critical allegations in the Amended Counterclaim. Proper consideration of this Sixth Circuit case law and those allegations mandates the conclusion that each count of the Amended Counterclaim states a valid claim for relief.

---

[1] Under Local Rule 7.1(a), there was a conference between the attorneys for the parties in which AML explained the nature of this Motion and its legal basis and requested, but did not obtain, concurrence in the relief sought.

While this Court stated that it could reconsider its ruling if the Report's findings were reversed, a ruling by the district court in Middle District of Florida or Eleventh Circuit will not resolve this issue, since that decision will necessarily be based upon Eleventh Circuit, not Sixth Circuit, law.

For these reasons, as spelled out more fully below, AML respectfully seeks reconsideration.

## II. THE REPORT'S CONCLUSIONS ON THE *PER SE* CLAIM CONSTITUTED CLEAR ERROR UNDER SIXTH CIRCUIT LAW

The Report's conclusions on each element of AML's *per se* antitrust claim contradicted Sixth Circuit law and ignored critical allegations. Once the controlling law and critical factual allegations are considered, it is apparent that the Amended Counterclaim states a valid claim for relief.

### A.    Conclusions on Horizontal Conspiracy Issue

First, the Magistrate Judge's conclusion that the Supplemental Class Action Complaint ("SAC") in the case before it (USDC, Middle District of Florida, Case No. 3:21-cv-00448, doc. 96) did not allege a horizontal conspiracy cannot apply, in particular, to *this* case. The Report's conclusions directly contradict the principles applicable to review of antitrust complaints under Sixth Circuit law, as well as Sixth Circuit case law on horizontal conspiracies.

The Report was based on a number of what could only be construed as factual findings. The Report characterized communications between brokers as

2

"*independent* expressions of enthusiasm and encouragement," *id*. p.23 (emphasis added), despite acknowledging that brokers "directed other brokers to the forum that UWM published to participate in the boycott." *Id*. pp.23-24. The Report also stated that:

> The mere fact that some brokers who watched the announcement expressed support for Ishbia's announcement via comments, or even directed other brokers to the form that UWM published to participate in the boycott, *is insufficient to establish* the "rim," or an agreement between the brokers. TAC ¶¶ 41, 44.

*Id*. at pp.23-24 (emphasis added).

This analysis indicates an effort to decide the weight of the evidence, and characterizes the evidence contrary to the Plaintiffs' allegations, i.e., calling statements "independent" even where they involved, by the Report's own words, encouragement of one broker by another. *See* also ECF No. 24, PageID.358-362 (additional communications between brokers). The Report also applied a standard, "insufficient to establish" that could only apply to a trier of fact.

Another statement in the Report also reflects an insistence on definitive proof, rather than a plausible indication of conspiracy:

> And, the fact that one organization expressed a statement of support, with no information regarding *how many* of the "mortgage professionals" in the organization are actually brokers, is also insufficient.

3

*Id*. (Emphasis added). The Report did not acknowledge that the Amended Counterclaim noted that "AIME says that it is the only non-profit trade association dedicated exclusively to independent mortgage brokers." (ECF No. 24, PageID.360 at ¶46.)

This violates well-established principles set forth in Sixth Circuit case law regarding the sufficiency of the allegations in a complaint. The court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir.2008) (internal quotation and citation omitted). The Report clearly failed to do so.

*Mediacom Southeast LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396 (6th Cir. 2012), is highly relevant here. In *Mediacom*, the district court dismissed a complaint based on its conclusion that the allegations were not "persuasive". The Sixth Circuit reversed, holding that "[t]he court improperly placed the burden of proof on the plaintiff. On a motion to dismiss, AT&T, the moving party, bore the burden, not the non-moving party." 672 F.3d at 399.

