UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE, LLC,

       Plaintiff,

v.

AMERICA'S MONEYLINE, INC.,

       Defendant.

Case No. 22-10228
Honorable Laurie J. Michelson

---

## OPINION AND ORDER DENYING AMERICA'S MONEYLINE, INC.'S MOTIONS FOR RECONSIDERATION [37] AND FOR LEAVE TO FILE SUPPLEMENTAL COUNTERCOMPLAINT [41] AND GRANTING UNITED WHOLESALE MORTGAGE'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT [45]

---

As its name suggests, United Wholesale Mortgage is a wholesale mortgage lender. In 2021, it issued an "ultimatum" to its mortgage broker clients: to continue working with us, you must stop working with two of our competitors, Rocket Pro and Fairway Mortgage. America's Moneyline was one of about 12,000 brokers subject to that ultimatum—and one of about 11,500 brokers that agreed to it through an Amended Wholesale Broker Agreement. But AML continued to submit loan applications to Rocket Pro while working with UWM.

So in 2022, UWM sued AML for breach of contract. (ECF No. 1.) AML countersued, alleging in its amended countercomplaint that UWM's ultimatum violates federal and state antitrust laws. (ECF No. 24.) The Court dismissed that countercomplaint for failure to state a claim. (ECF No. 35.) AML now asks the Court

to reconsider its dismissal (ECF No. 37) and to grant it leave to supplement its counterclaim based on "new facts" (ECF No. 41). For its part, UWM seeks leave to file a first amended complaint "to include other parties as AML's alter egos" and to "assert new claims against AML and its alter egos to whom AML conveyed assets" (ECF No. 45). The motions are fully briefed and do not require further argument. E.D. Mich. LR 7.1(f). For the reasons below, the Court denies AML's motions and grants UWM's.

## I. Florida Suit Background and Procedural History

AML's filings have closely mirrored those brought in a class action suit in the Middle District of Florida, *Okavage Group, LLC v. United Wholesale Mortgage, LLC*, No. 21-448 (M.D. Fla. filed Apr. 23, 2021). (*See* ECF No. 35, PageID.612–613 ("AML's counterclaim is the mirror image of the antitrust suit recently rejected by Magistrate Judge Lambert in *Okavage*. The brokers not only assert the same claims . . . but also make nearly identical allegations of fact and statements of law in their filings.").) There, Florida mortgage broker Okavage Group sued UWM for violating the Sherman Act. *Okavage*, No. 21-448, ECF No. 96. Unlike AML, Okavage never signed the agreement not to work with Rocket Pro and Fairway Mortgage. So its affirmative suit against UWM was "the" antitrust suit challenging the lawfulness of UWM's Amended Wholesale Broker Agreement.[1]

---

[1] The Court separately notes that a consumer-led case has been filed in this District. In *Escue v. Ishbia*, No. 24-10853 (E.D. Mich. filed Apr. 2, 2024), seven wholesale mortgage loan *borrowers* bring a proposed class action against UWM, alleging civil conspiracy, unjust enrichment, aiding and abetting breach of fiduciary duty, and violations of the Racketeer Influenced and Corrupt Organizations Act, the

After three years of litigation, the Middle District of Florida recently dismissed that case and denied Okavage's motion for leave to file a second supplemental complaint. Specifically, Magistrate Judge Laura Lothman Lambert recommended that District Judge Wendy W. Berger grant UWM's motion to dismiss Okavage's supplemental class action complaint, which Judge Berger did, over Okavage's objections. *Okavage* ("*Okavage R&R*"), No. 21-448, 2024 WL 982380 (M.D. Fla. Feb. 6, 2024) (available on that docket at ECF No. 112), *report and recommendation adopted*, 2024 U.S. Dist. LEXIS 171280 (M.D. Fla. Sept. 20, 2024) (available on that docket at ECF No. 125), *appeal docketed*, No. 24-13393 (11th Cir. Oct. 18, 2024). Judge Lambert in turn denied Okavage's motion to amend. *Okavage*, No. 21-448, 2024 U.S. Dist. LEXIS 168151 (M.D. Fla. Sept. 18, 2024) (available on that docket at ECF No. 124).

Meanwhile, in this Court, UWM sued AML for breach of contract (ECF No. 1), and AML countersued (ECF No. 7). The Court dismissed AML's countercomplaint for failure to state a claim (ECF No. 14), and AML filed an amended countercomplaint—raising the same antitrust claims that Okavage had raised in Florida two years prior. (*Compare* ECF No. 24), *with Okavage*, No. 21-448, ECF No. 96. The Court dismissed that amended countercomplaint, adopting the Florida court's rationale. (ECF No. 35.)

---

Real Estate Settlement Procedures Act, and state consumer protections. *See Escue*, No. 24-10853, ECF No. 21.

AML now moves for reconsideration of the Court's dismissal decision (ECF No. 37) and for leave to file a supplemental counterclaim (ECF No. 41). UWM moves for leave to amend its complaint for the first time. (ECF No. 45.)

In deciding AML's motions, the Court again looks to the Middle District of Florida's rulings addressing parallel issues based on parallel precedent. (*See* ECF No. 35, PageID.620 ("Judge Lambert's conclusions are factually based, legally sound, consistent with Sixth Circuit precedent, and equally applicable here as in *Okavage*.").) Indeed, AML's motion for reconsideration mirrors Okavage's since-overruled objections to Judge Lambert's Report and Recommendation. (*Compare* ECF No. 37), *with Okavage*, No. 21-448, ECF No. 116; *see Okavage* ("*Okavage Dismissal*"), No. 21-448, 2024 U.S. Dist. LEXIS 171280, at *8–9 (M.D. Fla. Sept. 20, 2024). Likewise, AML's motion to supplement and proposed supplemental counterclaim are almost identical to Okavage's since-denied motion to amend and proposed amended complaint. (*Compare* ECF Nos. 41, 41-1), *with Okavage*, No. 21-448, ECF Nos. 118-1, 119.

## II. Legal Standards

UWM's motion to amend its complaint (ECF No. 45) and AML's motion to supplement its counterclaim (ECF No. 41) are governed by the same legal standard: whether "justice so requires" amendment or supplementation. *See Spies v. Voinovich*, 48 F. App'x 520, 527 (6th Cir. 2002); Fed. R. Civ. P. 15(a).

The Court has broad discretion to determine when "justice so requires" amendment or supplementation, *see Hayden v. Ford Motor Co.*, 497 F.2d 1292, 1294

(6th Cir. 1974), balancing on the one hand the overarching principle that leave "should be freely granted" and on the other hand that "the non-moving party might be prejudiced by [amendment or] supplementation, adding post-complaint claims may be judicially inefficient, and the supplemental claims may be futile because they fail to state a claim upon which relief may be granted." *Bormuth v. Whitmer*, 548 F. Supp. 3d 640, 646 (E.D. Mich. 2021); *see Knight Cap. Partners Corp. v. Henkel AG & Co., KGaA*, 930 F.3d 775, 786 (6th Cir. 2019) ("[T]he district court may weigh the following factors when considering a motion to amend [or supplement]: undue delay or bad faith in filing the motion, repeated failures to cure previously-identified deficiencies, futility of the proposed amendment, and lack of notice or undue prejudice to the opposing party."). Indeed, "a court does not abuse its discretion in denying a motion for leave to amend or supplement where the new information sought to be added would not 'remedy the deficiencies in the original complaint.'" *Bormuth*, 548 F. Supp. 3d at 646 (quoting *Beezley v. Fremont Indemnity Co.*, 804 F.2d 530, 531 (9th Cir. 1986)).

