UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE,
LLC,

      Plaintiff,

v.

AMERICA'S MONEYLINE, INC.,

      Defendant.

Case No. 22-10228
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
UNITED WHOLESALE MORTGAGE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT [54]**

---

In 2021, United Wholesale Mortgage, a wholesale mortgage lender, issued an "ultimatum" to its mortgage broker partners, including America's Moneyline: to continue working with us, you must stop working with two of our competitors, Rocket Mortgage and Fairway Mortgage. AML did not heed the warning and, while working with UWM, also resumed submitting loans to Rocket. So in 2022, UWM sued AML for breach of contract. After years of litigation, including two dismissed countercomplaints, UWM now moves for partial summary judgment on liability. (ECF No. 54.)

Because there is no genuine issue of material fact that AML agreed to then breached the amended terms, and because AML fails to show that the disputed liquidated damages provision is invalid as a matter of law, the Court grants UWM's motion in part. But the Court denies without prejudice UWM's motion as to the

enforceability of the liquidated damages provision in effect prior to October 21, 2021, which, according to UWM's reply brief, contained different language.

## I.

On UWM's motion for partial summary judgment under Federal Rule of Civil Procedure 56, the Court views the facts in the record, and the reasonable inferences that can be drawn from those facts, in the light most favorable to AML, and presents them as such below. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## A.

When shopping for a mortgage, homebuyers have two basic options: go directly to a retail mortgage lending institution (like a bank) and apply for a loan, or hire an intermediary (like a mortgage broker) to compare wholesale lender and loan options on the borrowers' behalf. (*See* ECF No. 54, PageID.1030–1031); *see also United Wholesale Mortg., LLC v. Madison Atrena LLC*, No. 23-13176, 2025 WL 968897, at *1 (E.D. Mich. Mar. 31, 2025). In other words, there are two main channels for residential mortgage loans: retail, where there is direct borrower and lender communication, and wholesale, where brokers match borrowers' needs with lenders' offerings.

United Wholesale Mortgage, as its name suggests, is a wholesale mortgage lender. America's Moneyline is a mortgage broker. In April 2020, UWM and AML entered UWM's standard Wholesale Broker Agreement (ECF No. 60-1). (*See* ECF No. 54, PageID.1032; ECF No. 57, PageID.1454.) UWM agreed to underwrite mortgages

2

for AML's qualifying clients, compensate AML for each loan closed, and provide "training, marketing and/or information services . . . in furtherance of [AML's] business." (ECF No. 60, PageID.1616–1618.) In return, AML agreed to advise its clients about UWM's loan products and to only submit mortgage loan applications to UWM that met UWM's conditions and requirements. (ECF No. 60-1, PageID.1617; *see* ECF No. 54, PageID.1031–1032.)

Relevant here, the Wholesale Broker Agreement specified two ways the parties' contract could be modified. First, the parties could mutually agree in writing. Section 7.01, "Amendment of Agreement," stated: "Except as set forth [i]n Section 7.08, this Agreement may not be amended except in writing executed by authorized representatives of both Broker and UWM." (ECF No. 60-1, PageID.1621.) Second, a broker could agree to a UWM modification through continued performance. Section 7.08 provided that "[t]his Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, . . . may be amended by UWM from time to time" and that "Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind." (*Id.* at PageID.1622.)

The Wholesale Broker Agreement governed the parties' relationship for almost a year. Then, in March 2021, UWM announced what it called its "All-In Initiative" (ECF No. 54, PageID.1033), or, as AML refers to it, "the Ultimatum" (ECF No. 57, PageID.1455). If brokers wanted to continue working with UWM, they would have to

stop working with two of its competitors, Rocket Mortgage and Fairway Independent Mortgage. (*See* ECF No. 54, PageID.1033–1034; ECF No. 57, PageID.1453.) UWM cites Rocket and Fairway's "damaging business practices" as the basis for the prohibition. (ECF No. 54, PageID.1035.) Unlike UWM, which operates exclusively in the wholesale mortgage channel, Rocket and Fairway operate in both the retail and wholesale channels. (*Id.* at PageID.1034.) That business model, according to UWM, "negatively impacts consumers, brokers, and the wholesale mortgage channel in general," and "the All-In Initiative was necessary to protect the long-term viability of the wholesale lending channel." (*Id.*); *see United Wholesale Mortg., LLC v. Kevron Invs., Inc.*, No. 22-10395, 2025 WL 968895, at *9 (E.D. Mich. Mar. 31, 2025) (reviewing UWM's same description of Rocket and Fairway's "'very aggressive' strategies"). AML disagrees. It insists that UWM's stated rationale is "a mere façade" (ECF No. 57, PageID.1453) and that UWM simply seeks to eliminate its competition and increase its profit (*see id.* at PageID.1453–1455).

UWM followed its announcement with an Amended Wholesale Broker Agreement (ECF No. 60-2). It added two new provisions: a prohibition on brokers submitting loans to Rocket or Fairway (Section 3.03(x)) and a liquidated damages clause for violations of that prohibition (Section 7.30). Section 3.03(x) stated that "Broker will not submit a mortgage loan or mortgage loan application to Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase, and/or funding." (*Id.* at PageID.1633.) And Section 7.30, "Liquidated Damages," directed that "in the event of a violation of Section 3.03(x), Broker shall immediately

pay" UWM the greater of $5,000 per loan closed with Rocket or Fairway or $50,000.[1] (*Id.* at PageID.1643–1644.) The rest of the amended agreement was identical to the prior Wholesale Broker Agreement. (*Compare* ECF No. 60-1, *with* ECF No. 60-2.)

## B.

After UWM's announcement, AML continued sending loans to UWM. That is undisputed. Indeed, according to the log of AML's March 2021 loan submissions to UWM, AML resumed sending loan applications to UWM by March 5, 2021, the day after UWM announced the amended terms. (ECF No. 54-7, PageID.1383; ECF No. 64-2, PageID.1671.)

At first, AML did not sign the Amended Wholesale Broker Agreement. UWM emailed AML about the unsigned writing on March 17, 2021, stating that the lender had not "received your company's response to the UWM acknowledgement" and that "effective today, your ability to import any new loans has been suspended." (ECF No. 57-4, PageID.1502.) The email continued: "If you have decided to part ways with UWM, we appreciate your past partnership and are sorry to see it come to an end. . . . If you wish to continue as a UWM partner and accept the terms of the acknowledgment, . . . please reach out to your UWM Account Executive immediately." (*Id.* at PageID.1502–1503.) Notwithstanding UWM's email, AML

---

[1] UWM states in its reply brief that the liquidated damages provision "changed slightly" in October 2021. (ECF No. 64, PageID.1660 n.7.) In general terms (which the Court further addresses in section III.B), what changed was how the provision measured the amount a broker had to pay UWM per breach.

5

continued submitting loans to UWM.[2] (*See* ECF Nos. 54-7, 64-2.) Two months later, UWM emailed AML again. On May 14, 2021, it wrote, "This is your reminder to please complete the annual renewal of your application with United Wholesale Mortgage. . . [T]he deadline is: 05/20/2021." (ECF No. 57-5.) That deadline came and went without AML signing the renewal agreement.

So on June 1, 2021, UWM reached out more directly. The lender's Director of National Accounts, Bryan Miller, called AML's co-owner and Chief Operating Officer, Dean Lob, and verbally promised that UWM would not enforce the Rocket/Fairway prohibition or the liquidated damages provision. (ECF No. 57-3, PageID.1494–1495 (affidavit by Dean Lob).) Lob memorialized the phone call in an email to AML's other co-owner, Shawn Nevin, the same day:

> I just had a detailed conversation with Bryan Miller second in command at UWM . . . . Bryan stated that UWM is NOT going to enforce by fine or action the request that we stop utilizing [Rocket] . . . . He also told me that UWM has not FINED any of their partners and he insured [sic] me that he will make sure we are NOT fined in the rare case that UWM does in fact change their policy on this issue. He explained that he personally cannot put anything like this in writing but told me as always he HAS OUR BACK . . . .

(ECF No. 57-6, PageID.1508.)