The same analysis applies here. The Report's "insufficient to establish" standard, and refusal to draw all reasonable inferences in favor of the Plaintiff, were impermissible under Sixth Circuit case law. Certainly, requiring that a complaint identify the number of brokers represented by a trade association acting collectively

55562377.11

on their behalf requires far more than is necessary at the pleading stage. Determining that statements were necessarily independent when they were clearly made in the context of discussions between brokers is certainly incorrect, and, in any event, reflects a refusal to make all reasonable inferences in support of the plaintiff. *See also Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012) ("[A]t the pleading stage, the plaintiff is not required to allege facts showing that an unlawful agreement is more likely than lawful parallel conduct.").

As the Sixth Circuit stated in *Erie County, supra* at 869, "in order to state a Section One claim, a plaintiff need not allege a fact pattern that 'tends to exclude the possibility' of lawful, independent conduct." As the Court went on to explain:

> If a plaintiff were required to allege facts excluding the possibility of lawful conduct, almost no private plaintiff's complaint could state a Section One claim. Rational people, after all, do not conspire in the open, and a plaintiff is very unlikely to have factual information that would exclude the possibility of non-conspiratorial explanations *before* discovery. Accordingly, the regular motion-to-dismiss standard should apply.

702 F.3d at 869.

By characterizing comments as "independent" when they were made in the context of a group discussion, the Report unquestionably required that the Complaint offer facts that would "tend to exclude" the possibility of independent action, rather than concluding that conversations between the alleged conspirators could plausibly be concluded to be anything but independent. The conclusion that statements by the

5

trade association should be disregarded unless it was clear how many brokers were represented requires the counterclaim to definitively exclude the possibility that the association spoke for only a limited number of brokers. That is improper under *Erie County*.

The decision in *Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*, 648 F.3d 452, 458 (6th Cir. 2011), is also highly instructive. In *Watson Carpet*, the Sixth Circuit reversed a district court decision that, like the Report, effectively weighed inferences relating to conspiracy and independent action and decided which inference was most plausible. The Sixth Circuit rejected this analysis, stating that "[o]ften defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." The Report's conclusion that communications between brokers were most likely "independent", and the Report's conclusion that it was "equally likely" that the brokers individually chose to accede to the Ultimatum (USDC, Middle District of Florida, Case No. 3:21-cv-00448, doc. 112 at p.25), clearly violate that rule.

The Report's rejection of the factual allegations in the SAC also failed to consider that those alleged facts (and the same alleged facts in the Amended Counterclaim (ECF No. 24)) constitute direct evidence under the Sixth Circuit's standards. Statements such as "we are ALL IN," "unstoppable together," and "all for one and one for all," (ECF No. 24, PageID.358-359, at ¶¶40-41) are all statements

6

providing direct evidence that numerous brokers agreed on a common course of action. "One for all and all for one" is merely a colorful way to say "we are in agreement." This evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Hyland v. HomeServs. of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014).

The Report's "circumstantial evidence" analysis was also inconsistent with controlling Sixth Circuit law. The first element under the analysis is the presence of parallel conduct. *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1004 (E.D. Mich. 2010). Here, the signing of an agreement by more than 90% of UWM's brokers certainly qualifies. "93% of the brokers presented with the addendum agreed to join the boycott." (ECF No. 24, PageID.362-363 at ¶54.) UWM later stated that more than 11,500 of its 12,000 brokers participated in the initiative. (ECF No. 24, PageID.364 at ¶59(B).)

While parallel conduct alone is not sufficient, "[i]f the Court can discern *some* 'factual enhancement' pointing toward, or suggesting a basis for inferring, an illegal agreement, the motion to dismiss must be denied." *Id.* (citing *Twombly*, 550 U.S. at 556-557) (emphasis added). There was certainly more than just "some" factual enhancement here. The Sixth Circuit has spelled out the "plus factors" that are sufficient to support an inference of conspiracy even at the summary judgment stage:

> (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-

7

> interest; (2) whether defendants have been uniform in their
> actions; (3) whether defendants have exchanged or have
> had the opportunity to exchange information relative to the
> alleged conspiracy; and (4) whether defendants have a
> common motive to conspire. Ordinarily, an affirmative
> answer to the first of these factors will consistently tend to
> exclude the likelihood of independent conduct.