In contrast with motions to amend or supplement, motions for reconsideration are "disfavored." E.D. Mich. LR 7.1(h)(2). AML moves for reconsideration under Eastern District of Michigan Local Rule 7.1(h) yet nowhere acknowledges the high bar it must meet to justify reconsideration. Such motions may only be brought if a different outcome is warranted for one of three recognized reasons: (1) the Court made a mistake, (2) there has been an intervening change in controlling law, (3) "new facts" are available. *Id.* AML hangs its hat on the first reason: mistake. *See* E.D. Mich. LR

7.1(h)(2)(A). So it must show that the Court made a clear error and that, if that clear error were corrected, the outcome would be different. *See Roe v. Ford Motor Co.*, 439 F. Supp. 3d 922, 925 (E.D. Mich. 2020) (providing that party seeking reconsideration under Local Rule 7.1(h) "must show that the district court clearly erred, that the court's initial decision will change if the clear error is corrected, and that the error was based on the law and record as it stood when the district court made its initial decision"); *Good v. BioLife Plasma Servs., L.P.*, 647 F. Supp. 3d 555, 559–60 (E.D. Mich. 2022) ("For purposes of reconsideration [under Local Rule 7.1(h)(2)], mistakes and outcomes are mutually exclusive. . . . [T]he purported mistake must be some substantive error in the court's legal analysis or factual findings based on the record at the time of the decision—it cannot be the outcome itself.").

### III. AML's Motions

The Court starts with AML's motions.

In its motion for reconsideration of the dismissal of its amended counterclomplaint, AML argues that the Court made legal and factual mistakes "in relying upon" Judge Lambert's Report and Recommendation and granting UWM's motion to dismiss. (ECF No. 37, PageID.633.) It asserts it is entitled to reconsideration because Judge Lambert, and in turn this Court, applied an impermissibly heightened pleading standard to its counterclaims (*see id.* at PageID.634–638), "contradicted Sixth Circuit law," and "ignored critical factual allegations" (*id.* at PageID.634). But as the Court explained when it "agree[d] with and adopt[ed]" Judge Lambert's ruling and dismissed AML's operative

counttercomplaint, the *Okavage* decision "applie[d] Supreme Court precedent and [was] consistent with Sixth Circuit precedent." (ECF No. 35, PageID.612; *see also id.* at PageID.614 ("In an almost 50-page report based largely on Supreme Court precedent, Judge Lambert made the following conclusions, for the following factually based and legally sound reasons. And to the extent that Report was not based on Supreme Court case law, it is consistent with this Circuit's prior holdings.").) AML fails to show otherwise. So it is not entitled to reconsideration.

Alternatively, AML seeks leave to supplement its dismissed counttercomplaint based on three pieces of "new evidence": an April 2024 "market analysis" allegedly showing increased borrower costs in the wholesale mortgage market, the February 2024 "exit[]" of competitor lender Fairway from the wholesale mortgage market, and November 2023 statements by UWM's CEO that UWM "set[s] the margins daily" in the wholesale mortgage market. (ECF No. 41, PageID.690, 694–695.) AML contends that these "recent" developments "should lead to a different decision on dismissal." (*Id.* at PageID.682.) But as its proposed evidence suggests, and as AML itself concedes (*see id.* at PageID.702), these new allegations concern only the wholesale mortgage market—which AML has failed to show is the "relevant market" for purposes of its counterclaims. For that reason and more, AML's proposed supplemental counttercomplaint fails to remedy the dispositive deficiencies identified in the Court's previous order, so supplementation would be futile.

## A. Relevant Market Allegations

A (counter)plaintiff must plead three elements to state a plausible claim under Section 1 of the Sherman Act: (1) an agreement (2) that unreasonably restrains (3) interstate trade or commerce. *See Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022). The first element encompasses both "vertical" and "horizontal" agreements—respectively, agreements between entities at different levels of the market structure such as manufacturers and distributors ("vertical") and agreements between competitors at the same level ("horizontal"). *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). In turn, the second element asks whether that agreement effects an *unreasonable* restraint on trade. *See In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 (6th Cir. 2003).

A select few trade restraints are considered per se unreasonable, meaning that the Court need not "inquir[e] into the harm [the practice] has actually caused" to find a violation of Section 1. *Id.* at 907; (*see* ECF No. 35, PageID.614 (citing *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003)).) For all other trade restraints, the "rule of reason" test applies, and the Court evaluates, rather than assumes, the unreasonableness of the alleged restraint. (*See* ECF No. 35, PageID.614 (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 289 (1985)).) Relevant here, purely vertical agreements (e.g., between UWM and brokers) are subject to the rule of reason, whereas a combination of vertical and horizontal agreements—called a "hub-and-spoke" conspiracy—is a per se

8

violation of Section 1. *In re RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478, 500 (M.D. Tenn. 2023); *see Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 987 (6th Cir. 2001) ("Vertical restraints on trade are examined under a rule of reason analysis unless they include some agreement on price or price levels.").

To make out a Section 1 violation under the rule of reason, a plaintiff must present evidence that the trade restraint produces anticompetitive effects within the "relevant market." *NHL Players*, 325 F.3d at 718. Indeed, "an accurate definition of the relevant market" is a threshold element under the rule of reason "because '[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition.'" *Ogden v. Little Caesar Enters.*, 393 F. Supp. 3d 622, 630–31 (E.D. Mich. 2019) (alteration omitted) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)). The "essential test" for defining the relevant market is the interchangeability test. *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009). Under this test, a relevant market exists where consumers view a set of products as reasonably interchangeable (and view the producers or sellers of the products as alternative sources). *See id.*

The "relevant market" is likewise an essential element of a Section 2 attempted monopolization claim. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993); *see Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 962 (6th Cir. 2004) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."). An entity can only pose a danger of monopolization if it has

sufficient power in the relevant market. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (providing that a Section 2 attempted monopolization claim requires proof of the defendant's (1) "possession of monopoly power in a relevant market" and (2) "specific intent to 'destroy competition or build a monopoly'").

### 1. Motion for Reconsideration

So it follows that AML's failure to adequately allege the relevant market in its operative countercomplaint was dispositive of AML's Section 1 rule of reason counterclaim and Section 2 counterclaim.[2] According to AML, the relevant market is the wholesale mortgage market. (ECF No. 37, PageID.648.) UWM counters that wholesale mortgages and retail mortgages are reasonably interchangeable products or services in borrowers' minds, so together they comprise the relevant market of residential mortgage lending. (ECF No. 43, PageID.777.) The Court previously agreed with UWM and granted its motion to dismiss. (*See* ECF No. 35, PageID.617 (concluding that AML "fails to adequately plead facts establishing that a residential mortgage from a retail lender, as opposed to [from] a wholesale lender, would not be viewed as reasonable substitutes by a consumer" (alteration in original) (quoting *Okavage R&R*, 2024 WL 982380, at *13)).) In its motion for reconsideration, AML contends that the Court erred in its prior decision and that, under the proper pleading

---

[2] While the "relevant market" is made up of both a geographic market and a product market, *see NHL Players*, 325 F.3d at 719, the Court addresses only the latter. The parties say nothing about the geographic market, and the product market issue is dispositive.

standard and controlling Sixth Circuit law, its relevant market allegations were sufficient to survive UWM's motion to dismiss. (ECF No. 37, PageID.645–646.) The Court takes these arguments in turn.