After that phone call, AML started sending loan applications to Rocket again, which it had not done since before UWM's March 4 announcement. (*See* ECF No. 54, PageID.1036 (citing ECF No. 7, PageID.68); ECF No. 54-8, PageID.1389.) Thus, by

---

[2] Neither party explains whether UWM simply did not "suspend" AML's "ability to import any new loans" or how AML was otherwise able to continue submitting loans to UWM. But that detail is not relevant, as AML's continued loan submission is undisputed.

June 2, 2021, AML was submitting loans to both UWM and Rocket. (ECF Nos. 54-8, 64-2.)

But AML still did not sign the amended agreement. So on June 4, 2021, it received another email from UWM: "We'd love to welcome you back to the UWM Broker Network. Click Here to renew your application now" and "[w]e appreciate your renewed interest in UWM and look forward to being re-YOUNITED." (ECF No. 57-7; *see* ECF No. 57, PageID.1457.)

AML finally heeded UWM's requests on June 15, 2021, and signed the online renewal agreement. (ECF No. 57, PageID.1457.) But it says it terminated the agreement "[w]ithin a month" because "AML felt that it had been coerced and manipulated into executing the renewal based upon UWM's threats it would cease processing AML loans already in the pipeline." (*Id.*)

Then, on August 12, 2021, UWM representatives "visited AML's office unexpectedly . . . to assure AML that . . . it would *not* enforce the Ultimatum or the Liquidated Damages Provision" for working with Rocket Mortgage. (ECF No. 57-2, PageID.1486; ECF No. 57-3, PageID.1496.) According to AML, UWM's Senior Key Account Executive, Scott Welty, "had one meeting with only Lob and another meeting with Lob and Nevin jointly" and made "consistent and unequivocal" promises of non-enforcement. (ECF No. 57, PageID.1458 (citing ECF No. 57-2, PageID.1486; ECF No. 57-3, PageID.1496).) AML says that Welty's promises echoed the promises made by Miller during the June 1, 2021, phone call. (*Id.*)

AML in turn "agreed to enter into a new relationship with UWM only after receiving assurances from UWM that the new relationship would *not* include the Ultimatum."[3] (*Id.* at PageID.1471; *see id.* at PageID.1457–1458.) AML does not specify the form, if any, the parties' new contract took, only that it "did *not* include the Ultimatum." (*Id.* at PageID.1471.) For the next several months, AML says it "continued to do business with both Rocket [Mortgage] and UWM" (*id.* at PageID.1458) "with UWM's full knowledge and consent" (ECF No. 57-2, PageID.1487) and "without any criticism or objection" from UWM (ECF No. 57, PageID.1458). That said, the record also shows that AML had not *stopped* sending loan applications to either Rocket or UWM at any point since June 2021. (ECF Nos. 54-8, 64-2.)

In December 2021, "UWM's posture suddenly and inexplicably changed." (ECF No. 57, PageID.1459.) During a December 9, 2021, phone call, UWM "indicated that AML must immediately stop doing business with Rocket [Mortgage] because other brokers were calling UWM and demanding that they too be allowed to do business with Rocket." (*Id.* at PageID.1460 (citing ECF No. 57-3, PageID.1498–1499 (Lob's affidavit)).) During another phone call a few days later, on December 13, UWM reiterated that AML had to choose between working with UWM or Rocket. (*Id.* at PageID.1461.) AML responded that, if forced to choose, it would go with Rocket. (*Id.*)

---

[3] Just as it is unclear when AML alleges it terminated the prior agreement, other than "within a month" of the June 15, 2021, signed writing, it is also unclear when exactly AML contends it entered the "new relationship" with UWM—and whether it did so before or after the August 2021 meetings. (*See* ECF No. 57, PageID.1457–1458, 1470–1471.) These details do not affect the outcome of the instant motion.

UWM "asked if this was AML's final decision" because "there would likely be strong repercussions from UWM," including that "AML would likely be fined based on the Ultimatum and Liquidated Damages Provision." (*Id.* (quoting ECF No. 57-2, PageID.1488 (Nevin's affidavit)).) Two days later, on December 15, AML received a letter from UWM "demand[ing] that [AML] immediately cease submitting mortgage loans and/or mortgage loan applications to Rocket Mortgage . . . and pay UWM the applicable liquidated damages due under the Agreement." (ECF No. 57-10, PageID.1516; *see* ECF No. 57, PageID.1461.) The letter specified: "Based on the information currently known to us, UWM is entitled to at least $1,900,000.00 in liquidated damages under the Agreement for the more than 380 mortgage loans you submitted to Rocket Mortgage after agreeing to the All-In Provision."[4] (ECF No. 57-10, PageID.1516–1517.) This suit followed.

To summarize: Starting in April 2020, UWM and AML began working together under the original Wholesale Broker Agreement. On March 4, 2021, UWM announced an amendment—the Rocket/Fairway prohibition and liquidated damages provision. By March 5, 2021, AML was sending mortgage loans and loan applications to UWM, and it did so continuously at least through December of 2021. By June 2, 2021, AML was also sending loans to Rocket, which it did through at least December of 2021. On

---

[4] While UWM does not seek summary judgment on the liquidated damages amount, the Court notes that its amended complaint requests "at least $2,795,000 in liquidated damages" for "at least 559 mortgage loans" submitted by AML to Rocket. (ECF No. 60, PageID.1604.) Both the amended complaint and December 2021 letter base the calculated liquidated damages amount on the "revised version" of the provision, which requires payment of $5,000 per loan closed with Rocket rather than per loan closed with UWM. (*See id.*; ECF No. 57-10, PageID.1516.)

June 15, 2021, AML signed UWM's online agreement, although it says it terminated that agreement within a month. Then, "after receiving assurances from UWM," AML says it agreed to do business with UWM once more under an agreement that "did *not* include the Ultimatum." (ECF No. 57, PageID.1471.) All told, AML submitted "approximately 1,450" loans to UWM and "approximately 1,700" to Rocket between March 2021 and March 2022. (ECF No. 54-6, PageID.1371. *Compare* ECF No. ECF No. 60, PageID.1604 (UWM's amended complaint stating that AML submitted "at least 559" mortgage loans to Rocket in violation of the parties' amended agreement); ECF No. 54-8 (log of AML's loan submissions to Rocket between June and December 2021).)

## II.

## A.

In February of 2022, UWM sued AML for breaching the parties' contract by continuing to do business with Rocket while also submitting loans to UWM. (ECF No. 1.) AML responded to UWM's complaint with its own countercomplaint (ECF No. 7), which UWM moved to dismiss (ECF No. 11). The Court granted that motion in large part, agreeing with UWM that AML failed to state counterclaims of promissory estoppel or fraud (whether general fraud, fraudulent inducement, or bad faith promises). *See United Wholesale Mortg. v. Am.'s Moneyline, Inc.* ("*Am.'s Moneyline I (Largely Dismissing Countercomplaint)*"), 647 F. Supp. 3d 587, 594–601 (E.D. Mich. 2022). The Court also largely agreed with UWM that AML's declaratory judgment counterclaims were "redundant of UWM's [breach of contract] claims and AML's

10

putative defenses" and dismissed under the mirror image rule all but one—AML's antitrust declaratory judgment subclaim alleging that "the Ultimatum represents an anticompetitive practice in violation of antitrust statutes." *Id.* at 601.

In March of 2023, AML expanded that surviving antitrust declaratory judgment subclaim into a 12-antitrust-count amended countercomplaint (ECF No. 24), which UWM likewise moved to dismiss (ECF No. 27). The Court will not rehash its bases for granting UWM's motion to dismiss AML's amended countercomplaint, which are laid out in its March 2024 dismissal order, *see United Wholesale Mortg. v. Am.'s Moneyline, Inc.* ("*Am.'s Moneyline II (Dismissing Antitrust Countercomplaint)*"), No. 22-10228, 2024 WL 1349301 (E.D. Mich. Mar. 29, 2024), and again in its February 2025 order denying AML's motion for reconsideration and for leave to file a supplemental countercomplaint, *see United Wholesale Mortg. v. Am.'s Moneyline, Inc.* ("*Am.'s Moneyline III (Denying Reconsideration)*"), No. 22-10228, 2025 WL 502743 (E.D. Mich. Feb. 14, 2025). Worth noting, though, is that at the same time as the Court denied AML's motions for reconsideration and for leave to supplement, it granted UWM's motion for leave to file a first amended complaint "'to include other parties as AML's alter egos' and to 'assert new claims against AML and its alter egos to whom AML conveyed assets.'" *Id.* at *1. UWM in turn amended its complaint in March 2025 to add three defendants (Mortgage Moneyline Inc., Shawn Nevin, and Dean Lobb) and three counts (for violations of the Michigan and California Uniform Voidable Transactions Acts and for declaratory relief). (ECF No. 60.)