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) (internal

citation omitted).

Several such "plus factors" are undoubtedly present here and were ignored by

the Report. The most important factor, actions against interest, is quite specifically

alleged. The Amended Counterclaim alleged at ¶34 that "[f]rom 2018 to 2021

Rocket's wholesale business increased from 3,000 mortgage broker partners to

10,000, reflecting the fact that Rocket's products and prices were especially

attractive to mortgage brokers and their customers." (ECF No. 24, PageID.356.) The

abrupt "about face" after the Ultimatum, when more than 11,000 brokers agreed to

not deal with Rocket or Fairway (ECF No. 24, PageID.363 at ¶55), despite the

attractiveness of Rocket's prices, were plausibly actions against the brokers'

individual interests, as reflected in their behavior before the Ultimatum was issued.

The second factor listed in *Re/Max*, "whether defendants had been uniform in

their actions", is also present here. The coconspirators, the brokers, virtually all

responded affirmatively to the Ultimatum. *See* discussion *supra*.

8

Here, there are also well pleaded allegations of the third *Re/Max* requirement, extensive exchanges of information (and views) by the brokers through an interactive Facebook meeting. (ECF No. 24, PageID.358-340.) As the Sixth Circuit held in *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008), "[t]he critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other." Here, the allegations make clear that the "spokes", the brokers, were connected through the interactive Facebook meeting. (ECF No. 24, PageID.358-362.)

Numerous courts have held that parallel behavior coupled with interfirm communications (i.e. exchanges of information between competitors) is sufficient to support a conspiracy, even at the summary judgment stage. *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (*en banc*) ("Courts have held that a high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy."); *In re Plywood Antitrust Litig.*, 655 F.2d 627, 633, 634 (5th Cir. 1981).

The allegations here are even more compelling, because statements such as "unstoppable together," "brokers are better when we work together," and "we don't go against our family" constitute, at the least, explicit invitations to collude. *See In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d at 1372, *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018) (per curiam)

9

("Numerous cases have recognized that an invitation to collude can serve as evidence of a conspiracy."); *Fishman v. Wirtz*, 1981 WL 2153, at \*59 (N.D. Ill. Oct. 28, 1981) ("One of the strongest circumstantial indicators of a conspiracy is the existence of a common invitation or request to join into a concerted plan of action.").

Finally, the brokers certainly had "a common motive to conspire", the final *Re/Max* factor. The Ultimatum contained the threat that if the brokers did not cease dealing with Rocket and Fairway, they would be cut out by UWM. (ECF No. 24, PageID.357 at ¶37.)

AML is unaware of any court decision, anywhere, that rejected an inference of conspiracy, either on a motion to dismiss or summary judgment, where there were such extensive discussions by the alleged conspirators regarding their collective action, and where all of the *Re/Max* plus factors were present.

It was clear error to reject the horizontal conspiracy allegations in light of these Sixth Circuit decisions. The Amended Counterclaim's allegations are more than sufficient to make it plausible that the brokers conspired with one another.

**B.** **The Cutoff of Access to the Market**

The Report also rejected the SAC's allegations regarding the boycott's effects, stating that:

> Upon review of the TAC, it is not facially apparent, nor characteristically likely, that the anticompetitive conduct alleged here cut off consumer or broker access to the wholesale mortgage market.

10

*See* USDC, Middle District of Florida, Case No. 3:21-cv-00448, doc. 112 at p.27.

In so concluding, the Report made several errors. First, it misapplied the language of the Supreme Court's decision in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985). In *Northwest Wholesale Stationers*, the court noted that boycotts considered *per se* "*often* cut off access to a *supply, facility or market* necessary to enable the boycotted firm to compete…" 472 U.S. at 294. The court also noted that "a concerted refusal to deal need not necessarily possess all of [the traits discussed above] to merit per se treatment…" *Id*. at 295.