First, the pleading standard. AML asserts that Judge Lambert, and in turn this Court, applied an impermissibly heightened pleading standard to its relevant market allegations. (*See id.* at PageID.645–648, 650.) It says that Judge Lambert "incorrectly faulted" the broker's complaint "for insufficiently detailed factual allegations" and that her "request for detailed factual allegations . . . contravenes well-established Sixth Circuit case law on the pleading standards under *Twombly* and its progeny." (*Id.* at PageID.645.) But AML conflates two distinct concepts.

AML is correct that "[d]etailed factual allegations' are not required to survive a motion to dismiss." (*Id.* (quoting *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012)).) But *some* detail—enough to state a claim—is surely required.[3] And that is all Judge Lambert and this Court asked for—*sufficiently* detailed factual allegations. (*See id.* ("[T]he Magistrate Judge incorrectly faulted the [dismissed complaint] for *insufficiently* detailed factual allegations." (emphasis added) (citing

---

[3] AML treats the word "detail" itself as a nonstarter. That logic is plainly unsupported. *E.g.*, *Ivey v. Hard Rock Casino Cincinnati*, LLC, No. 20-278, 2020 U.S. Dist. LEXIS 153652, at *7–8 (S.D. Ohio Aug. 25, 2020) ("Once [Plaintiff] provides a more definite statement of his claims, the Defendant and this Court will be able to evaluate whether Plaintiff has included sufficient factual detail to state a claim."); *accord Martinez v. Nueces County*, 71 F.4th 385, 390 (5th Cir. 2023) ("[Plaintiff] has not pleaded a claim with sufficient detail to survive a 12(b)(6) motion. . . . [T]his court cannot entertain claims pleaded without sufficient detail . . . ."); *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021) ("While the required level of specificity is not easily quantified, a plaintiff must allege enough details about the subject-matter of the case to present a story that holds together." (internal quotation marks omitted)).

*Okavage R&R*, 2024 WL 982380, at \*16))); *Okavage R&R*, 2024 WL 982380, at \*16 ("[P]laintiff has not alleged *sufficient* factual detail to support its [Section 1] claim . . . because it has not successfully defined the relevant market as the wholesale lending market or established that defendants possessed adequate market power." (emphasis added)); *see also Okavage R&R*, 2024 WL 982380, at \*12 ("Although the parameters of a given market are questions of fact, antitrust plaintiffs still must present *enough* information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." (emphasis added) (quoting *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010))). And regardless of the specific turn of phrase, neither Judge Lambert nor the Court in practice imposed a heightened pleading standard on AML's relevant market allegations.

Next, Sixth Circuit precedent. The arguments AML raises here are almost identical to the arguments it raised in response to UWM's motion to dismiss. (*Compare* ECF No. 37, PageID.645–646, *with* ECF No. 31, PageID.506–507, 510.) So what AML said were reasons to deny UWM's motion to dismiss are now refashioned as errors the Court made when it came out the other way. The Court has already considered and rejected these arguments. "[A] motion for reconsideration is not a second bite at the apple," *Collins v. Nat'l Gen. Ins. Co.*, 834 F. Supp. 2d 632, 641 (E.D. Mich. 2011), nor is it a vehicle for expressing mere disagreement with the Court's decision, *see BioLife Plasma*, 647 F. Supp. at 559–60 ("[T]he purported mistake must be some substantive error in the court's legal analysis or factual findings based on

12

the record at the time of the decision—it cannot be the outcome itself." (citation omitted)).

What is more, AML mischaracterizes Sixth Circuit precedent. It first contends that the Court erred because "[Judge Lambert's] conclusion on [the] relevant market contradicts the rule in the Sixth Circuit that '[m]arket definition is a highly fact-based analysis that generally requires discovery.'" (ECF No. 37, PageID.645 (alteration in original) (quoting *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001)); *see id.* at PageID.646 (quoting *Mich. Div.- Monument Builders of N. Am. v. Mich. Cemetery Ass'n* ("*Mich. Div. I*"), 458 F. Supp. 2d 474, 482–83 (E.D. Mich. 2006)).) True, the Sixth Circuit has acknowledged that discovery is "generally" required, but it has also emphasized that "the fact that market definition *generally* requires discovery has not prevented this court, and others, from affirming grants of motions to dismiss on the basis of an insufficiently pled or totally unsupportable proposed market." *Monument Builders of N. Am. v. Mich. Cemetery Ass'n* ("*Mich. Div. II*"), 524 F.3d 726, 733 (6th Cir. 2008) (emphasis added). Even in the case AML quotes (in fact, in the very next sentence, which AML omits), the Sixth Circuit concluded that discovery was unnecessary because the counterclaimant's failure to adequately allege the relevant market was clear at the motion to dismiss stage. *Found. for Interior Design*, 244 F.3d at 531 ("Market definition is a highly fact-based analysis that generally requires discovery. Here, however, definition of the relevant market requires relatively little factual analysis." (citations omitted)); *see also Mich. Div. I*, 458 F. Supp. 2d at 483 ("[As in] *Foundation*

13

*for Interior Design Education Research*, this is a case where the definition of the geographic market requires very little factual analysis.").

In other words, the Sixth Circuit has not created the sort of blanket "rule" that AML advocates. Nor have the Eleventh Circuit or Middle District of Florida. *See Okavage R&R*, 2024 WL 982380, at *12; *accord Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("It is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers. Plaintiffs err, however, when they try to turn this general rule into a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed. R. Civ. P. 12(b)(6)." (citation omitted)); *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (same).

Not to mention, a rule that courts should not grant dismissal for failure to define the relevant market, or should defer the issue until after discovery, would contravene a plaintiff's basic obligation to plead facts plausibly supporting each element of the claims alleged. *See, e.g.*, *Jacobs*, 626 F.3d at 1338 ("We cannot accept this argument [that pre-discovery dismissal is inappropriate], however, because it would absolve Jacobs of the responsibility under *Twombly* to plead facts 'plausibly suggesting' the relevant submarket's composition."). It would also run counter to the well-established principle, discussed above, that "[f]ailure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Worldwide Basketball*, 388 F.3d at 962.

AML's second argument that the Court violated controlling precedent in dismissing its countercomplaint is that "substantial Sixth Circuit law" has "endorsed the use of submarkets under *Brown Shoe*." (ECF No. 37, PageID.646 (citing *Spirit Airlines, Inc. v. Nw. Airlines*, 431 F.3d 917, 933–35 (6th Cir. 2005); *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)).) The Court erred, according to AML, by agreeing with "the [Florida] Report's rejection of a submarket analysis." (*Id.*; *see id.* at PageID.648.) As with its previous argument, AML's characterization of precedent is only half right.

Excerpted out of context, as by AML in its motion for reconsideration, *Brown Shoe* can be misleading. The Supreme Court indeed said that, within a product market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325. But "confusion" among courts following *Brown Shoe* led the Sixth Circuit to clarify that "a submarket analysis incorporates, but does not replace, the standard market test. It merely adds new factors to that test so as to more precisely define the market affected by the defendant's actions." *Worldwide Basketball*, 388 F.3d at 962; *see White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983) (addressing "the confusion arising from the comparatively recent use of 'submarket analysis' by courts"). In other words, only after concluding that a relevant market is adequately pled does the Court consider the existence of a narrower submarket. *See White*, 723 F.2d at 502 ("The fundamental error of the district judge . . . was the mistaken

premise that standard market tests may be abandoned or ignored and replaced with a less demanding 'submarket test.'").