11

AML filed a motion to dismiss the amended complaint, which the Court denied in short order for "rais[ing] identical issues as addressed in this Court's recent opinions in *United Wholesale Mortgage, LLC v. Madison Atrena LLC d/b/a District Lending*, No. 23-13176, 2025 WL 968897 (E.D. Mich. Mar. 31, 2025), and *United Wholesale Mortgage, LLC v. Kevron Investments, Inc.*, No. 22-10395, 2025 WL 968895 (E.D. Mich. Mar. 31, 2025), which [were] [t]hereby incorporated and adopted in full." *United Wholesale Mortg. v. Am.'s Moneyline, Inc.* ("*Am.'s Moneyline IV (Denying Motion to Dismiss)*"), No. 22-10228, 2025 WL 1085792, at *1 (E.D. Mich. Apr. 10, 2025).

## B.

Before amending its complaint—indeed, while UWM's motion for leave to amend and AML's motions for reconsideration and for leave to supplement were each pending—UWM filed this motion for partial summary judgment on its breach of contract claim (ECF No. 54) in accordance with the parties' dispositive motion deadline (*see id.* at PageID.1021). UWM states that the new claims asserted in its amended complaint "do not relate" to its motion for partial summary judgment. (ECF No. 64, PageID.1657 n.1.) UWM "requests that the Court grant summary judgment in UWM's favor as to the issue of AML's breach of the parties' contract and reserve the issue of damages for trial." (ECF No. 54, PageID.1021.) Put another way, UWM argues it is entitled to judgment as a matter of law that (1) AML breached the Amended Wholesale Broker Agreement and (2) the liquidated damages (and

12

attorney's fees) provision of the contract is enforceable. But it does not seek summary judgment on the specific damages amount to which it would be entitled.

AML opposes UWM's motion. (ECF No. 57.) It does not contest that, as prohibited by the ultimatum, it submitted loans to Rocket while also sending loans to UWM but argues instead that (1) UWM did not validly amend the Wholesale Broker Agreement and that, (2) even if the amended terms became part of the parties' contract, whether via its continued loan submissions to UWM or via its online agreement in June 2021, it terminated that agreement soon after entering it. AML further argues that summary judgment is premature in light of "outstanding discovery" (*id.* at PageID.1463) and that its "numerous defenses," if proven (through that outstanding discovery), would "entirely defeat" UWM's breach of contract claim (*id.* at PageID.1476).

Given the adequate briefing (ECF Nos. 54, 57, 64), not to mention the Court's extensive familiarity with many of these issues (and arguments), the Court considers UWM's motion for partial summary judgment without further argument, E.D. Mich. LR 7.1(f); *see Madison Atrena*, *supra*; *Kevron Invs.*, *supra*; *see also Am.'s Moneyline I (Largely Dismissing Countercomplaint)*, *supra* (largely dismissing AML's countercomplaint and addressing many of the same factual allegations and arguments as raised in AML's instant response brief).[5]

---

[5] To elucidate, AML is not the only broker to have sued UWM over the amended Wholesale Broker Agreement. Similar arguments have been raised by all.

## III.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." So "[t]o survive summary judgment, the nonmoving party must present significant probative evidence putting the material facts in doubt." *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1057 (6th Cir. 2024) (internal quotation marks omitted).

Thus, UWM "must show that the record contains evidence satisfying [its] burden of persuasion" as to each element of its breach of contract claim. *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)). Under Michigan law, which governs here, those elements are (1) the existence and terms of the contract, (2) the defendant's breach thereof, and (3) damages to the plaintiff resulting from that breach. *See Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014); *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

## A.

AML makes two main arguments as to the first element: (1) the at-issue amendment was not the sort of modification that AML could accept via conduct and (2) even if AML accepted the modification by conduct in March 2021 or by signage in June 2021, it terminated that agreement "within a month after AML's online renewal." (ECF No. 57, PageID.1470.)

14

**1.**

The first argument is easily dispensed with. The Court has already spilled much ink explaining why. *See Madison Atrena*, 2025 WL 968897, at *3–6; *Kevron Invs.*, 2025 WL 968895, at *5–6; *Am.'s Moneyline IV (Denying Motion to Dismiss)*, 2025 WL 1085792, at *1. Put simply, the plain writing of the parties' contract makes clear that UWM could propose unilateral prospective modifications to the Wholesale Broker Agreement as long as it "endeavor[ed] to provide broker[s] with prompt notice thereof," and that brokers could accept UWM's proposed terms by continuing to submit loan applications to the lender. (ECF No. 60-1, PageID.1622); *see Madison Atrena*, 2025 WL 968897, at *5; *Kevron Invs.*, 2025 WL 968895, at *6. It is undisputed that process occurred here: UWM announced the Rocket/Fairway prohibition and associated damages provision on March 4, 2021, and AML continued sending in loan applications. So by June 2, 2021, when AML was sending loan applications to both UWM and Rocket, the amended terms governed, and AML's conduct in turn constituted a breach. There is no genuine dispute of material fact as to any of those points, and AML's contract interpretation to the contrary—that UWM could only make the at-issue modification in a bilateral signed writing per Section 7.01—is "unreasonable as a matter of law." *Kevron Invs.*, 2025 WL 968895, at *1; *see id.* at *6; *Madison Atrena*, 2025 WL 968897, at *5. Nor can AML prevail on its preexisting duty argument that UWM failed to validly amend the contract because it provided only its continued business relationship as consideration. That continued relationship was sufficient consideration where either party could terminate their relationship at any

15

point, i.e., where neither had a preexisting duty to continue working together. *See Madison Atrena*, 2025 WL 968897, at *7–9; *United Wholesale Mortg., LLC v. Atl. Tr. Mortg. Corp.*, No. 24-10216, 2025 WL 907883, at *7–9 (E.D. Mich. Mar. 25, 2025).

This conclusion is not changed by AML's argument that it simply rejected UWM's modification by refusing to sign the amended contract (at least at first) when repeatedly presented with it in written form.[6] That is just another way of arguing that acceptance by conduct was invalid, i.e., that AML could only accept UWM's proposed modification in a signed writing. AML's argument also disregards the two methods of rejection, equally clear and unambiguous from the contract's plain language: AML could reject a UWM-proposed modification either by not submitting loans to UWM or by terminating the parties' relationship. *Madison Atrena*, 2025 WL 968897, at *5 ("Section 7.08 makes clear that (1) a broker's continued loan submission constitutes acceptance and (2) a broker may reject an amendment proposed by UWM by either not submitting loan applications to UWM or terminating the agreement."); *Kevron Invs.*, 2025 WL 968895, at *6 (same). In short, by continuing to work with UWM, AML accepted the amended terms pursuant to Section 7.08, and cannot rely

---

[6] AML's contention that UWM promised not to enforce the amended terms starting with the June 1, 2021, phone call between Miller (UWM) and Lob (AML) fares no better. Again, because of its continued loan submission prior to that date, AML had already accepted the amendment by the time UWM allegedly made those promises. It is thus irrelevant whether AML's June 15 signage was "[b]ased upon UWM's promises that it would not enforce the Ultimatum" because it had already accepted the amended terms via conduct. *See also Am.'s Moneyline I (Largely Dismissing Counterclaim)*, 647 F. Supp. 3d at 596 ("UWM's earliest promise not to enforce the ultimatum was made on June 1, 2021, well after the date of acceptance by performance. So AML could not have relied on a promise made on June 1 when it had already accepted the ultimatum weeks or months prior." (citation omitted)).