Thus, the Report conflated the denial of access to a "supply, facility or market" with a requirement that access to the market as a whole be cut off.

Second, the Report ignored the very specific evidence in the SAC (and the Amended Counterclaim) that the Ultimatum did cut off access to "supplies" (brokers) necessary to allow lenders to compete in the wholesale market. The Amended Counterclaim alleges that Rocket's and Fairway's shares dropped significantly due to the boycott (ECF No. 24, PageID.363 at ¶56), that Mr. Ishbia said that Rocket and Fairway would be cut off from 70-90% or more of the referrals they received from brokers, and that he subsequently confirmed that the result was even more successful than he expected. (ECF No. 24, PageID.363 at ¶55.) Moreover, the broker is an essential part of the wholesale process as the source of all referrals

11

to wholesale lenders. (ECF No. 24, PageID.350-351 at ¶16.) These allegations are more than sufficient to plausibly suggest that the *Northwest Wholesale Stationers* standard will ultimately be met here. At the complaint stage, the Sixth Circuit does not require that exclusion is likely: "the plausibility standard is not akin to a 'probability requirement'" *Erie County, supra*, at 868.

Significantly, since the filing of the Amended Counterclaim and the briefing on the Motion to Dismiss, Fairway, one of the two targets of the conspiracy, has exited the market, ceasing to offer mortgages at wholesale. https://www.housingwire.com/articles/fairway-shuts-down-wholesale-channel/ Apparently, the effort to exclude Rocket and Fairway from the wholesale market has already succeeded as to one of the two parties.

The Report also imposed this "cut off" element as an absolute requirement, when the Supreme Court made clear that this was simply a factor to be considered. But whether considered as one factor or treated as an absolute requirement, this element is satisfied by AML's well-pleaded allegations.

### C.  <u>Dominance Requirement</u>

The Report also misapplied the next requirement for *per se* liability under *Northwest Wholesale Stationers*, that "*frequently* the boycotting firms possessed a dominant position in the relevant market." 472 U.S. at 294 (emphasis added), noting, again, that not all the listed traits were necessary "to merit per se treatment." *Id.* at

295. The allegations of the Amended Counterclaim plausibly indicated that the boycotting brokers and UWM were each dominant.

The first basis for the Report's conclusion was its finding that the SAC failed to adequately plead a relevant submarket of wholesale mortgage lending. This conclusion was based upon a series of errors. First, in support of that conclusion, the Magistrate Judge incorrectly faulted the SAC for insufficiently detailed factual allegations. (USDC, Middle District of Florida, Case No. 3:21-cv-00448, doc. 112 at p.38.) But the request for detailed factual allegations again contravenes well-established Sixth Circuit case law on the pleading standards under *Twombly* and its progeny. *See, e.g., HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012). ("Detailed factual allegations" are not required to survive a motion to dismiss.). The allegations of the SAC (and Amended Counterclaim) contain sufficient general facts to meet the plausibility standard. *See* ECF No. 24, PageID.350-354.

Second, the Report's conclusion on relevant market also contradicts the rule in the Sixth Circuit that "[m]arket definition is a highly fact-based analysis that generally requires discovery." *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001).

This principle has been followed by many district courts in this circuit. Judge Edmonds in *In re Cardizem CD Antitrust Litigation*, 105 F. Supp. 2d 618, 681 (E.D.

Mich. 2000), rejected a motion to dismiss on relevant market grounds, stating that the issue "involves questions of fact not properly addressed in a Rule 12(b)(6) motion to dismiss." In *Mich. Div. Monument Builders v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 483 (E.D. Mich. 2006), the court explained that the relevant market issue "is typically a fact-based analysis that generally requires discovery[.]" The claim was dismissed in that case only because "plaintiffs' complaint contains no allegations whatsoever" that supported its market definition, *id.*, numerous other courts had already rejected plaintiffs' assertion, *id.* at 484, and its proposed market "blatantly ignore[d] economic and commercial reality and the facts in the record before the Court," *id.* at 483.