So AML is not wrong that the Sixth Circuit has in some sense "endorsed the use of submarkets under *Brown Shoe*" (ECF No. 37, PageID.646), but it is an overstatement to say the Sixth Circuit accepts "the use of submarkets" without a sufficient definition of the broader "relevant market." AML cannot get around its failure to plead the relevant market by overstating the supposed submarket.[4]

### 2. Motion for Leave to Supplement

AML contends it can save its antitrust counterclaims by supplementing its dismissed countercomplaint. It points to three pieces of "new evidence"—but concedes that "[t]he new evidence does not address the Report's relevant market analysis." (ECF No. 41, PageID.702.) It says only that "that issue was clearly wrongly decided," incorporates its motion for reconsideration, and moves on. (*Id.*) This dooms AML's Section 1 rule of reason and Section 2 counterclaims. Without an adequate definition of the relevant market, adding any "new evidence" is futile. (ECF No. 43, PageID.777; *see id.* at PageID.780, 782, 785.)

Specifically, AML contends that a recent "market analysis" by Hunterbrook Media provides direct and indirect evidence of anticompetitive effects under the rule of reason (ECF No. 41, PageID.690), that Fairway's "exit" further supports the existence of "harm to competition" (*id.* at PageID.691) in the form of "significant

---

[4] Moreover, for the reasons detailed by Judge Lambert, AML's relevant submarket allegations remain insufficient even upon consideration of the *Brown Shoe* criteria. *See Okavage R&R*, 2024 WL 982380, at *12–14.

diminution in customer choice" (*id.* at PageID.698), and that "new statements" by UWM's CEO demonstrate the lender's monopoly power vis-à-vis its ability to control profit margins (*id.* at PageID.692). But AML cannot overcome the threshold issue. Harm to competition and probability of monopolization can only be gauged by reference to the relevant market. *See Ogden*, 393 F. Supp. 3d at 630–31 ("Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition."); *Comprehensive Sec. v. Metro. Gov't*, No. 21-5617, 2022 U.S. App. LEXIS 6050, at *10 (6th Cir. Mar. 7, 2022) (explaining that "any claim under Section 2 . . . presents a threshold inquiry" into the definition of the "relevant . . . markets in which [the plaintiff] competes with the alleged monopolizer"); *accord Jacobs*, 626 F.3d at 1336 ("Regardless of whether the plaintiff alleges actual or potential harm to competition, . . . he must identify the relevant market in which the harm occurs.").

As UWM puts it, "even if the Court were to accept AML's 'new facts,' at most they pertain to wholesale mortgage lending and do not establish market power in the relevant market of all residential mortgage loans." (ECF No. 43, PageID.783; *see id.* at PageID.780 ("AML asserts that its Supplemental Counterclaim 'remedies' the Amended Counterclaim's failure to plead facts demonstrating anticompetitive effects from UWM's All-In Initiative. But that question cannot be separated from the relevant market analysis." (citation omitted)).)

AML's assertion that "Fairway has been driven from the wholesale market" illustrates this point. (ECF No. 41, PageID.699–700; *see* ECF No. 41-1, PageID.729.)

17

UWM does not dispute the substance of AML's allegation—that Fairway no longer offers wholesale mortgages. (ECF No. 41, PageID.690; ECF No. 43, PageID.783.) Even so, AML cannot make out its antitrust counterclaims. As UWM asserts, "Fairway did not exit the relevant market of residential mortgage loans." (ECF No. 43, PageID.784.) Instead, Fairway exited the *wholesale* mortgage market—but it continues to offer retail mortgages. (*See* ECF No. 24, PageID.354; ECF No. 41-1, PageID.718; ECF No. 43, PageID.783–784.) As far as the relevant market is concerned, Fairway remains a competitor. Meanwhile, as far as the wholesale mortgage market is concerned, AML already alleged, and the Court already considered, that many lenders "recently exited the wholesale market." (ECF No. 24, PageID.373.)

In sum, the Court's conclusion that AML failed to adequately define the relevant market, and in turn that AML failed to sufficiently plead Section 1 rule of reason or Section 2 attempted monopolization counterclaims, was consistent with controlling law. AML's mere disagreement with that outcome is not a basis for reconsideration. It follows that supplementation is futile; without sufficient allegations that wholesale mortgage lending is the relevant market, AML's complaint cannot survive dismissal.

## B. Per Se Allegations

The Court next turns to AML's allegations that UWM's conduct constituted a per se violation of Section 1. If a plaintiff makes out a per se unlawful trade restraint, it adequately states a Section 1 claim; it need not define the relevant market to

survive dismissal. *See Am. Express Co.*, 585 U.S. at 543 n.7; *In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*, No. 18-00825, 2019 U.S. Dist. LEXIS 181298, at *29–30 (W.D. Ky. Oct. 21, 2019).

AML alleges two types of per se illegal trade restraints: a hub-and-spoke conspiracy and a group boycott. A hub-and-spoke conspiracy consists of vertical agreements joined by horizontal agreements—specifically, a "hub" (like UWM) at one level of the market structure, "spokes" (brokers) competing at a different level, vertical agreements between the hub and each spoke (e.g., brokers agreeing to UWMs' addendum), and horizontal agreements among the spokes (to adhere to the hub's terms). *See Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 & n.3 (6th Cir. 2008). A per se unlawful group boycott entails "collective action among a group of competitors that may inhibit the competitive vitality of rivals." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135–36 (1998); *see Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 890 (W.D. Ky. 2009) ("Commercially motivated group boycotts . . . are 'designed to pressure another party into doing something by withholding, or enlisting others to withhold, patronage or services from the target.'" (cleaned up)).

As can be seen, both types of per se violations require a plaintiff to establish horizontal agreements between direct competitors. *See In re RealPage, Inc.*, 709 F. Supp. 3d at 501; *Total Benefits*, 552 F.3d at 435. It was thus dispositive of AML's per se restraint counterclaim that it failed to show brokers agreed among themselves to comply with UWM's addendum. (*See* ECF No. 35, PageID.615.) AML argues in its

motion for reconsideration that it adequately alleged horizontal agreements between brokers in its dismissed countercomplaint and that the Court erred in concluding otherwise.

AML first reiterates its argument that the Court applied an impermissibly heightened pleading standard to its allegations. (*See* ECF No. 37, PageID.634–639.) This argument fails for the same reasons as discussed above: it mischaracterizes the Court's dismissal opinion and the *Okavage R&R*. AML again nitpicks Judge Lambert's turn of phrase and distorts the substance of her analysis to argue that she "insiste[d] on definitive proof . . . of conspiracy" (*id.* at PageID.635) and "refus[ed] to draw all reasonable inferences" in its favor (*id.* at PageID.636). She did not. She properly required "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Despite what AML may suggest, factual matter is not "enough" at the pleading stage if it supports only the inference that competitors acted alike. It must also support the inference that competitors agreed to act in concert. *See In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1004 (E.D. Mich. 2010).