16

on Section 7.01's independent, alternative modification requirement of a signed writing to avoid a breach of contract claim.[7]

## 2.

AML attempts to avoid summary judgment by insisting that it terminated the parties' contract in early-to-mid-July 2021. In affidavits attached to AML's summary judgment response, AML's principals Nevin and Lob aver that "[w]ithin a month after the online renewal, AML informed UWM that it was cancelling and terminating its relationship with UWM based upon UWM's threats and insistence that AML executed an amended agreement containing the Ultimatum." (ECF No. 57-2, PageID.1485; ECF No. 57-3, PageID.1495; *see* ECF No. 57, PageID.1457.) Then, after some indefinite period of time and "only after receiving assurances from UWM that the renewed relationship would not include the Ultimatum," AML says it "agreed to enter into a new relationship with UWM." (ECF No. 57-2, PageID.1485; ECF No. 57-3, PageID.1495–1496; *see* ECF No. 57, PageID.1471.) But AML cannot defeat summary judgment by asserting, for the first time in conclusory and contradictory

---

[7] There is no genuine dispute that the amended terms—including "the Ultimatum"—governed. AML's mere denial that the online agreement contained the amended terms, through conclusory statements that it "[a]t no time . . . sign[ed] any amendment to the Original AML/UWM Agreement that included the Ultimatum" (ECF No. 57, PageID.1457), fails to create a fact issue, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 256 (1986). Indeed, AML asserts that it resisted signing the online renewal agreement until June 15, then finally agreed to sign after UWM promised it would not enforce the amended terms, then later terminated the agreement because UWM changed course and insisted on enforcement. The only reasonable conclusion to be drawn from AML's own allegations is that the online agreement contained the amended terms.

17

affidavits attached to its summary judgment response, that it terminated the parties'
contract around July 2021.

For starters, AML's conclusory and bare affidavit statements are insufficient
to raise a genuine issue of material fact. *See Engle v. Meister*, 495 F. Supp. 2d 826,
835 (S.D. Ohio 2007) ("The Sixth Circuit has . . . repeatedly held that a conclusory
statement in an affidavit or declaration cannot create a genuine issue of material
fact."). Indeed, neither Nevin nor Lob provide the most basic of details, such as how,
by whom, and to whom AML's alleged termination was communicated. In identical
affidavit assertions, they aver only that "[w]ithin a month after the online renewal,
AML informed UWM that it was cancelling and terminating its relationship with
UWM." (ECF No. 57-2, PageID.1485; ECF No. 57-3, PageID.1495.) That statement is
"devoid of specific information that might conceivably create a genuine issue,"
*Emmons v. McLaughlin*, 874 F.2d 351, 355 (6th Cir. 1989), and "completely silent as
to the particulars," *id.* at 354 n.3; *see id.* at 355 & n.4. And they point to no other
record evidence supportive of their termination allegation. *See Moore v. Vanderwall*,
No. 313419, 2013 WL 5539280, at *5 (Mich. Ct. App. Oct. 8, 2013) (per curiam)
(affirming grant of summary judgment where "petitioners provided two nearly
identical affidavits that merely consisted of unsupported allegations"); *Livingston
Care Ctr. v. Dep't of Health & Hum. Servs.*, 388 F.3d 168, 176 (6th Cir. 2004)
(concluding that declaration attached to summary judgment response, which
contained only conclusory statements, did not raise a genuine issue of a material fact
where declarant "ma[de] no reference to . . . any other documentation in support of

18

her conclusory statement"). Affidavit statements that are "nothing more than rumors, conclusory allegations and subjective beliefs" are "wholly insufficient" to create a fact issue capable of defeating a motion for summary judgment. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990); *U.S. ex rel. Tenn. Valley Auth.*, No. 21-02465, 2021 WL 6332770, at *2 (W.D. Tenn. Nov. 10, 2021).

The conclusory affidavit statements are particularly fatal here because the contract expressly required "prior *written* notice" of termination. (*See* ECF No. 60-1, PageID.1622 ("7.06. Termination. This Agreement may be terminated by either party for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice . . . ."); ECF No. 60-2, PageID.1639 (same).) Yet Nevin and Lob say only that AML "informed" UWM that it was terminating the parties' agreement. (ECF No. 57-2, PageID.1485; ECF No. 57-3, PageID.1495.) They provide nothing to suggest the manner of informing was by writing. Their affidavits make no mention of a written notice of termination. They do not attach a written notice of termination. Nor does any exhibit contain a written notice of termination.

In the absence of written notice, the only way for AML to create a fact issue on termination would be by presenting evidence of the parties' mutual modification or waiver of that contractual requirement. *See Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 257 (Mich. 2003) ("[C]ontracting parties are at liberty to design their own guidelines for modification or waiver of the rights and duties established by the contract, but even despite such provisions, a modification or waiver

19

can be established by clear and convincing evidence that the parties mutually agreed to a modification or waiver of the contract."). But Michigan law sets a high bar for mutual modification—and AML comes nowhere close to meeting it.

"A modification or waiver can be established by clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract." *Id.* at 258 (cleaned up). AML does not contend the parties expressly agreed, either orally or in writing, to waive the relevant contract terms. That leaves only the affirmative conduct route, which is especially hard to make out.

Indeed, waiver by conduct requires clear and convincing evidence that the contracting party "was intentionally and voluntarily relinquishing its right to confine the parties' relationship to the terms of the contract." *Id.* at 260. Further, when a contract includes express modification provisions, "[a]ny clear and convincing evidence of conduct must overcome not only the substantive portions of the previous contract allegedly amended"—here, the written-notice-of-termination requirement—"but also the parties' express statements regarding their own ground rules for modification or waiver as reflected in any restrictive amendment clauses"—i.e., the modification methods set out in Sections 7.01 and 7.08. *Id.* at 259. And to be clear and convincing, such evidence must be "so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Martin*, 538 N.W.2d 399, 410 (Mich. 1995) (alteration in original); *see id.* ("[T]he clear and convincing evidence standard[] [is] the most

demanding standard applied in civil cases . . . ."). But again, Nevin and Lob aver only that "AML informed UWM that it was cancelling and terminating its relationship with UWM." (ECF No. 57-2, PageID.1485; ECF No. 57-3, PageID.1495.) That is not clear and convincing evidence that UWM waived the written termination requirement, let alone that it waived the written modification provisions. And while Nevin and Lob say that AML agreed to a new contract after terminating the original agreement, they provide no evidence of that contract, nor even allegations about how and when it was entered or its contents.

At best—that is, generously construing the vagueness in AML's response and affidavits—AML suggests that after it terminated the parties' agreement around July 2021, UWM "visited AML's office unexpectedly" in August 2021 to try to win AML back. (ECF No. 57-2, PageID.1486; ECF No. 57-3, PageID.1496.) Putting aside that AML does not even say that much, *see supra* note 3, and that its allegations about the August 2021 meetings equally support that UWM was simply investing in its continuing business relationship with AML, AML still fails to raise a triable fact issue as to termination. Because even that most favorable interpretation of AML's allegations does not amount to clear and convincing evidence of mutual modification. "[E]vidence establish[ing] only that [a contracting party] remained silent despite being aware of [the other party's] conduct inconsistent with the terms of their contract" is not enough to establish waiver. *Quality Prods.*, 666 N.W.2d at 254; *see id.* ("Mere knowing silence generally cannot constitute waiver."); *Price v. Kosmalski*, 821 N.W.2d 503, 514 n.45 (Mich. 2012) ("[Michigan's] waiver jurisprudence generally does

not recognize mere acquiescence as a means to waive a known right."); *Bd. of Washtenaw Cnty. Rd. Comm'rs v. Lincoln Consol. Sch. Dist.*, No. 304525, 2013 WL 5288915, at \*7 (Mich. Ct. App. Sept. 19, 2013) (per curiam) ("[T]he fact that defendant knew plaintiff's activity was inconsistent with the Agreement's terms and remained silent amounts only to a forfeiture of contract rights, not a waiver of express contract terms."). Indeed, "[t]he potential for ambiguous acts being construed as waiver by conduct is the reason parties often include a written modification provision[:] 'to protect against unintended and unilateral modification or waiver.'" *Washtenaw Cnty. Rd. Comm'rs*, 2013 WL 5288915, at \*8 (quoting *Quality Prods.*, 666 N.W.2d at 258 n.5).