Third, the Report's rejection of a submarket analysis also contradicts substantial Sixth Circuit law. In *Spirit Airlines, Inc. v. Northwest Airlines*, 431 F.3d 917, 933-935 (6th Cir. 2005), the Sixth Circuit endorsed the use of submarkets under *Brown Shoe*, and found that the narrow market alleged by the plaintiff was proper. In *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 961-962 (6th Cir. 2004), the court also cited to the Supreme Court's submarket analysis. *See also United States v. Dairymen, Inc.*, 660 F.2d 192, 195 (6th Cir. 1981) (recognizing the relevance of geographic submarkets).

Fourth, the Report addressed only one of the many paragraphs in the SAC (and Amended Counterclaim) which provide a significant and detailed basis for market definition here. In particular, it did not address the highly detailed allegations below:

> 18.   For wholesale lending, third parties, such as mortgage brokers, provide loan applications to the consumer/prospective borrower, collect completed loan applications, perform income verification and collect other required documentation. Additionally, mortgage brokers advise the customer of available interest rates and loan terms and select a particular wholesale mortgage lender in order to find the best mortgage loan product and pricing for their client.

> 19.   The central pillar of the mortgage broker business is independence – the ability of the broker to choose from a variety of wholesale lenders to select the mortgage product and experience that best matches the specific needs of the broker's client (the consumer seeking a mortgage).

> 20.   Buyers may opt to hire an independent mortgage advisor or broker to search and match the buyer to a mortgage that satisfies the buyer's needs and preferences. The broker's value rests in his or her sophistication and knowledge of mortgage options that various wholesale lenders offer. The broker can often find mortgage options that are less expensive, but still meet the buyer's preferences, based on the broker's knowledge of which wholesale lenders' options are most suitable for each particular buyer. The mortgage broker can also choose among lenders with respect to the services (and quality of services) they offer. Brokers prefer to have more choices in wholesale lenders, and therefore more mortgage options available, because the larger the menu from which a broker can provide options, the more likely the broker can find a favorable mortgage for the broker's clients.

(ECF No. 24, PageID.351-352.)

Fifth, the Report's rejection of the "low price" allegations in the SAC (and Amended Counterclaim) directly contradict Sixth Circuit law. The fact that wholesale mortgage lending is substantially cheaper, very specifically alleged at ECF No. 24, PageID.354 ¶23.E, is recognized in the Sixth Circuit case law as one of the criteria that justify a separate submarket. In *Spirit Airlines, supra,* 431 F.3d at 933, the Sixth Circuit specifically recognized that "Northwest had separate fares for business travelers and leisure travelers" as supportive of a separate submarket for leisure travelers. *Id.* at 933-5.

In light of these factual allegations, AML plausibly alleged a relevant wholesale market under controlling Sixth Circuit law.

The Report also erred in concluding that the SAC did not adequately allege market dominance as required by *Northwest Stationers* even aside from its findings on market definition. This analysis involved three separate errors, the correction of any one of which would require a change in the Report's conclusions. First, and perhaps most significantly, the Report erred in applying the *Northwest Stationers* standard applicable to the "boycotting firms", 472 U.S. at 294, to UWM, not the brokers. The boycotting brokers clearly represented a dominant force.

UWM announced "93% of the brokers presented with the addendum agreed to join the boycott." *Id.* ¶54, PageID.362-363. UWM later stated that more than 11,500 of its 12,000 brokers participated in the initiative. *Id.* ¶59(B), PageID.364.

16

Since these 12,000 brokers represent significantly more than 60% of the wholesale mortgage brokers in the United States, *id.* ¶25, PageID.354, simple arithmetic indicates that more than 55% of the brokers (93% of 60%) in the market joined the boycott.