Put another way, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 1003–04 (quoting *Twombly*, 550 U.S. at 556). The proper pleading standard was applied, and AML, like Okavage, failed to satisfy it. (*See* ECF No. 35, PageID.614–617); *Okavage Dismissal*, 2024 U.S. Dist. LEXIS 171280, at *12; *see, e.g.,*

*Okavage R&R*, 2024 WL 982380, at \*10 ("[T]here are not enough facts in the [third amended complaint] to plausibly suggest the brokers agreed among themselves to boycott Rocket and Fairway. Put differently, plaintiff does not plausibly allege any horizontal agreement between each spoke (the brokers) . . . ."); *id.* ("Although plaintiff cites to several independent expressions of enthusiasm and encouragement among the brokers who observed [the UWM CEO's] speech and a statement of support from one organization whose members include mortgage brokers, this is inadequate to plausibly suggest 'concerted action' or an agreement among the brokers . . . .").

AML next argues that its per se counterclaims should survive dismissal based on its circumstantial evidence of brokers' horizontal agreements—that the allegations in its operative countercomplaint were sufficient under Sixth Circuit precedent (ECF No. 37, PageID.639–642) and that it has new evidence warranting supplementation (ECF No. 41, PageID.699–700). AML presents its arguments for reconsideration as legal errors in the Court's dismissal opinion, but in practice it reargues the sufficiency of its countercomplaint under the standards the Court already applied. It simply asserts the Court's conclusions contradicted Sixth Circuit law because it disagrees with those conclusions. The Court applies that precedent to AML's proposed supplement as it did to its operative countercomplaint, again concluding that AML's allegations fail to state a Section 1 claim under the per se rule, such that supplementation would be futile.

Circumstantial evidence of an agreement for purposes of Section 1 is evidence of (1) parallel conduct and (2) at least one "plus factor"—that is, "parallel conduct

'plus' some further factual enhancement sufficient to 'plausibly suggest an agreement to restrain trade.'" (ECF No. 35, PageID.615 (quoting *Hobart-Mayfield*, 48 F.4th at 665).) AML has already established brokers' parallel conduct (that they agreed to UWM's addendum), so it needs a "plus factor" to state a per se claim. The Sixth Circuit has identified several. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (quoting *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999)). Relevant here, it has held that a preceding agreement can be inferred from evidence that competitors engaged in parallel action that, "if taken independently, would be contrary to their economic self-interest." *Id.* According to AML, the article by Hunterbrook Media satisfies this plus factor. (*See* ECF No. 41, PageID.700.)

Its argument goes like this: Wholesale mortgage brokers' value comes from their independence and flexibility, specifically in the form of providing borrowers with multiple loan options from various wholesale mortgage lenders. (*Id.* (citing ECF No. 41-1, PageID.716–717, 743–744)); *see Okavage R&R*, 2024 WL 982380, at *2. Anything that places limits on brokers' lender options is necessarily against their economic self-interest, and UWM's addendum imposed such limits by requiring brokers to choose between working with UWM or two competitor lenders. Yet countless brokers agreed to UWM's addendum, as recently shown by Hunterbrook Media, even though it went against their economic self-interest. (*See* ECF No. 41, PageID.700 ("[T]he Ultimatum doubled the number of brokers sending more than 99% of their loans to UWM. This was against their clear interest as 'independent'

brokers to offer multiple options to consumers.").) So brokers must have agreed among themselves that they would collectively agree to the addendum.

There are a number of problems with that argument. For one, it is not new. AML already argued in its operative counterclaim that agreeing to UWM's addendum was contrary to brokers' economic self-interest because it interfered with their independence and thus lessened their value-add for consumers. (*See* ECF No. 24, PageID.364, 378; *see also* ECF No. 41, PageID.700 ("AML believes that the [operative counterclaim] already plausibly suggests that brokers acted against their interests.").) It likewise cited evidence that the majority of brokers nonetheless agreed to UWM's addendum and subsequently sent UWM increased numbers of loan applications. (*See* ECF No. 24, PageID.362–363 (asserting that "[t]he boycott was highly successful," with 11,000 of 12,000 brokers, i.e., "93% of the brokers presented with the addendum," agreeing to it); *id.* at PageID.363 ("[A]fter the boycott was initiated, UWM received more than 17,000 more loan applications . . . than it had in the month prior to the boycott.").) What AML offers in its proposed supplement is simply more data of the trend it already alleged—that since agreeing to the addendum more brokers are sending a greater portion of borrowers to UWM for their wholesale mortgage needs. (ECF No. 41-1, PageID.744 ("The Hunterbrook study found that as compared to 2020, before the boycott occurred, in 2023 more than twice as many (8,682) loan officers sent greater than 99% of their loans to UWM. The number sending more than 75% to UWM also doubled."); *see* ECF No. 41, PageID.700 (AML asserting that "the Supplemental Counterclaim provides important new

23

evidence" that brokers acted against their economic interests); ECF No. 43, PageID.781 (UWM responding that AML's proposed supplement has simply "bolstered its 'plus factor' allegation by including Hunterbrook's so-called 'evidence'").)

But the Court's dismissal of AML's horizontal agreement allegations was not a function of AML inadequately showing that many more brokers had sent many more loans to UWM as a result of the addendum. Instead, what AML failed to demonstrate was a plausible connection between that alleged trend and the conclusion that brokers were acting against their economic interests. It "asks the court to observe a scenario [of parallel conduct] and conclude that the only proper explanation for it is a conspiracy among [competitors], but . . . offers the court nothing but speculation to support that conclusion." *Hobart-Mayfield*, 48 F.4th at 667. "[W]ithout that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* at 665–66 (alteration in original) (*quoting Twombly*, 550 U.S. at 557). "The specific number of brokers that accepted UWM's new terms does not alter the analysis and still provides nothing more than a conclusory assertion that the decision to deal with UWM was contrary to the broker's self-interest." *Okavage Dismissal*, 2024 U.S. Dist. LEXIS 171280, at *7; (*see* ECF No. 43, PageID.782 ("AML offers no factual allegations plausibly demonstrating how brokers act 'against their interests' by sending most of their mortgages to UWM; it just asserts *ipse dixit* that this is so.").)

24

Indeed, as UWM points out, "[s]ending business to UWM as a leading innovator in the industry is equally consistent with UWM providing critical benefits to brokers and borrowers—making the loan process faster, easier, and more reliable with fewer contingencies, hassles, or headaches for borrowers." (ECF No. 43, PageID.782.) AML acknowledges as much when it notes that prior to the addendum brokers were working with Rocket Pro and Fairway in increasing numbers "because of Rocket Pro's and Fairway's strong reputations, good prices and high-quality service." (ECF No. 24, PageID.364 (operative countercomplaint); ECF No. 41-1, PageID.729 (proposed supplement); *see* ECF No. 41, PageID.701.) It concedes that shifting business to certain lenders over others can be a shared but independent reaction to myriad market considerations, at least when that shift is away from UWM. But it fails to explain why brokers' shift in the opposite direction (toward UWM and away from Rocket Pro and Fairway) "was against their clear interest as 'independent' brokers to offer multiple options to consumers." (ECF No. 41, PageID.700); *see Okavage R&R*, 2024 WL 982380, at *11 ("This conclusory assertion is inadequate to establish that signing UWM's addendum was against the interest of the brokers who did so. For instance, it seems equally likely that the participating brokers viewed the possibility of being unable to work with UWM as worse than being unable to work with Rocket and Fairway.").