Instead, "a valid waiver may be shown by express declarations or by declarations that manifest the parties' intent and purpose, or be an implied waiver, evidenced by a party's decisive, unequivocal conduct reasonably inferring the intent to waive." *Patel v. Patel*, 922 N.W.2d 647, 651 (Mich. Ct. App. 2018) (per curiam) (citation modified); *see Quality Prods.*, 666 N.W.2d at 261 ("It is well settled that a course of affirmative conduct, particularly coupled with oral or written representations, can amount to waiver."). AML's evidence falls far short. *Compare Sweeney v. Visalus, Inc.*, No. 334509, 2017 WL 6502935, at \*9 (Mich. Ct. App. Dec. 19, 2017) (per curiam) (finding waiver of written notice requirement based on course of conduct where contracting parties "acknowledged in writing their awareness that they had been terminated"), *with Washtenaw Cnty. Rd. Comm'rs*, 2013 WL 5288915, at \*5–9 (concluding that defendant's course of conduct amounted to only "silence and

ambiguous statements" and not waiver of contract's deadline where defendant knew about project delays, knew deadline passed, and sent a post-deadline letter expressing "commitment to the project"). Meanwhile, what is clear from the record evidence is that AML did not stop sending loans to UWM in July 2021 when it now purports to have terminated the contract. (*See* ECF No. 64-2.) Its loan submission instead stopped around December 2021 (*see id.*), consistent with its prior discovery response (*see* ECF No. 54-6, PageID.1376). (More on that later.) That alone undercuts AML's bare assertion that it terminated the contract "[w]ithin a month after the online renewal" (ECF No. 57-2, PageID.1485; ECF No. 57-3, PageID.1495) or that UWM and AML mutually modified the contract to waive the written-notice-of-termination requirement and modification methods (ECF No. 57, PageID.1470–1471).

Resisting this conclusion, AML makes a halfhearted argument that the written termination requirement is inapplicable because the contract terminated under a different clause in Section 7.06, which provides that "[t]his Agreement . . . may be terminated immediately . . . if any warranty, representation or statement made by a party to this Agreement was false in any material respect when made or furnished." (ECF No. 60-1, PageID.1622; ECF No. 60-2, PageID.1639.) The entirety of AML's argument on this point is that "Nevin and Lob testified that UWM's representation that it would not enforce the Ultimatum was false, and therefore the agreement terminated immediately when AML informed UWM it was ending the relationship in June 2021." (ECF No. 57, PageID.1471.) In other words, AML appears to contend that

23

UWM's promises of nonenforcement became a "warranty, representation or statement" under Section 7.06 such that their falseness "when made" terminated the parties' contract. (ECF No. 60-1, PageID.1622; ECF No. 60-2, PageID.1639.) But AML altogether fails to explain how UWM's post-contractual promises of nonenforcement constituted a "warranty, representation or statement" within the meaning of the provision. Nor does it attempt to define those contract terms. AML also fails to assert that UWM's promises were false when made. It contends only that UWM made post-contractual promises of nonenforcement it later "renege[d] upon." (ECF No. 57, PageID.1458.) Moreover, the provision simply says that the contract "*may* be terminated immediately," not that it occurs automatically. This would presumably still require written notice.

In short, AML's conclusory affidavits do not create any genuine issue of material fact that it terminated the parties' agreement around July 2021.

Nor can AML create a fact issue where its affidavits plainly contradict its prior discovery responses. On this point, UWM has it half right. According to UWM, "AML cannot—after the close of discovery and to avoid summary judgment—concoct self-serving facts through affidavits that contradict its pleadings and discovery responses."[8] (ECF No. 64, PageID.1661.) It elaborates that AML (1) alleged in its

---

[8] The Court disagrees with UWM's rejection of AML's affidavits as "self-serving." Because "there is no prohibition against 'self-serving' affidavits." *Jonna v. Bitcoin Latinum*, No. 22-10208, 2024 WL 3029505, at *5 n.2 (E.D. Mich. June 17, 2024), *aff'd sub nom. on other grounds*, *Jonna v. GIBF GP, Inc.*, No. 24-1537, 2025 WL 1392206 (6th Cir. May 14, 2025). "At one level, all statements in litigation are self-serving," *Gresham v. Meden*, 938 F.3d 847, 850 (6th Cir. 2019), so labeling an affidavit "self-serving" "does nothing to undermine the other side's evidence under

then-operative countercomplaint that it "'informed UWM that it was cancelling and terminating the relationship with UWM,' but ultimately '*did not* terminate the relationship" (*id.* (quoting ECF No. 7, PageID.70–71)) and (2) in its discovery responses "made no mention of a purported termination within a month after the June 2021 renewal" (*id.* (citing ECF No. 54-5, PageID.1359; ECF No. 54-6, PageID.1376)). Take those arguments in turn.

UWM's first argument seems to be that AML made a judicial admission in its original countercomplaint that precludes the broker from asserting termination now. Not so. Judicial admissions are "formal concessions in the pleadings in the case . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Hilgendorf v. St. John Hosp. & Med. Ctr. Corp.*, 630 N.W.2d 356, 367 (Mich. Ct. App. 2001) (per curiam); *see Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 549 (6th Cir. 2000) ("Plaintiffs are bound by admissions in their pleadings, and a party cannot create a factual issue by subsequently filing a conflicting affidavit."). But "judicial admissions must be read narrowly." *Hilgendorf*, 630 N.W.2d at 367. For a statement to be treated as a judicial admission, it "must be 'deliberate, clear and unambiguous' and 'expressly concede . . . an alleged fact.'" *Kay v. Minacs Grp. (USA), Inc.*, 580 F. App'x 327, 331 (6th Cir. 2014) (omission in original) (citation omitted).

---

Rule 56," *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 841 (6th Cir. 2021) (collecting cases).

Importantly, amended allegations control. *See Kimber Baldwin Designs, LLC v. Silv Commc'ns, Inc.*, 225 F. Supp. 3d 670, 676 (S.D. Ohio 2016); *see also Raymond James & Assocs., Inc. v. 50 N. Front St. TN, LLC*, No. 18-02104, 2025 WL 793577, at *5, 8 (W.D. Tenn. Mar. 12, 2025) (concluding that original complaint allegations were not binding judicial admissions where complaint was twice amended following district court's dismissal orders). So "[e]ven if Plaintiff's amended allegations were fundamentally inconsistent with the original allegations, '[f]actual assertions in pleadings . . . *unless amended*, are considered judicial admissions conclusively binding on the party who made them.' Because the complaint was amended, Plaintiff is not bound by the original allegations." *Kimber Baldwin Designs*, 225 F. Supp. 3d at 677 (omission, second alteration, and emphasis in original) (quoting *Kay*, 580 F. App'x at 331). Here, AML's original countercomplaint (ECF No. 7) was superseded by its amended countercomplaint (ECF No. 24), which was in turn superseded by its answer and affirmative defenses (ECF No. 69). In other words, "the purported judicial admission was effectively eliminated and nullified twice. Thus, the factual statements can no longer constitute judicial admissions." *Raymond James & Assocs.*, 2025 WL 793577, at *8.

And while superseded factual allegations "may still be advanced at the summary judgment stage as evidence rebutting a subsequent contrary assertion," even if they "cannot be considered judicial admissions," a party "cannot prevail on summary judgment in sole reliance on [plaintiff's] allegations from a complaint that has now been superseded twice over." *Id.* Here, too, UWM fails to acknowledge that

AML's amended countercomplaint allegations (since superseded by AML's answer to UWM's recently amended complaint[9]) were consistent with its termination argument. Indeed, AML alleged that "[w]ithin a month after executing the Amended AML/UWM Agreement, AML informed UWM that it was cancelling and terminating the relationship with UWM." (ECF No. 24, PageID.369.)