Such a share is sufficient to satisfy the (even greater) standards for attempted monopolization in this Circuit. *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1116-1117 (N.D. Ohio 2004) (holding that while "*monopoly power* requires proof of more than sixty percent market power . . . courts will generally find a *dangerous probability of success* where the defendant has a market share of fifty percent or more . . . [and firms] with market shares between thirty and fifty percent may be found to have a dangerous probability of success if other factors are present" (emphasis added)). *See Collins Inkjet Corp. v. Eastman Kodak Co.*, No. 1:13CV664, 2014 WL 11516553, at *10 (S.D. Ohio Mar. 21, 2014), *aff'd*, 781 F.3d 264 (6th Cir. 2015) (Greater than 30% share sufficient under Section 1).

Second, the Report also erred in assessing UWM's market share. The Report acknowledged that the SAC alleged that in the most recent quarter UWM had achieved a 54% market share, (ECF No. 24, PageID.354 at ¶25). But the Report then stated, without any support or logic, that the more relevant number is the 38% share for the last overall year of UWM's operation. (USDC, Middle District of Florida, Case No. 3:21-cv-00448, doc. 112 at pp.41-42.) This ignores the fact that 54% is

17

thus the most recent—and therefore most relevant—figure reflecting UWM's market share. *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶807d2 ("Where the defendant's market share rises substantially during the course of the challenged behavior, the later higher number is the one most relevant for determining the existence of a dangerous probability of success."). The Sixth Circuit has recognized the persuasive power of the Areeda treatise. *Spirit Airline, Inc.*, *supra*; *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000); *Little Caesar Enterps., Inc. v. Smith*, 172 F.R.D. 236, 246-47 (E.D. Mich. 1997).

But even if the Court were to conclude that an average share over a year is more persuasive than a higher number in the most recent quarter, that is an insufficient basis to grant a motion to dismiss. As discussed *supra*, the Sixth Circuit has specifically rejected the idea that a motion to dismiss can be granted because one inference is more believable or persuasive than another. *Mediacomp Southeast*, *supra* at 399, *Watson Carpet*, *supra*.

Third, the Report ignored the fact that market share is not the only way to measure UWM's power under Sixth Circuit law. The Sixth Circuit has made clear that the simplest way of showing monopoly power is to assess the defendant's ability to exercise control over prices or exclude competitors. *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 850 (6th Cir. 1979). ("The material consideration in determining whether a monopoly exists, is not that prices are raised and that competition is

18

excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.").

As the Sixth Circuit said in *Tarrant Service Agency, Inc. v. American Standard, Inc.*, 12 F.3d 609, 615 (6th Cir. 1993) "[c]ourts often look at market share as *a short cut* to determine if monopoly power exists." (Emphasis added). *See also Byars, supra* at 880 (reference to market share as "shortcut").

UWM's substantial market power is reflected in its ability to force its brokers to exclude competition from Rocket or Fairway. 93% of UWM's brokers agreed to the Ultimatum, even though that deprived them of access to lower priced, high quality lenders. (ECF No. 24, PageID.362-363 at ¶54.) In a February 2023 interview, Mr. Ishbia explained that the boycott was so successful because "[t]he penalty of working with Rocket … is you don't get to work with UWM. And nobody is willing to take that chance." (ECF No. 24, PageID.364 at ¶59.A.) That statement more than plausibly suggests UWM's market dominance.

The Report's rejection of the SAC's (and Amended Counterclaim's) allegations regarding barriers to entry also violates the same established Sixth Circuit law discussed above. The Magistrate Judge effectively imposed a requirement that the Complaint anticipate, and address, every possible counterargument on barriers to entry, e.g. possible entry by retailers. This improperly shifted the burden of proof on barriers to the plaintiff. It also effectively

19

required that facts be alleged excluding the possibility of entry. The statements of the law in *Erie County* regarding the "tends to exclude standard" and in *Mediacomp* on the impropriety of placing the burden of proof on the plaintiff, both mandate rejection of this conclusion.