In fact, AML specifically argues that brokers were harmed regardless of the choice they made and indeed were harmed by agreeing to the addendum. In both its operative countercomplaint and proposed supplement, it contends that because of the

addendum, "independent mortgage brokers . . . were deprived of the ability to offer all the leading mortgage lenders to their clients. Those who refused the Ultimatum were unable to offer UWM loans. Those who accepted the Ultimatum . . . were unable to offer lower priced, higher quality Rocket Pro and Fairway loans to their customers." (ECF No. 24, PageID.378; ECF No. 41-1, PageID.744.) But the crux of the contrary-to-economic-self-interest "plus factor" is that the Court can infer an agreement between competitors because their conduct makes little economic sense in the absence of one—their "actions, if taken independently, would be contrary to their economic self-interest." *Re/Max Int'l*, 173 F.3d at 1009. If instead they are harmed no matter what—regardless of their conduct or whether they agree to act in concert— then there is no basis to infer a horizontal conspiracy. "[T]he facts alleged must plausibly suggest, rather than be merely consistent with, an agreement to restrain trade in violation of the Sherman Act." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011) (cleaned up); *see In re Travel Agent Comm'n*, 583 F.3d at 903 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").

This Court also does not overlook that Magistrate Judge Lambert's opinion, on which it relied, was upheld by the Florida District Judge Berger. And this Court also agrees with Judge Berger: "Plaintiff has failed to make any nonconclusory, factual

allegations that support an inference that the brokers that agreed to the ultimatum would not have agreed absent an understanding that the other brokers would follow suit. In fact, Plaintiff specifically alleges that numerous brokers made dissenting comments as well," *Okavage Dismissal*, 2024 U.S. Dist. LEXIS 171280, at *4—not to mention that many brokers, Okavage included, rejected UWM's addendum (*see* ECF No. 24, PageID.359, 378–380; ECF No. 41-1, PageID.724, 745–747). "[B]ut this lack of mutual assurance did not hinder several brokers from agreeing to the new terms from UWM. Taken together, Plaintiff's allegations, as stated in the R&R, only plausibly allege individual expressions of support and parallel conduct." *Okavage Dismissal*, 2024 U.S. Dist. LEXIS 171280, at *4 (citation omitted); *see id.* at *6.

So AML's proposed supplement, like its operative counterclaim, fails to establish the contrary-to-economic-self-interest "plus factor" and thus fails to show brokers entered horizontal agreements.[5]

---

[5] For the sake of completeness, the Court briefly addresses AML's arguments for supplementation based on recent statements by UWM's CEO, Mathew Ishbia. It contends these new statements demonstrate that UWM "control[s] its margins and therefore its price, the definition of monopoly power." (ECF No. 41, PageID.692.) But this argument is wholly redundant of allegations already dismissed as deficient. AML itself describes these statements as "*even more* directly probative of UWM's control over price," as compared with the similar statements it already raised. (ECF No. 41, PageID.702 (emphasis added).) It merely seeks to reference two earnings "calls," rather than the singular earnings "call" already described in its operative counterclaim, and to excerpt newer statements that echo statements already included.

AML's proposed supplement speaks for itself; it alleges the following, with additions to its operative allegations noted in brackets: "UWM's market power is also evidenced by Mr. Ishbia's statements in [one of] UWM's most recent earnings call[s] that UWM has 'great control of our margins' and that 'we do control the margins in this industry.'" (*Compare* ECF No. 41-1, PageID.739–740, *with* ECF No. 24, PageID.374.) From there, AML proposes to add two sentences, though both offer more

**IV. UWM's Motion to Amend**

The Court finally turns to the case in chief: the breach-of-contract suit UWM brings against AML for allegedly agreeing to work with UWM to the exclusion of Rocket Pro, then submitting loan applications to Rocket Pro anyway. UWM seeks to amend its complaint for the first time to name Shawn Nevin, Dean Lob, and Mortgage Moneyline, Inc. ("MML") "as AML's alter egos and add appropriate claims against them for fraudulent conveyances between AML and [MML]." (ECF No. 45, PageID.807.) According to UWM, three months after it filed this suit against AML, AML's CEO and CFO/Secretary, Nevin and Lob, founded a new mortgage broker company, MML, to stand in AML's place. (*See id.* at PageID.806.) UWM says that "AML, under Shawn Nevin's and Dean Lob's direction," transferred its assets, and "effectively the entire business," to MML (*id.* at PageID.807), in an "effort[] to avoid a potential judgment in this Court," (*id.* at PageID.813). So UWM seeks to hold MML, Nevin, and Lob liable for AML's breach of contract under an alter ego theory and seeks to bring new claims for fraudulent conveyance in violation of the Michigan and California Voidable Transactions Act. (*See* ECF Nos. 45, 45-1.) AML opposes the motion. (ECF No. 47.) It argues that amendment is "untimely, prejudicial, and futile." (*Id.* at PageID.908.) The Court disagrees.

---

of the same: "[In fact, Mr. Ishbia has recently stated that he can 'set the margins daily,' and that they are 'not market driven.' Instead, industry margins are 'completely tied to what UWM does, and others will follow.'] Thus UWM is able to control price in the market." (*Id.*)

First, AML objects to UWM amending its complaint on the grounds of delay and prejudice. Emphasizing that MML was incorporated in 2022 (*id.*), AML contends that UWM was remiss in not seeking amendment sooner and that "[t]he addition of these new claims and defendants would also be highly prejudicial to AML because it would revert this case back to square one." (*Id.* at PageID.909.) According to AML, "UWM offers this Court no justification, much less a persuasive one, for its years-long delay in seeking to bring these claims." (*Id.* at PageID.908.) UWM counters that while Nevin and Lob may have formed MML in 2022, "the new entity was not prepared to take on AML's operations at its formation" and "only became ready to do that this year." (ECF No. 48, PageID.927.) "To legally do business and issue mortgages to consumers, MML needed to become licensed and registered in several states" (*id.*)— a process that has been ongoing "from May 2022 through the present" (*id.* at PageID.928). Then, recent developments—for example, the fact that "nearly all of AML's employees . . . transferred their mortgage licenses to MML" in early 2024— prompted UWM to finally "discover[] AML's tactics." (*Id.*)

In other words, once UWM learned the information necessary to plausibly plead its claims, it moved to amend its complaint. As UWM puts it, "[e]ven if AML could point to some 'delay' in UWM seeking this amendment, any such delay is certainly not 'undue.'" (ECF No. 45, PageID.812); *see Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 347 (6th Cir. 2007) ("Delay alone will ordinarily not justify the denial of leave to amend; however, delay will at some point become 'undue,' 'placing an unwarranted burden on the court,' or 'prejudicial,' 'placing an unfair

29

burden on the opposing party.'"). Similarly, AML cannot show unfair prejudice, especially not where substantial motion practice is largely the reason for this case's protracted timeline. AML's objection that "rather than taking steps to advance this years['] old litigation, UWM now wants to send it back to the starting gate by adding entirely new claims and defendants" (ECF No. 47, PageID.909) rings especially hollow in light of AML's instant motions for supplementation of its dismissed, once-amended countercomplaint and for reconsideration of that dismissal decision.

That leaves AML's futility argument, which boils down to whether UWM adequately pleads alter ego liability and fraudulent conveyance.