UWM makes a similarly unavailing argument that "AML did not plead termination as a defense to UWM's Complaint." (ECF No. 64, PageID.1662.) But UWM cites only the general rule that "failure to plead results in waiver of affirmative defense[s]" and cites no support for the proposition that contract termination is one such waivable affirmative defense. (*Id.* (citing *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 750 (6th Cir. 2015)).) Meanwhile, Michigan law suggests the opposite. *See Mich. Alt. Hous. v. Delta Com. Props.*, No. 197186, 1998 WL 1992821, at *5 (Mich. Ct. App. May 5, 1998) (per curiam). And even if contract termination were a waivable affirmative defense, "[i]t is well established . . . that failure to raise an affirmative defense by responsive pleading does not always result in waiver." *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993). "A district court may, in its discretion, allow a defendant to raise an affirmative defense for the first time in a motion for summary judgment," *Lauderdale v. Wells Fargo Home Mortg.*, 552 F. App'x 566, 573 (6th Cir. 2014), or summary judgment response, *see Moore*, 992 F.2d at 1445,

---

[9] In response to UWM's operative complaint, AML filed an answer (ECF No. 69) rather than a countercomplaint. So it simply admits, denies, or asserts defenses against UWM's allegations without making any factual allegations of its own. AML thus does not say anything about termination in its operative responsive pleading.

"if doing so does not result in either surprise or prejudice to the plaintiff," *Lauderdale*, 552 F. App'x at 573; *see Moore*, 992 F.2d at 1445 (finding that plaintiffs "were aware, or at least should have been aware," of defendant's affirmative defense raised for the first time in his response to summary judgment motion and "in his affidavit in opposition to the . . . motion"); *see generally Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 680 (6th Cir. 2018) ("[I]f a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice."). UWM does not say it was unaware of (or prejudiced by) AML's claim of termination. And its other arguments discussed above—such as that AML alleged in its original countercomplaint that it told UWM it was terminating the contract but then did not follow through—support the opposite conclusion.

UWM's second argument, that AML's affidavit statements contradict its prior discovery responses, is more persuasive. As UWM points out, "AML's discovery responses made no mention of a purported termination within a month after the June 2021 renewal." (ECF No. 64, PageID.1661.) UWM made a straightforward request for admission that "AML has not terminated the Wholesale Broker Agreement" (ECF No. 54-5, PageID.1359), to which AML gave an equally clearcut answer that "Nevin terminated all agreements with UWM on or about December 13, 2021" (ECF No. 54-6, PageID.1376). Now, in their post-discovery affidavits, Nevin and Lob claim that "[w]ithin a month after the online renewal," i.e., within a month of June 15, 2021, "AML informed UWM that it was cancelling and terminating its relationship with

28

UWM." (ECF No. 57-2, PageID.1485; ECF No. 57-3, PageID.1495.) AML thus attempts to move its termination up about five months without any justification for the contradiction.

But "[i]f an affidavit is untimely" under Federal Rule of Civil Procedure 26(e)(1), i.e., filed post-discovery, "and inconsistent with prior discovery responses, it is inadmissible and should not be considered." *Graham v. Am. Cyanamid Co.*, 350 F.3d 496, 509 (6th Cir. 2003); *see Marietta v. Hartford Underwriters Ins. Co.*, 198 F.3d 245, 1999 WL 1021852, at *4–5 (6th Cir. 1999) (unpublished table decision) (explaining that affidavits that are "untimely" under Rule 26(e) and "inconsistent with a party's prior discovery responses" are inadmissible under Rule 56(c), *id.* at *4, finding that the at-issue affidavit should not have been considered by the district court, and concluding that "[w]ithout [that] affidavit, there is no genuine issue of material fact remaining in dispute," *id.* at *5); *Advanced Mech. Servs., Inc. v. Auto-Owners Ins. Co.*, No. 14-388, 2017 WL 3381366, at *6 (W.D. Ky. Aug. 4, 2017) (reviewing Sixth Circuit precedent and finding that affidavit submitted in opposition to summary judgment motion that contradicted interrogatory answers did not create genuine issue of material fact); *Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 12 F. Supp. 2d 760, 770 (M.D. Tenn. 1998) ("[T]he Court should not allow [plaintiff] to file a post-discovery affidavit that is inconsistent with [plaintiff's] 14 month old interrogatory answer."); *see also Marietta*, 1999 WL 1021852, at *5 ("[A] court must determine whether an untimely affidavit is inconsistent with a party's interrogatories, admissions, or depositions before deciding whether it creates a

genuine issue of material fact."). Federal Rule of Civil Procedure 26(e)(1) imposes an ongoing obligation on parties to "supplement or correct" any response to a request for admission "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Rule 37(c)(1) in turn bars a party from using as "evidence on a motion" any information it should have disclosed under Rule 26(e) "unless the failure was substantially justified or is harmless." And "[t]he burden is on the potentially sanctioned party to prove harmlessness or substantial justification." *Gelan v. Miranda*, No. 23-76, 2025 WL 1137414, at *3 (E.D. Tenn. Apr. 16, 2025) (citing *Hunt v. Hadden*, 127 F. Supp. 3d 780, 789 (E.D. Mich. 2015)); *see R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) ("Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a) [and (e)], that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'"); Fed. R. Civ. P. 37(c) advisory committee's note to 1993 amendment (explaining that Rule 37(c)(1) provides an "automatic sanction" for failure to make a disclosure required by Rule 26(e)(1), with exceptions for substantially justified or harmless non-disclosures).

Similarly, there also appears to be some support for excluding under the sham affidavit doctrine affidavit assertions that contradict a party's prior discovery responses. *See Dunavant v. Frito Lay*, No. 11-0028, 2013 WL 816673, at *4 (M.D. Tenn. Mar. 5, 2013) ("The sham affidavit rule precludes [a party] from creating a genuine dispute of material fact by contradicting its prior interrogatory answers."

(alteration in original) (collecting cases)); *Rider v. Stillman, P.C.*, No. 21-12660, 2024 WL 3501880, at *4 (E.D. Mich. July 22, 2024) (applying sham affidavit doctrine to purported contradiction between affidavit and discovery responses and finding no direct contradiction); *Turner v. Beydoun*, No. 14-14801, 2017 WL 11717250, at *4 (E.D. Mich. Jan. 26, 2017) (same).

In sum, UWM is entitled to partial summary judgment on the issue of liability. When AML resumed sending loans to UWM after the March 2021 announcement, it accepted the amended terms. And when it resumed sending loans to Rocket in June 2021, it breached those terms. UWM has also shown that it suffered actual damages as a matter of law, and AML's argument to the contrary—in effect, that UWM cannot show actual damages because it cannot show its liquidated damages provision is enforceable—is non-responsive.[10]

## B.

UWM also asserts it is entitled to summary judgment on the enforceability of the liquidated damages provision. But its motion for partial summary judgment concerns only the "revised version" of the provision (ECF No. 64, PageID.1660 n.7), i.e., the liquidated damages provision that appears in the Amended Wholesale Broker Agreement attached to its complaint (ECF No. 60-2, PageID.1643–1644). UWM raises

---

[10] AML fails to create a fact issue as to the damages element of UWM's breach of contract claim. It essentially argues that UWM cannot show the liquidated damages provision is enforceable because it fails to show it suffered actual damages. But that argument is circular and skips the threshold issue. Indeed, AML fails to address UWM's asserted measure of actual damages, *see infra* section III.B, such as the forfeited costs of UWM's investment in brokers who do business with Rocket/Fairway and the overall cost to the wholesale mortgage channel.

for the first time in its reply brief that the language of the provision changed on October 21, 2021. (ECF No. 64, PageID.1660 n.7.) While the later version required a broker to pay UWM $5,000 per loan it submitted to Rocket, the earlier, pre-October 21 version required payment per loan submitted to *UWM*. Either way, a broker breached the contract by sending a loan application to Rocket, but under the earlier version it would owe damages based on each loan it subsequently sent to UWM.

UWM claims that this difference in language is substantively irrelevant, but the Court is not so sure. And AML, which bears the burden of establishing the unconscionability of the liquidated damages provision, *see Kevron Invs.*, 2025 WL 968895, at *7 (collecting cases), has not yet had the chance to address the earlier version of the provision, seeing as the difference was brought out in UWM's reply brief. Without more, the Court cannot say that the pre-October-21 version is consistent with the principle of just compensation. So to the extent UWM seeks partial summary judgment on the enforceability of the liquidated damages provision as written before October 21, 2021, the Court denies that claim without prejudice.