## III.   THE REPORT'S ANALYSIS OF COMPETITIVE EFFECTS IS CONTRARY TO SIXTH CIRCUIT LAW

The Report incorrectly rejected Okavage's (and the Amended Counterclaim's) allegations regarding harm to competition by concluding that there were "no underlying facts at all" in the SAC to "support its conclusion that the Ultimatum has increased the costs of mortgage loans." (USDC, Middle District of Florida, Case No. 3:21-cv-00448, doc. 112 at p.37.) The Magistrate Judge contrasted allegations of harm to Rocket and Fairway with what it claims to be "no supporting facts regarding how this harmed the overall mortgage market – or wholesale market as a whole . . ." since "consumers were free to access these mortgages from the brokers who did not work with UWM or sign the agreement." *Id.* at pp.38-39.

In so concluding, the Report ignored a series of very specific allegations in the SAC (and Amended Counterclaim) that established that Rocket and Fairway offered lower prices and better quality than UWM. The Report ignored, for example, the allegations in the SAC (and Amended Counterclaim) that Rocket Mortgage is less restrictive than UWM in credit scores, *see* ECF No. 24, PageID.355 ¶28.B; ECF No. 24. PageID.356 ¶31 (quoting UWM acknowledging that its competitors have

20

"more operational flexibility in approving loans"); and ECF No. 24, PageID.355 ¶28.C (Rocket and Fairway rated higher than UWM in national satisfaction studies). The Amended Counterclaim also alleges that Rocket and Fairway are lower priced than UWM. *See* ECF No. 24, PageID.347 ¶1 (Rocket and Fairway rated higher in affordability); ECF No. 24, PageID.355-356 ¶30 (UWM admits "not trying to be the best price and Rocket consistently beats UWM in price across every product type offered"); ECF No. 24, PageID.355-356 ¶30 (examples of lower Rocket prices as compared to UWM).

The Report also ignored the allegations in SAC and Amended Counterclaim which explained that from "2018 to 2021, Rocket Pro's wholesale business increased from 3,000 mortgage broker partners to 10,000 mortgage broker partners, reflecting the fact that Rocket Pro's products and prices were especially attractive to mortgage brokers and their customers." (ECF No. 24, PageID.356-357.) The fact that customers preferred Rocket to UWM in such significant numbers is strong evidence that its products were more attractive in price and quality.

This is more than sufficient to plausibly allege anticompetitive effects under Sixth Circuit law, which acknowledges that the exclusion of low priced competitors can harm overall competition. *Realcomp II, Ltd. v. Federal Trade Commission*, 635 F.3d 815, 827 (2011) ("Courts have found potential antitrust violations when MLS rules deny MLS membership to some brokers… and when dealers have excluded

discount brokers altogether from the venue…") *See also id*. at 829-830 (finding "barriers to the dissemination of discount listings" anticompetitive).

Additionally, the Report ignored the allegations that the boycott disrupted the basic mechanism of the wholesale lending market: that brokers act as independent agents of their clients, seeking the best wholesale lender for their clients. *See* ECF No. 24, PageID.351 ¶19 (that is "the central pillar of the mortgage broker business"). The Sixth Circuit has made clear that restrictions on choice can constitute anticompetitive effects. The "anticompetitive nature of the restraint" in *Realcomp II* was the reduction in competitive brokerage options available to home sellers, *id*. at 827, quite analogous to the restriction of consumers' lender options which were constricted by UWM's actions here. Realcomp's policies were held unlawful by the Sixth Circuit because they "narrow[ed] consumer choice" and "hinder[ed] the competitive process." *Id.* at 829-31.

The Report also faulted the SAC for failing to distinguish between competitors and competition. But *Realcomp* makes clear that exclusion of competitors, the brokers, can harm competition. *See also Realcomp II, supra* at 830 ("limited-service brokers testified that Realcomp's policies placed them at a competitive disadvantage.") (citations omitted).

It is of no consequence that Rocket and Fairway were not initially entirely excluded from the wholesale market. In *Realcomp*, the court found it sufficient that

"by reducing by 10% the number of home buyers that are exposed to discount listings, the website policy may very well constitute an unreasonable restraint." *Id*. at 830. *See also id*. at 832-833 (decline in limited service discount listings an actual anticompetitive effect).