## A. Fraudulent Transfer

UWM seeks to amend its complaint to add fraudulent transfer claims under Michigan's and California's Uniform Voidable Transactions Acts. (ECF No. 45-1, PageID.839–840.) AML disputes the applicability of Michigan's UVTA, arguing that California's statute instead governs. (ECF No. 47, PageID.914–915.) But as shown below, and as AML concedes, the relevant provisions of both statutes are identical— the Uniform Voidable Transactions Acts of Michigan and California are indeed uniform. (*See id.* at PageID.916 n.5.) So the Court's analysis of the plausibility and futility of UWM's claims is the same under both Acts.

The Acts provide that if an entity transfers assets to another entity with the intent to defraud, hinder, or delay a creditor, the transfer is voidable as to the creditor, i.e., the creditor may "avoid" the fraudulent transfer to recover against the assets. Mich. Comp. Laws § 566.34(1)(a); Cal. Civ. Code § 3439.04(a)(1); *see* Mich.

Comp. Laws §§ 566.35, .37, .38; Cal. Civ. Code §§ 3439.05, .07, .08. So too if an entity receives inadequate consideration in exchange for its assets, intending that its remaining assets will be insufficient to satisfy its debts "as they bec[o]me due." Mich. Comp. Laws § 566.34(1)(b)(ii) (providing that debtor's transfer of assets is voidable as to creditor if transfer was made"[w]ithout receiving a reasonably equivalent value in exchange for the transfer" and where debtor "believed or reasonably should have believed that [it] would incur[] debts beyond the debtor's ability to pay as they became due"); Cal. Civ. Code § 3439.04(a)(2)(B) (same).

Put another way, the fraudulent transfer laws of Michigan and California allow claims under theories of both "actual" or "intentional" fraud and "constructive" fraud. *See In re Woodberry*, 621 B.R. 665, 673 (Bankr. E.D. Mich. 2020); *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008). UWM raises claims under both theories. But according to AML, UWM alleges "no facts" to support its UVTA claims. (ECF No. 47, PageID.917.) AML asserts that "UWM does not specifically allege the transfer of any asset to MML, does not identify the exact nature of the asset, does not allege when any asset was allegedly transferred, and certainly does not allege that any asset was transferred without an exchange of reasonably equivalent value." (*Id.*)

Start with AML's assertion that UWM fails to allege "when any asset was allegedly transferred." (*Id.*) True, UWM does not give a detailed accounting of dates on which assets were allegedly transferred from one entity to the other. But it lays out "the facts and timeline" of "the transition of business operations from AML to MML" over a span of about two years. (ECF No. 48, PageID.933.) Between May 2022

31

when MML was incorporated and June 2024 when UWM filed its motion, MML "has ramped up," says UWM, while AML has shuttered—both physically and operationally. (ECF No. 45-1, PageID.835.) During that period, MML has obtained mortgage broker licensures and registrations in 14 states, while AML has let all but five of its licensures expire. (*See id.* at PageID.835–836.) Notably, UWM contends that AML no longer has an active license "in its home state of California," and in January of 2024 its office address changed from a physical office building to a "rented private mailbox" in a "strip mall." (*Id.* at PageID.836.) Meanwhile, between January and March of 2024, 16 of AML's loan officers and originators went to work for MML (*id.* at PageID.834–35), leaving Nevin as "AML's sole remaining employee" (*id.* at PageID.835).[6] In short, UWM asserts that over the course of about two years, AML has "shift[ed] its collectible assets to a new entity . . . [while] operating AML in name only." (ECF No. 45, PageID.811.) That is enough at the pleadings stage.

AML also maintains that "UWM does not specifically allege the transfer of any asset to MML" and "does not identify the exact nature of the asset[s]" allegedly transferred. (ECF No. 47, PageID.917.) That argument is belied by AML's own words

---

[6] In response to UWM's allegations that all of MML's "loan officers, originators, or employees . . . were employed by AML immediately before becoming [MML] employees" (ECF No. 45, PageID.806), AML asserts that employees are not "assets" that can be fraudulently "transferred" under the Acts (ECF No. 47, PageID.916–917). It contends that "change of employment of at-will employees is not a transfer" subject to the UVTA "because employees are not 'assets' as defined by the statute" and that "an employee's decision to change employment cannot, as a matter of law, amount to . . . an act performed with the 'intent to hinder, delay, or defraud.'" (*Id.*) But as shown above, UWM sufficiently pleads that AML transferred numerous non-personnel assets to MML. So UWM makes out its UVTA claims regardless of whether employees count as fraudulently transferred assets within the meaning of the Acts.

two sentences prior. It directly quotes UWM's proposed amended complaint, acknowledging that UWM alleges the transfer of "assets like 'accounts receivable, business expectations, equipment, customers, customer lists, and goodwill.'" (*Id.* (quoting ECF No. 45-1, PageID.837)); *see SCD Chem. Distribs. v. Medley*, 512 N.W.2d 86, 88 (Mich. Ct. App. 1994) ("[T]he property that plaintiff alleges to have been fraudulently conveyed—the inventory, equipment, customers, chemical formulas, product names, and goodwill . . . —are assets within the meaning of the statute because each has some value."). And as UWM puts it, "the transition of business operations from AML to MML . . . undoubtedly includes the assets of AML. . . . Where else would AML, which now has only one employee and a postal box address, transfer such assets?" (ECF No. 48, PageID.933.) If instead by "exact nature" AML means that UWM must present evidence of specific "accounts receivable" or particular "equipment" allegedly transferred, that argument is better suited to a later stage of litigation.

Finally, AML argues that UWM fails to plausibly allege "that any asset was transferred without an exchange of reasonably equivalent value." (ECF No. 47, PageID.917.) But inadequate value exchanged, i.e., a constructive fraud theory, is just one way to establish a voidable transfer. *See* Mich. Comp. Laws § 566.34(1)(b)(ii); Cal. Civ. Code § 3439.04(a)(2)(B). UWM can also plead actual fraud, i.e., that AML transferred its assets with "actual intent to hinder, delay, or defraud." Mich. Comp. Laws § 566.34(1)(a); Cal. Civ. Code § 3439.04(a)(1). Actual fraudulent intent can be inferred from "badges of fraud" including those enumerated in the Acts. Mich. Comp.

Laws § 566.34(2); Cal. Civ. Code § 3439.04(b); *see In re Energy Conversion Devices, Inc.*, 621 B.R. 674, 750 (Bankr. E.D. Mich. 2020) ("This list of eleven factors is non-exclusive . . . . Badges of fraud are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." (citations omitted)); *In re Medina*, 619 B.R. 236, 242 (B.A.P. 9th Cir. 2020) ("Because transferors rarely admit that they acted with bad intent, the UVTA and its ancestors permit the creditor to prove intent using circumstantial evidence, and they provide a nonexclusive list of circumstances relevant to the intent determination."). Relevant here, these statutory "badges of fraud" include that the transfer "was to an insider" or "was of substantially all of the debtor's assets" and that the debtor "had been sued . . . before the transfer was made" or "retained possession or control of the property transferred after the transfer." Mich. Comp. Laws § 566.34(2); Cal. Civ. Code § 3439.04(b); *see also* Mich. Comp. Laws § 566.31(a) (defining "insider" to include director, officer, or "person in control" of debtor-corporation).