However, as for the revised version, which AML plainly addresses in its response brief, UWM is entitled to enforcement. AML fails to carry its burden of showing the provision is unconscionable. It makes similar arguments as were made, and rejected by this Court, in *Kevron Investments. See id.* at *7–10. The Court need not reiterate that extensive analysis. To be sure, the validity of a liquidated damages clause is context specific. *See Papo v. Aglo Rests. of San Jose, Inc.*, 386 N.W.2d 177, 181 (Mich. 1986). So the Court is not concluding that the liquidated damages

32

provision at issue here is enforceable simply because it contains identical language as the provision at issue in *Kevron*. Instead, it concludes that the arguments AML raises for why the liquidated damages provision is unenforceable are equally as legally insufficient as they were in *Kevron*.

For example, AML's primary argument is that "[c]ourts only enforce liquidated damages provisions when the court can see that the parties actually agreed upon a formula . . . to compute uncertain damages in case of breach." (ECF No. 57, PageID.1472; *see also id.* at PageID.1473 ("UWM concedes that it made no attempt to calculate its compensatory damages.").) That argument shares the same "fatal flaws" as in *Kevron*: it "fails to engage with the evidence presented by UWM and mischaracterizes the applicable law." *Kevron Invs.*, 2025 WL 968895, at *8. Indeed, as the Court has explained, *see id.* at *10, it is simply not the case that the enforceability of a liquidated damages provision depends on an "actually agreed upon . . . formula" attempting to approximate actual damages (ECF No. 57, PageID.1472). Instead, "enforceability depends on the broader principle of whether the liquidated damages provision is 'reasonable' in relation to the 'possible' injury caused by the breach, i.e., based on the pre-breach context." *Kevron Invs.*, 2025 WL 968895, at *8 (citing *UAW-GM Hum. Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 421 (Mich. Ct. App. 1998)). By altogether "fail[ing] to engage with the evidence presented by UWM" as to the actual harm the liquidated damages provision is intended to compensate, AML necessarily fails to carry its burden of showing unenforceability. *Id.*; *see id.* at *9 ("More fundamentally, Kevron talks past UWM

when it asserts that UWM is not harmed by Kevron's submission of loans to Rocket or Fairway."); *id.* at \*10 ("[T]he only question for the Court is whether it is 'obvious from the contract . . . that the principle of just compensation has been disregarded.' And Kevron has failed to present any evidence to that effect or even address UWM's arguments on the issue." (quoting *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 706 (6th Cir. 2017))).

So the Court does not reach the question of the enforceability of the pre-October 21 liquidated damages provision but finds the post-October 21 version enforceable.

## C.

In a last-ditch effort to avoid summary judgment, AML asserts that UWM's motion is "premature" due to "outstanding discovery." (ECF No. 57, PageID.1463.) It says that UWM's amended complaint "alter[s] the breadth and scope of this case," thus necessitating further discovery, and that "UWM has not complied with its discovery obligations in that it has not fully responded to AML's written discovery and has failed to provide any dates at all for depositions requested by AML on August 6, 2024." (*Id.* at PageID.1464.)

Start with the issue of the amended complaint. AML is right that on February 14, 2025, UWM was granted leave to amend its complaint, after the parties' November 27, 2024, discovery deadline and February 7, 2025, dispositive motion deadline. But AML was well aware of the contents of that amended complaint when UWM filed its motion for leave to amend back in June 2024—i.e., six weeks into discovery and two months before AML made the at-issue discovery requests—given

34

that UWM's motion detailed the basis for the amendment (ECF No. 45) and attached its proposed amended complaint (ECF No. 45-1). That amended complaint adds three new parties and three new claims, all stemming from the same facts underlying UWM's breach of contract claim. *Am.'s Moneyline III (Denying Reconsideration)*, 2025 WL 502743, at *11–12 (granting UWM leave to amend and describing UWM's proposed amendments); (ECF No. 60 (UWM's first amended complaint).) But UWM does not seek partial summary judgment on its amended claims or against the newly added parties. As the lender points out, "UWM's new claims in the Amended Complaint do not relate to UWM's motion." (ECF No. 64, PageID.1657 n.1.) Instead, the instant motion concerns AML's liability for breaching the parties' contract (*see generally* ECF No. 54 (citing ECF No. 1))—the basis for UWM's suit since the start of this case over three years ago. UWM's amended complaint does not provide a reason to defer summary judgment on the issue of whether AML breached the parties' contract. To the extent AML seeks the distinct relief of reopening discovery in connection with the amended complaint, its summary judgment response brief is an improper vehicle.

AML further contends that UWM's motion for partial summary judgment is premature in light of its outstanding discovery requests—specifically, its request to depose five UWM representatives (ECF No. 57, PageID.1462, 1464) and its requests for production related to UWM's alleged selective enforcement of the ultimatum and liquidated damages provision (*id.* at PageID.1476 n.6). AML explains that it made the relevant discovery requests in August 2024 but that UWM has neither provided

deposition dates nor "fully responded" to AML's written discovery requests. (*Id.* at PageID.1464; *see* ECF No. 57-11 (AML's email to UWM requesting depositions); ECF No. 54-2, PageID.1299–1301 (UWM's objections to AML's requests for production).) It in turn looks to Federal Rule of Civil Procedure 56(d), which provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may," among other things, defer or deny the motion or "allow time . . . to take discovery." Fed. R. Civ. P. 56(d).

As UWM points out in reply, AML fails to meet Rule 56(d)'s affidavit requirement. (*See* ECF No. 64, PageID.1657 n.1.) "A party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively demonstrating," through an affidavit or declaration, "how postponement of a ruling on the motion will enable him . . . to rebut the movant's showing of the absence of a genuine issue of fact." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014) (alterations and omission in original). The affidavit requirement "serves as a vehicle through which the non-movant meets [its] obligation to inform the district court of [its] need for discovery." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) (cleaned up). That said, "a formal affidavit may not be required 'when a party has clearly explained its need for more discovery on a particular topic to the district court prior to or contemporaneously with the motion for summary judgment.'" *Unan v. Lyon*, 853 F.3d 279, 293 (6th Cir. 2017) (quoting *United States v. Rohner*, 634 F. App'x 495, 504 (6th Cir. 2015)). Specifically, the nonmovant must "indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not

36

previously discovered the information." *Cacevic*, 226 F.3d at 488; *see Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995) (explaining factors that guide abuse of discretion review of denial of Rule 56 motion for further discovery, including "whether the appellant was dilatory in its discovery efforts" and "whether the desired discovery would have changed the ruling below").

Here, AML "fail[s] to comply not only with the formal requirements of Rule 56(d), but also its substance." *Unan*, 853 F.3d at 293; *Rohner*, 634 F. App'x at 504–05. For starters, AML cannot now evade summary judgment after it failed to diligently pursue the discovery it says it needs to adequately oppose UWM's motion for partial summary judgment. *See Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 478 (6th Cir. 2010) (explaining that, when the Sixth Circuit reviews a district court's denial of additional time for discovery, "[t]he overarching inquiry . . . is whether the moving party was diligent in pursuing discovery"). It made the at-issue discovery requests in August 2024. (ECF Nos. 57-11, 57-13.) UWM in turn objected to AML's requests for production, asserting that they were irrelevant, unduly burdensome, disproportionate, and so on. (ECF No. 54-2, PageID.1299–1301.) The parties corresponded about the "deficiencies in UWM's discovery responses" in October and November 2024. (ECF No. 57, PageID.1463 (citing ECF Nos. 57-14, 57-15).) AML knew that the parties' discovery deadline was November 27, 2024, yet failed to seek court intervention, whether in the form of a motion to compel or to extend discovery deadlines, before that cutoff date. AML simply let the parties' discovery deadline pass it by. It likewise failed to take action before the parties' dispositive motion deadline

of February 7, 2025, at which time UWM filed this motion for partial summary judgment. *See, e.g.*, *Rector v. N.Y. Bank of Mellon*, No. 12-08587, 2014 U.S. Dist. LEXIS 23855, at *16 (C.D. Cal. Feb. 14, 2014) ("If [plaintiff] believed that he needed more time to conduct discovery before . . . opposi[ng] . . . the defendant bank's motion for summary judgment[], the proper course of action was to file a much earlier request to push back the summary-judgment brief deadlines and defer ruling on summary judgment pursuant to Fed. R. Civ. P. 56(d).").