## IV.    THE REPORT'S CONCLUSIONS ON ATTEMPTED MONOPOLIZATION FAIL FOR THE SAME REASONS

The Report's rejection of Okavage's contentions on attempted monopolization rests on its conclusions regarding the inadequacy of the SAC's allegations concerning relevant market, competitive effects, market dominance, and barriers to entry, discussed above. Given the errors involved in the Report's analysis of those elements, its conclusions regarding attempted monopolization must also be rejected. AML's allegations plausibly state a claim for attempted monopolization. The Opinion and Order effectively relied on those errors (e.g. reliance on 38% market share).

The conclusions of the Opinion and Order regarding specific intent to monopolize also fail to address controlling Sixth Circuit law. "Specific intent to monopolize may be inferred from evidence of anticompetitive conduct…" *White & White, Inc. v. Am. Hosp. Supply Corp*., 723 F.2d 495, 507 (6th Cir. 1983) (citations omitted). Here, there is substantial evidence of anticompetitive conduct, conduct targeting Rocket and Fairway, low priced competitors in the market. *See* discussion

23

*supra*. That is more than enough to establish intent to monopolize at the complaint stage.

## V.  <u>CONCLUSION</u>

For the forgoing reasons, AML respectfully believes that this Court's acceptance of the Report involved clear errors of law and fact, the correction of which leads to the conclusion that the Amended Counterclaim states a valid claim for relief. AML requests that the Court reconsider its decision and deny the Motion to Dismiss.

Dated: April 12, 2024

By: /s/Jeffrey B. Morganroth (w/permission)
Jeffrey B. Morganroth (P41670)
Jason R. Hirsch (P58034)
**MORGANROTH & MORGANROTH, PLLC**
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000
jmorganroth@morganrothlaw.com
jhirsch@morganrothlaw.com

David A. Ettinger (P26537)
**HONIGMAN LLP**
660 Woodward Avenue, Suite 2290
Detroit, MI 48226
(313) 465-7368
DEttinger@honigman.com

Matthew D. Novello (P63269)
**NOVELLO & ASSOCIATES, PC**
3542 Lakeview
Highland, Michigan 48356
mnovello@novellolawfirm.com

*Attorneys for Defendant/Counter-Plaintiff, AML*

55562377.11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED WHOLESALE MORTGAGE, LLC<br><br>*Plaintiff/Counter-Defendant*,<br><br>v.<br><br>AMERICA'S MONEYLINE, INC.,<br><br>*Defendant/Counter-Plaintiff.* | Case No. 22-cv-10228<br><br>Hon. Laurie J. Michelson<br>Magistrate Judge Elizabeth A. Stafford |

**BRIEF FORMAT CERTIFICATION FORM**

I, David A. Ettinger, hereby certify that the foregoing brief complies with Eastern District of Michigan Local Rules 5.1(a), 5.1.1, and 7.1 and Judge Michelson's Case Management Requirements. In particular, I certify that each of the following is true (click or check box to indicate compliance):

☒ the brief contains a statement regarding concurrence, *see* LR 7.1(a);
☒ the brief, including footnotes, uses 14-point font, *see* LR 5.1(a)(3);
☒ the brief contains minimal footnotes and, in all events, no more than 10, *see* Case Management Requirements § III.A;
☒ the brief and all exhibits are searchable .pdfs, *see* Case Management Requirements § III.A;
☒ the brief is double spaced (except for footnotes and necessary block quotes) with one-inch margins, *see* LR 5.1(a)(2);
☒ deposition transcripts have been produced in their entirety and not in miniscript, *see* Case Management Requirements § III.A;
☒ if the brief and exhibits total 50 pages or more, a courtesy copy with ECF headers will be sent to chambers, *see* Case Management Requirements § III.B.

1

I also acknowledge that if the Court later finds that these requirements are not met, my brief will be stricken.

Dated: April 12, 2024

/s/David A. Ettinger
David A. Ettinger (P26537)

2