Except for a passing comment (on an unrelated point) in a footnote (ECF No. 47, PageID.915 n.3), AML does not address UWM's actual intent arguments—and thus does not show that UWM's UVTA claims are implausible. Meanwhile, UWM alleges sufficient facts to support several badges of fraud. *See In re Energy*, 621 B.R. at 750 ("Badges of fraud are not conclusive, but are more or less strong or weak according to their nature and the number concurring in the same case . . . . [A] a concurrence of several [of these factors] will always make out a strong case [in support of fraudulent intent]." (alterations in original)); *In re Ezra*, 537 B.R. 924, 931 (B.A.P.

34

9th Cir. 2015) ("No single factor necessarily is determinative, and no minimum or maximum number of factors dictates a particular outcome."). It offers evidence that AML transferred substantially all of its assets to MML and to "insiders" Nevin and Lob; that the transfers were made after AML had been sued by UWM; and that, through Nevin and Lob, AML retained possession or control of the assets transferred to MML. *See Prime All. Bank, Inc. v. Great Lakes Tissue Co.*, No. 23-10564, 2024 U.S. Dist. LEXIS 93668, at \*15 (E.D. Mich. May 24, 2024); *Alter Domus, LLC v. Winget Jvis-USA, LLC*, No. 23-10458, 2024 U.S. Dist. LEXIS 53916, at \*15–16 (E.D. Mich. Mar. 26, 2024).

So at this stage, UWM has adequately stated a claim against MML, Nevin, and Lob for fraudulent transfer under the UVTA and may amend its complaint accordingly.

## B. Alter Ego Liability

For many of the same reasons, UWM adequately alleges that MML, Nevin, and Lob are alter egos of AML. So even though it is undisputed that they are not parties to the contract at issue, UWM may also amend its complaint to assert its breach of contract claim against them.

"Michigan courts will not pierce the corporate veil [to find alter ego liability] unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2008); *see also In re Energy*, 621 B.R. at 736

(explaining that alter ego liability is a remedy rather than an independent cause of action); *Lim v. Miller Parking Co.*, 560 B.R. 688, 705 (Bankr. E.D. Mich. 2016) ("Michigan courts regard proof of the 'wrong' to be a separate and distinct showing from the mere proof that failure to pierce the corporate veil would cause the plaintiff to suffer an 'unjust loss.'"). "[T]he Court should 'examine the totality of the evidence surrounding the owner's use of an artificial entity and, in particular, the manner in which the entity was employed in the matter at issue'" to determine whether "the owner operated the entity as his or her alter ego—that is, as a sham or mere agent or instrumentality of his or her will." *Franklin Cap. Funding, LLC v. Austin Bus. Fin., LLC*, 676 F. Supp. 3d 515, 526–27 (E.D. Mich. 2023) (quoting *Green v. Ziegelman*, 873 N.W.2d 794, 807 (Mich. Ct. App. 2015)).

UWM makes out each of these elements. For one, it asserts that MML "has ostensibly all but supplanted AML" (ECF No. 45, PageID.806) and that AML has "effectively morphed itself into [MML] at the hands of Shawn Nevin and Dean Lob" (ECF No. 45-1, PageID.837). As already described, UWM alleges that in May 2022, "three months after UWM filed its $2.8 million suit" against AML (*id.*; ECF No. 45, PageID.806), Nevin and Lob "form[ed] a parallel mortgage lending business" (ECF No. 45, PageID.806 (cleaned up) (citing ECF No. 45-3)). In the time since, says UWM, AML has "conveyed effectively the entire business" to MML (*id.* at PageID.807), including "AML's accounts receivable, business expectations, equipment, customers, customer lists, . . . goodwill" (*id.* at 817; ECF No. 45-1, PageID.837) and its loan officers and their mortgage broker licenses (ECF No. 45, PageID.806; ECF No. 45-1,

PageID.834–836; *see* ECF No. 45-3). UWM contends that AML has ceased operations. It asserts that AML has only one remaining employee, Nevin; has no physical office space; and is licensed and registered as a mortgage broker business in only five states, in contrast with its 31 state registrations at the time of UWM's motion. (ECF No. 45-1, PageID.835–836.) The totality of the allegations is sufficient to allege that MML, Nevin, and Lob are "mere instrumentalit[ies]" of AML. *See Servo*, 475 F.3d at 799 (finding that transfer of assets essential to running the business, including employees and customers, supported a finding that corporate entity was a mere instrumentality of another); *In re Energy*, 621 B.R. at 737–38 (noting relevance of degree and manner of control, such as whether alleged alter ego entities have "common management and decision making or intertwined financial affairs").

UWM likewise plausibly alleges the second element of the alter ego test—that AML used MML "to commit a fraud or wrong." This element can be satisfied by the breach of contract alleged. *See Servo*, 475 F.3d at 799–800 ("[A]ssuming that a jury concluded that [plaintiff] could recover for breach of contract, this breach would constitute a 'fraud or wrong' for the purpose of veil-piercing liability."); *Tredit Tire & Wheel Co, Inc v Regency Conversions, LLC*, 636 F. Supp. 2d 598, 602 (E.D. Mich. 2009) (concluding that corporate party's breach of contract is legally sufficient to constitute "fraud or wrong" under alter ego test); *EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 502 (6th Cir. 2021) ("Michigan recognizes that a breach of contract can satisfy the 'fraud or wrong' requirement of its veil-piercing doctrine.").

Finally, as outlined above, UWM sufficiently alleges that it "suffered an unjust loss" as a result of the fraud or wrong or would suffer an unjust loss if the corporate veil is not pierced. *Cf. H&H Wholesale Servs. v. Kamstra Int'l*, No. 17-13422, 2020 U.S. Dist. LEXIS 233855, at *16 (E.D. Mich. Dec. 14, 2020) ("[A]t bottom, disregarding corporate formalities comes down to fairness."). Losses stemming from a breach of contract are "sufficient to constitute an unjust loss for the purpose of veil-piercing liability." *Franklin*, 676 F. Supp. 3d at 529 (quoting *Servo*, 475 F.3d at 798); *see Servo*, 475 F.3d at 800 ("800 ("[T]he fact that [plaintiff] suffered losses from [transferor's] breach of contract is sufficient to constitute an unjust loss for the purpose of veil-piercing liability.").

That in turn resolves AML's argument that the Court lacks personal jurisdiction over MML, Nevin, and Lob. *See Est. of Thomson ex rel. Est. of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) ("[I]t is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002))); *Franklin*, 676 F. Supp. 3d at 533–34 ("To determine whether an entity is the alter ego of another for purposes of establishing personal jurisdiction, the Court applies the same test for piercing the corporate veil that it uses to determine whether alter ego liability applies.").

Because UWM has plausibly alleged its alter ego allegations and fraudulent transfer claims, amendment would not be futile, and the Court grants UWM leave to amend its complaint and add claims against MML, Nevin, and Lob as alter egos of AML.

### V. Conclusion

In conclusion, the Court DENIES AML's motions for reconsideration (ECF No. 37) and for leave to supplement its countercomplaint (ECF No. 41) and GRANTS UWM's motion for leave to amend its complaint (ECF No. 45).

SO ORDERED.


Dated: February 14, 2025


                                         s/Laurie J. Michelson
                                         LAURIE J. MICHELSON
                                         UNITED STATES DISTRICT JUDGE