Only in its February 28, 2025, response brief, did AML finally assert that additional discovery was needed. It also said it "refrained from filing a motion to compel the depositions in light of UWM's then-pending request for leave to file an amended complaint." (ECF No. 57, PageID.1462 n.4.) But, as already explained, UWM's amended complaint has little if any bearing on the pending motion for summary judgment, and even if it did AML could have acted sooner by at minimum seeking to extend discovery while the motion to amend was pending. And while AML said in its response that it "is now pursuing a motion to compel this discovery" (*id.* at PageID.1463), no such motion was filed. The parties had a discovery dispute conference with the Court on March 13, 2025—i.e., a month after the Court granted UWM's motion for leave to amend and a week after UWM filed its amended complaint—but no discovery motion followed. (And, again, even that conference came months after the close of discovery.)

Further, AML has not established the relevance or necessity of the at-issue discovery. In the section of its response brief focused on why UWM's motion is

38

premature under Rule 56(d), it reiterates its outstanding discovery requests and asserts that "[s]ummary judgment is improper where the non-moving party has not been granted access to discovery it could use to oppose a motion for summary judgment." (*Id.* at PageID.1464–1465.) But whether AML "could" use the desired discovery to oppose UWM's motion is not the relevant question.[11] Rule 56(d) imposes a higher bar: it requires the nonmovant to "show[] . . . that, for specified reasons, it cannot present facts *essential* to justify its opposition." Fed. R. Civ. P. 56(d) (emphasis added). AML does not make that showing. It merely describes its outstanding discovery requests, but the utility of that evidence is not self-evident. (*See* ECF No. 57, PageID.1464–1465 ("This Motion is premature in light of the facts that . . . UWM will be filing an amended complaint . . . and UWM has not complied with its discovery obligations in that it has not fully responded to AML's written discovery and has failed to provide any dates at all for depositions requested by AML . . . .")); *Kline v. Mortg. Elec. Sec. Sys.*, No. 08-408, 2015 WL 13048741, at *8 (S.D. Ohio Sept. 25, 2015) ("Plaintiff has not articulated what 'material facts' he hopes to uncover by deposing Mr. Reimer."); *accord Alicea v. County of Cook*, 88 F.4th 1209, 1219 (7th Cir. 2023) ("[A Rule 56(d) affidavit or declaration] requires more than a fond hope that more

---

[11] AML cites *Tribe v. Snipes*, 19 F. App'x 325 (6th Cir. 2001), for the proposition that "[s]ummary judgment is improper where the non-moving party has not been granted access to discovery it could use to oppose a motion for summary judgment." (ECF No. 57, PageID.1465 (citing *Tribe*, 19 F. App'x at 327).) *Tribe* does not support that statement. It is also inapposite. There, the plaintiff moved for partial summary judgment "before the defendants were served or had the opportunity to answer," so the motion was denied as premature "because the defendants had not had the opportunity to amass *any* evidence." *Tribe*, 19 F. App'x at 327.

fishing might net some good evidence. Mere speculation, for example, about unnamed witnesses that might have helpful information will not suffice." (citation omitted)).

AML separately argues that it "has raised numerous defenses which, if proven, entirely defeat UWM's claim. Because UWM does not and could not claim that these defenses should be dismissed as a matter of law, summary judgment in UWM's favor is improper." (ECF No. 57, PageID.1476.) That misstates UWM's burden. Indeed, "it is not for [UWM] to offensively demonstrate the inapplicability of [AML's] affirmative defenses, rather, the burden is on [AML] to assert and prove the affirmative defense." *Swartz v. DiCarlo*, No. 12-3112, 2017 U.S. Dist. LEXIS 51157, at *13 (N.D. Ohio Mar. 31, 2017).

AML elaborates that "UWM has unclean hands and is estopped from bringing its claim against AML because it has selectively enforced the Ultimatum against certain mortgage brokers and not others" (ECF No. 57, PageID.1476) but that "UWM has refused to produce any documents related to its enforcement and lack of enforcement of the Ultimation and Liquidated Damages Provision" (*id.* at PageID.1476 n.6). In other words, it contends that its affirmative defenses (or at least its unclean hands defense), "if proven," would preclude partial summary judgment for UWM. That is not enough to establish a genuine issue of material fact as to the applicability of AML's affirmative defenses. *See Speedeon Data, LLC v. Integrated Direct Mktg., LLC*, 718 F. App'x 333, 337 (6th Cir. 2017). It is likewise too attenuated and speculative to justify Rule 56(d) relief. *See Jasman v. DTG Operations, Inc.*, 533 F. Supp. 2d 753, 756 (W.D. Mich. 2008) ("[A] party cannot oppose summary judgment

based on vague generalizations that discovery has been inadequate."); *Ironside v. Simi Valley Hosp.*, 188 F.3d 350, 354 (6th Cir. 1999).

Again, it is only proper to defer summary judgment for further discovery if the nonmovant carries its burden of showing it cannot otherwise "present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see In re Bayer Healthcare*, 752 F.3d 1065, 1074 (6th Cir. 2014) ("A district court does not abuse its discretion in denying discovery when the discovery requested would be irrelevant to the underlying issue to be decided."). Yet AML fails to show how UWM's "selective enforcement," even if established, would constitute "unclean hands" that would negate AML's own conduct. "The doctrine of unclean hands requires that the alleged misconduct on the part of the plaintiff relate directly to the transaction about which the plaintiff has made a complaint," *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1383 (6th Cir. 1995), "i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants," *Diamond Resorts U.S. Collection Dev., LLC v. Wesley Fin. Grp., LLC*, No. 20-00251, 2021 WL 3277260, at *6 (E.D. Tenn. July 14, 2021), *report and recommendation adopted*, 2021 WL 3278034 (E.D. Tenn. July 30, 2021); *see Cyber Sols. Int'l, LLC v. Pro Mktg. Sales*, 634 F. App'x 557, 569 (6th Cir. 2016) ("Michigan law . . . requires a 'more or less direct' relationship between the allegedly improper conduct and the claim at issue."). It is thus unclear how UWM's selective enforcement as to third parties would have any bearing on its unclean hands in the present case, and AML says nothing on the issue.

41

**D.**

Finally, UWM asserts that the contract's attorney's fees provision is enforceable as a matter of law, with the exact amount "to be determined later." (ECF No. 54, PageID.1040; *see id.* at PageID.1046–1047.) The Court agrees.

It is well established under Michigan law that a contractual provision for reasonable attorney's fees is judicially enforceable. *See, e.g., Zeeland Farm Servs., Inc. v. JBL Enters., Inc.*, 555 N.W.2d 733, 736 (Mich. Ct. App. 1996). Enforceability itself is a distinct question from whether the amount sought is in fact reasonable. *See id.*; *Papo*, 386 N.W.2d at 183; *cf. Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 762 (6th Cir. 2004). Here, pursuant to Section 7.16 of the parties' agreement, UWM, as the prevailing party on liability, is contractually entitled to recover its reasonable attorney's fees and costs. (ECF No. 60-1, PageID.1622; ECF No. 60-2, PageID.1641.) As for the amount to which UWM is entitled, i.e., what constitutes a reasonable amount here, UWM concedes that "the extent of UWM's incurred attorney fees, costs, and other expenses can be determined later." (ECF No. 54, PageID.1047.) So the Court will determine the reasonableness of the amount owed to UWM in attorney's fees and costs after all of the issues have been resolved and the parties have submitted supplemental briefing and supporting documentation on the issue.

**IV.**

For the reasons above, the Court GRANTS IN PART and DENIES IN PART UWM's motion for partial summary judgment on the issue of AML's liability for breaching the parties' contract (ECF No. 54). UWM is entitled to judgment as a

matter of law that AML is liable for its breach of contract claim. The enforceability of the pre-October 21, 2021, version of the liquidated damages provision, and the specific damages amount owed to UWM, are issues for trial.

SO ORDERED.

Dated: July 1, 2025

<u>s/Laurie J. Michelson</u>
LAURIE J. MICHELSON
United States District Judge